# EXHIBIT A

1  Michael E. Reznick SBN 116126
   E. Jay Gotfredson SBN 52428
2  LAW OFFICES OF MICHAEL E. REZNICK
   A Professional Corporation
3  283 Ocho Rios Way
   Oak Park, California 91377-5540
4  Tel: (818) 437-5630
   *reznagoura@aol.com*
5  *jay@gotfredsonassociates.com*

6  Attorneys for Plaintiffs DOE JEWISH USC FACULTY
   MEMBER 2004 and DOE JEWISH USC STUDENT
7  1987, individually and on behalf of all others similarly
   situated

**Electronically FILED by
Superior Court of California,
County of Los Angeles
7/09/2025 12:03 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Covarrubias, Deputy Clerk**

8              SUPERIOR COURT OF THE STATE OF CALIFORNA

9                        COUNTY OF LOS ANGELES

10
   DOE JEWISH USC FACULTY MEMBER          CASE NO.: 25STCV20404
11 2004; DOE JEWISH USC STUDENT 1987,
   Individually and on behalf of all others  **CLASS ACTION COMPLAINT FOR**
12 similarly situated,                      **DAMAGES AND INJUNCTIVE RELIEF**

13           Plaintiffs,                    **(1)  VIOLATION OF THE BANE ACT
14 v.                                            [Civil Code §52.1]
                                           (2)  VIOLATION OF THE UNRUH ACT
15 UNIVERSITY OF SOUTHERN                        [California Civil Code § 51]
   CALIFORNIA, a private public-benefit    (3)  VIOLATION OF THE RALPH ACT
16 nonprofit corporation; JEWISH VOICES         [California Civil Code § 51.7]
   FOR PEACE ("JVP"), a business           (4)  NEGLIGENCE
17 organization, form unknown; STUDENTS    (5)  NEGLIGENT INFLICTION OF
   FOR JUSTICE IN PALESTINE ("SJP"), a          EMOTIONAL DISTRESS
18 business organization, form unknown; and (6)  ASSAULT
   DOES 1 through 50, inclusive,           (7)  BATTERY
19                                         (8)  BREACH OF CONTRACT
            Defendants.                    (9)  DECLARATORY RELIEF
20                                         (10)     VIOLATION OF TITLE VI
                                                CIVIL RIGHTS ACT OF 1964
21                                                [42 U.S.C. § 2000d]
                                           (11) VIOLATION OF 42 U.S.C. § 1981
22                                         (12) VIOLATION ED CODE § 220**

23                                         **DEMAND FOR JURY**

24

25

26

27

28**

                                    1**

## HISTORICAL BACKGROUND AND CONSTITUTIONAL PRINCIPLES

1.  On April 24, 2024, an occupation protest began at the University of Southern California ("USC") in Los Angeles, California. The protest was a part of pro-Palestinian protests on university campuses campaigning for divestment from Israel that began on the East Coast and spread throughout the United States. USC cancelled their main commencement ceremony over "safety concerns" about protests. The encampment was cleared by the Los Angeles Police Department on the morning of May 5, 2024.

2.  Contrary to the false narrative promulgated by the so-called "Legacy Media," this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counter-protest movements responding thereto. Nor is this case about the content or viewpoints contained in any protest or counter protest slogans or other expressive conduct, which are generally protected by the 1st amendment. See *Virginia v. Black*, 538 US 343, 358 (2003) ("The hallmark of the protection of free speech is to allow free trade of ideas - even ideas that the overwhelming majority of people might find distasteful or discomforting").

3.  But the Free Exercise Clause provides that "Congress shall make no law... prohibiting the ['free exercise of religion']." U.S. Const., amend. I; see also *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free Exercise Clause extends to the States under the Fourteenth Amendment). The clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status. (See *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status"). *Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a state violates the free exercise clause when it excludes religious observers from otherwise

1   available public benefits").

2       4.  The material facts in this are not in dispute and summarized as follows:

3   In the year 2024, in the United States of America, in the State of California, in the City

4   of Los Angeles, Jewish students and faculty - including the individual Plaintiffs and

5

6   putative classes - were excluded from portions of the USC campus by violent thugs

7   ("Campus Terrorists") who took over the campus because Jewish students and faculty

8   refused to denounce their faith. This fact is so unimaginable and so repugnant and

9   abhorrent to our constitutional guarantee of religious freedom that it bears repeating:

10   ***Jewish students and faculty were excluded from portions of the USC campus by***

11   ***Campus Terrorists because they refused to denounce their faith.***

12       5.  USC does not dispute the facts alleged hereinabove but asserts that USC has no

13   responsibility to protect the religious freedom of its Jewish students because the "Encampment"

14   or "Jew Exclusion Zone" alleged in this Complaint was not created, maintained, orchestrated and

15   engineered by USC, or the "Campus Terrorists," but rather third party "lawful protesters,"

16   including USC's Co-Defendants, "JEWISH VOICES FOR PEACE" ("JVP") and "STUDENTS

17   for JUSTICE in PALESTINE" ("SJP").

18

19       6.  At all times herein mentioned, JVP and SJP were and are well-funded, radical left-wing,

20   Jew-hating political organizations whom USC encouraged long before and well into the Spring of

21   2024 to spread Jewish hatred and violence on campus by supporting the message of antisemitism

22   in sanctioned university classes, lectures, speeches and fundraisers.   USC further allowed the

23   Campus Terrorists, JVP, SJP and other like political organizations and supporters to roam freely

24   on campus during class hours while shouting out hateful and violent antisemitic epitaphs and

25   slogans like "Global Intifada," "Student Intifada," "From the River to the Sea, Palestine will be

26   Free" and similar harmful rhetoric unabated at Jews under the guise of "lawful protests."   Hatred

27

28

3

of Jews was and is still allowed to flourish at USC functions and on USC property and facilities, including the public square.

7.    The institutionalized antisemitism that existed and still exists at USC against Jewish students and faculty culminated in the Campus Terrorists' creation of – and

USC's tolerance for - a "Jew Exclusion Zone."  USC's cowardly response to the Campus Terrorists' occupation and siege, as well as the Jew Exclusion Zone, was to order and direct Jewish students and faculty to remain in their dormitories and offices, respectfully, or "shelter in place," for their "protection."  The Jew Exclusion Zone and USC's response to it amounted to sanctioned segregation of Jewish students and faculty, including the Plaintiffs herein.

7a.    USC apparently learned nothing from history:   Jewish students and faculty in Germany during the 1930s were similarly barred from attending universities for their "protection," and were segregated into separate classes early into the Nazi's reign of terror. By 1939, most Jewish students and faculty had been expelled entirely.

7b.    Instead of combatting antisemitism on campus or taking punitive measures against the Campus Terrorists, such as calling the Campus Police or LAPD, arresting, expelling or suspending "bad actor" students and perpetrators of the siege, or disbursing the crowds, USC encouraged and enabled JVP, SJP and the Campus Terrorists to continue their antisemitic rants and occupation unabated for more than two weeks during finals, cancelling commencement exercises while paying "lip service" to the USC Jewish Community about how USC's segregation policy was "protecting" Jews from antisemitism on campus.

7c. Contrary to USC's assurances, Jews who took classes, studied or worked at USC were disparately impacted by USC's clear discriminatory policy of making Jews "second class citizens" during the Campus Terrorists' occupation and siege in April – May 2024, when compared to USC non-Jewish "citizens" or "citizens" sponsoring the "Palestinian Cause"

4

trumpeted by JVP, SVP and other pro-Hamas supporters on campus who were not lawfully protesting at all but violently wreaking havoc on Jewish students and faculty who were in the middle of taking and grading final exams.

7d.  USC's tolerance of the siege not only discriminated against Jews at USC, it sent a message about how USC treats Jewish students and faculty all over the World.  USC's licensing and support of JVP and SJP and allowing both groups to maintain offices on campus long before and during the siege only added to the "legitimacy" of these designated terrorist organizations and the institutionalized antisemitism on USC's campus.

8.  USC's patent discrimination against Jews took many forms in the Spring of 2024, most notably its response to the Campus Terrorists reign of terror against Jewish students and faculty. Rather than ordering the USC Campus Police or calling in the Los Angeles Police Department ("LAPD") to disburse or arrest the violent protestors and Campus Terrorists operating the Jew Exclusion Zone, as well as others who were engaging in the violent takeover of university property, USC's answer to the Campus Terrorists' siege and Jew Exclusion Zone was to segregate the Jewish students and faculty and in particular, ordering them to remain in their respective dormitories and offices, appeasing and enabling the Campus Terrorists, JVP and JFP to the detriment of Plaintiffs.

8a    Under constitutional principles, USC may not allow services to some students when USC knows that other students are excluded on religious grounds, regardless of who engineered the "Jew Exclusion Zone." It is a flagrant disregard of Plaintiffs' constitutional rights under the Free Exercise Clause.

9.  JVP is the largest progressive Jewish anti-Zionist organization in the world.  SJP is a similar well-funded radical left organization whose policies also include support and advocate for the destruction of the Jewish State of Israel and eradication of the Jewish People.  JVP and SJP

are now designated as "terrorist organizations" by the United States Government.  At the time of the siege in the Spring of 2024, JVP and SFP maintained offices at USC and were allowed and encouraged by USC's policies and the administration that implemented them to spew and foment intolerance of Jewish students and faculty.

10. At all times herein mentioned, USC licensed JVP, SFP and other left-wing on and off-campus organizations and protestors to infiltrate USC's property for the purpose of spewing, hurling and publishing in the public square and elsewhere on campus violent rhetoric designed to coerce, threaten, intimidate and harm Jews generally and in particular, those attending or working at USC like the Plaintiffs herein.

10a. Well-recognized slogans like "Global Intifada," Student Intifada," "From the River to the Sea" and other violent hate speech (which is well recognized as terrorist "lingo" designed and intended by terrorist organizations like Hamas to threaten, terrorize and intimidate Jews) have become as common in USC life as supporting Trojan Football.  Jew haters were and are encouraged by USC's administration and hate speech is alive and well at USC and allowed to flourish under the guise of "anti-Zionism."

11. At all times herein mentioned, USC not only tolerated, encouraged, aided, abetted, and enabled JVP, SFP and other radical left-leaning protest groups and "Non-Governmental-Organizations" ("NGOs")) (which formerly scammed taxpayers through USAID and other phony liberal and radical left "fronts") by allowing the "Jew Exclusion Zone" to continue unabated for more than two weeks (during finals no less).  From Plaintiffs' viewpoint, USC aligned itself with the Campus Terrorists by its actions and inaction before, during and after the siege rather than supporting its own Jewish students and faculty.  Towards that end, USC invited and hired many of the Jew-hating organizers of the clearly violent protests in the Spring of 2024 to the USC campus to beforehand to lecture students about such controversial matters as the alleged

6

1    "genocide" being conducted by the Israeli government against Palestinians in Gaza.

2    11a    USC also tolerated, enabled and further encouraged these so-called third party

3    "protesters" after the Jew Exclusion Zone was created by providing them with megaphones, food,

4    encouragement and water bottles that were used as projectiles against Jews in an attempt to

5

6    further harm Jewish USC students, faculty and others who tried to seek entrance to property the

7    Campus Terrorists took over without denouncing "Zionism." (True and correct depictions of the

8    USC "Jew Exclusion Zone" are in the I Phone photographs attached hereto as Exhibit A).

9    12. The "third party protestors" in fact were an unruly and violent mob of antisemitic thugs

10    (hereinafter referred to as the "Campus Terrorists").  While the Jew Exclusion Zone was licensed,

11    tolerated and permitted to continue by USC and created and organized by Co-Defendants JVP

12    and SJP and their followers, it was also funded, and orchestrated by a number of so-called outside

13

14    agitators – including the George Soros, Tides Foundation and Rockefeller Brothers.  The Campus

15    Terrorists included and were comprised of not only Jew-hating students, JVP and SFP, but also

16    faculty members and more importantly, outside, third-party "agitators" who do not even attend

17    USC.

18    12a.    USC not only facilitated the Jew Exclusion Zone - it allowed it to happen by acquiescing

19    in the antisemitism with knowledge that the harm to Plaintiffs and destruction of property was

20

21    virtually certain to occur.  Among other things, USC knew or certainly should have known that

22    the antisemitism and hatred of Jews that gave rise to the exclusion zone was being exported to

23    West Coast universities and colleges from liberal "Ivy League" colleges funded and encouraged

24    by well-organized hatemongers on the East Coast, radical left members of the Democratic Party

25    and other donors who were funding the sieges, occupations and operations taking place at college

26    campuses en masse in the Spring of 2024.

27

28    13. Regrettably, the Court may and should take judicial notice of the indisputable fact that the

7

campus uprisings, antisemitic behavior, takeovers of campus properties, including encampments to exclude Jewish students and faculty, continue to this day - emphasizing the need for injunctive relief or a consent decree to abate the antisemitism at USC.  As recently as March 2025, USC was faced with another campus uprising by Jew-hating students, ostensible "protestors" and outside agitators.  The March 2025 siege and occupation (reported by the national media) was quelled in a matter of hours by the new administration's decision to call in the LAPD, a stark contrast to what occurred in 2024 and a recognition and admission by USC that better policies in the Spring of 2024could and should have avoided the harm that predictably followed.

14. USC had plenty of historical precedent to rely on with respect to the potential of a violent uprising and takeover of Campus property occurring in the Spring of 2024 at the hands of antisemitic students, mobs, outside agitators and student-led organizations like JVP and SJP.  In light of the recent history of uprisings and occupations that have been ongoing at other American universities in the wake of the October 7, 2023 and are continuing to this day, USC knew or should have known in the Spring of 2024 that on-campus Jew Exclusion Zones, campus uprisings to the detriment of Jewish students and faculty and violent anti-Jewish protests were in fact not an isolated incident but erupting nationwide. What started as a movement of antisemitic "protests" on East Coast campuses like Columbia, NYU and George Washington University about the ongoing Gaza conflict between Israel and Hamas turned into multiple instances of "Jewish Exclusion Zones" and similar ad hoc but well-funded "Encampments" that excluded Jewish students and faculty at college campuses across America. Discriminating against and excluding Jewish students festered like a malignant cancer, spreading across university campuses with almost daily reports of different new colleges and universities coming under attack.

15. And the attacks were clearly well-organized. Among other things, "tents" and other structures erected by the Campus Terrorists all looked the same and came from the same

8

expensive suppliers. The "protest signs" were all had the same font and production values and carried the same obnoxious Hamas propaganda and carefully designed slurs and slogans against Jews that are well known to most Americans by now, such as ""from the River to the sea, Palestine will be free," "freedom for Palestine," "divest from death," and related propaganda.

16. USC did nothing to discourage antisemitism on its campus but rather facilitated it and appeased the Campus Terrorists. Among other things, USC invited and tolerated Jew-hating and Hamas supported organizations like "Justice for Palestine" ("JFP") and "Student Voices for Peace" ("SJP") to set up offices on campus for the purpose of spewing Jewish hatred and Hamas sponsored antisemitic propaganda to USC students and faculty. USC also allowed alleged "protesters" to roam freely at the USC campus while concealing their identities with face masks, sunglasses and the traditional Keffiyeh scarves, denouncing Jews and advocating their harm, death, eradication, and destruction such that it became business as usual. Instead of calling the LAPD or campus security to step in and remove the trespassers and quell the clear disturbance on campus caused by the Jew Exclusion Zone, USC provided them with megaphones, food, and water bottles that were used as projectiles and weapons against Jewish students and others attempting to seek entrance to the Jew Exclusion Zone.

17. This Complaint and the pleadings originally filed by Plaintiffs in the aftermath of the October 7, 2023 Massacre are replete with allegations that Plaintiffs and other Jewish students and faculty were denied access or the same access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs. However, under constitutional principles, USC cannot allow services to some students when USC knows that other students are excluded on religious grounds - regardless of who engineered the exclusion.

18. Jews were told to "shelter in place" and stay in their dorms or offices if they did not like or could not tolerate it. USC aided, abetted, encouraged, tolerated, and implemented as policy the

9

Terrorist Mob's "Jew Exclusion Zone." Under any legal theory, USC's reprehensible conduct is actionable and should not be tolerated by society or this Court.

19. Segregating Jewish students and faculty, as alleged herein – is discriminatory based on religion or perceived ethnicity. Even if intended as a safety measure, singling out Jewish students and faculty is stigmatizing and discriminatory to them, not protective.

20. The 14th Amendment's Equal Protection Clause prohibits government entities and public and private universities from treating individuals differently based on protected characteristics such as religion, race or ethnicity, unless there is a compelling reason and the policy is narrowly tailored.

21. The 1st Amendment protects the free exercise of religion. If a public or private university treats Jewish students differently because of their religious identity, it constitutes religious discrimination. Singling them out implies that their religious identity is inherently a security risk, which is inherently unconstitutional. USC's actions must be neutral and not target a specific group. Creating policies that only apply to Jewish students and faculty (for example, ordering them to "shelter in place," moving them to different dormitories, classes, offices, labs or areas for their "protection" rather than doing the same for all students and faculty miss the mark because they fail the neutrality test.

22. Protective measures must apply equally to all students and faculty at risk of harm, not just t specific religious or ethnic groups. The United States has a legal history (e.g., *Brown v. Board of Education*) that establishes that segregation – even if labeled "protective," is inherently "unequal." Past cases have shown that "separate but safe" is not a valid justification under constitutional scrutiny.

23. Another Southern California university that the Jew-hating cancer spread to in the Spring of 2024 – which continues through the present time -- is the University of California Los Angeles

10

("UCLA"). In a case filed by Jewish students against UCLA for similarly permitting, encouraging and tolerating the creation, establishment and maintenance of a virtually identical "Jew Exclusion Zone" on UCLA's Westwood campus, the United States District Court, Honorable Mark C. Scarsi, issued an injunction on August 13, 2024 in favor of Jewish students against UCLA, enjoining any further antisemitic action and inaction by UCLA in *Frankel v. Regents of the University of California*, United States District Court No. 2:24-cv-04702-MCS-PD ("Frankel"). (A true and correct copy of the Court's "Order Re: Motion for Preliminary Injunction (ECF No. 48) is attached hereto as Exhibit B and incorporated herein by this reference).

24. Plaintiffs assert that the instant case and *Frankel v. Regents of the University of California* are "related cases" in the sense that both cases arise out of the same set of facts, transaction or occurrence – namely, both USC's and UCLA's failure to combat the spread of a pattern and practice of rampant antisemitism on campus and administrators enabling Campus Terrorists sponsored by Hamas – a designated foreign terrorist organization since 1997 -- to create unconstitutional "Jew Exclusion Zones" and perpetrate and cause other harmful conduct against Jewish students and faculty on American college campuses.

25. On November 5, 2024, Donald J. Trump was elected in a mandate to replace Joseph R. Biden as President of the United States ("President Trump"). On January 29, 2025, President Trump issued an executive order identifying additional measures that his government intends to take to combat anti-Semitism (the "Executive Order"). (A true and correct copy of the Executive Order is attached hereto as Exhibit C). Among other things, the Executive Order states that:

> "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

*Id.*

11

Exhibit A – Page 23

26. The Executive Order also reaffirmed President Trump's prior executive order against antisemitism and noted that the Biden administration effectively nullified his prior order to protect American Jews to the same extent to which all other American citizens are protected. The [new] Executive Order reaffirms [President Trump's prior order against antisemitism] and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. The executive order correctly notes that these attacks unleashed an unprecedented wave of vile antisemitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. The order recognized that "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; And intimidation, harassment, and physical threats and assault. A [House of Representatives] report calls the federal government's failure to fight anti-Semitism and protect Jewish students quote 'astounding." This failure is unacceptable and ends today."

27. On March 5, 2025, the United States Department of Justice ("DOJ") announced the creation of a "Task Force"within the DOJ's Civil Rights Division to investigate claims of anti-Semitism against 10 college campuses in the United States *including UCLA and USC*.

28. As of May 5, 2025, USC and UCLA were two of the 10 colleges in the United States targeted by the DOJ for federal investigation by the Task Force under allegations that they have not properly addressed campus antisemitism and in particular, failed to protect Jewish students from harm. Plaintiffs have notified the Task Force about their pending action and are seeking either intervention or a statement of interest from the Department of Justice's Task Force.

29. The current Trump Administration is once again enforcing the United States' policy of designating "Hamas" as a foreign "terrorist group" under federal law. The Trump Administration has also stated that it will not negotiate with Hamas, other terrorist groups and Hamas supporters, a lesson that USC refuses to learn. USC's Co-Defendants - "Jewish Voices for Peace" ("JVP") and "Students for Justice in Palestine" ("SFP") - are sponsored and funded by Hamas, as well as Hamas supporting organizations in the United States and around the World. Most recently, the

12

1  United States government disclosed and reported that Hamas and organizations like JVP and SJP
2  received substantial funding from USAID, the recently disbanded conduit through which
3  taxpayers unwittingly paid for the support of radical left-wing causes, including the antisemitic
4  behavior and protests spreading like fire across American university campuses.

5     30. At all times herein mentioned, JVP and SJP maintained and operated (and on information
6  and belief, still maintain and operate offices on USC's campus.  JVP and SJP also used and
7  continue to use USC's internet platforms to promulgate their Jew-hating propaganda with the
8  knowledge, consent, acquiescence and encouragement of USC.

9     31. USC further encouraged the antisemitism and entirely predictable "Jew Exclusion Zone"
10  on its own campus by inviting and hiring radical, left-leaning Hamas supporting guest and
11  tenured professors to lecture students in USC-sponsored classes about the "war crimes" of Jews
12  and the State of Israel. Instead of teaching courses on the subject matter for which they were
13  hired, they spewed antisemitic hate against Jews, Israel and Americans. Many of these pro-Hamas
14  lecturers and professors also canceled classes and gave extra credit to students who participated in
15  the Jew Exclusion Zone and "protests for Palestine" or against "Genocide."  (USC's direct
16  connection to these violent political organizations and support of Hamas and Palestinian causes is
17  confirmed by the flyers supporting "disinvestment" from Israel published on USC internet
18  platforms that are attached hereto as Exhibit D)

19     32. This case is not about "free speech," "academic freedom" or the First Amendment rights
20  of JVP, JFP, Hamas or any other left-leaning, radical speaker or "lawful peaceful protests" but
21  rather about the religious freedom of Plaintiffs and USC's encouragement of the disparate
22  treatment and harm Plaintiffs suffered. USC not only condoned, allowed, aided, abetted, tolerated
23  and encouraged the Jew Exclusion Zone, trespass and destruction of property on its campus and
24  open space, it became USC's standard operating procedure and policy for weeks on end until
25  President Carol Folt – in response to public pressure rather than the Trustees - belatedly made the
26  decision to call in the LAPD.

27     33. The individual Plaintiffs as well as the two putative "subclasses" (Jewish USC students
28

13

and Jewish USC faculty members) have sincerely held religious beliefs and obligations to support the Jewish state of Israel.  Unlike the Legacy Media and far left-leaning radical Hamas supporting mobs like the Campus Terrorists and unruly mob complained about herein who commandeered the Jew Exclusion Zone, trespassed and took over public USC property during April – May 2024 and still continue to this day, as alleged herein, Plaintiffs assert that there is no genuine distinction between "antisemitism" and "anti-Zionism." It is hatred of Jews by any other name. USC not only condones such hatred it sponsors it.

34. USC has taken no remedial action whatsoever against the thugs who created the Jew Exclusion Zone, or any actions against the Campus Terrorists alleged herein. USC has not expelled nor barred from the USC campus the local divisions of JVP and SJP, despite knowledge that they support and are sponsored and funded by Hamas, Hamas supporters and other known and are now publicly designated "terrorist groups."

35. While violent protests at USC have been reduced since the LAPD belatedly intervened in May 2024, USC has not disavowed anything that occurred and has not made any policy changes or done anything to assuage Plaintiffs concerns that some Jewish students or faculty may be excluded from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should other "Jew Exclusion Zones" or exclusionary encampments return. Conversely, USC has not stated anywhere publicly or otherwise that it will not provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students.

36. Courts consider a party's failure to disavow "unconstitutional acts" as a factor in favor of finding standing and the likelihood of imminent likelihood of future injury justifying injunctive relief. *Bland v. Fessler*, 83 F.3d 729, 737 (9th Cirt. 1986). USC has done nothing to minimize the risk that Plaintiffs will again be wronged by their exclusion from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs.

37. Accordingly, injunctive relief is necessary and appropriate at this time to remedy and combat USC's wrongs and future wrongs.  Injunctive relief or a consent decree is also necessary and appropriate and to force USC to institute policies that include actions to prevent future

1    wrongs and protect Jewish students and professors.  Plaintiffs seek a permanent injunction or

2    "consent decree" in this case similar to the one issued by the Court in *Frankel v. Regents* that

3    simply provides that if any ordinarily available USC programs, activities, or campus areas

4    become unavailable to any Jewish student of faculty member of the basis of religion, then such

5    programs, activities, or campus areas must be suspended for all students and faculty.  Such relief

6    in this case is necessary to prevent further irreparable harm to Jewish students and faculty and

7    ensure equal access for and non-discrimination against Jews on USC's campus.  Notably USC has

8    not committed to the equal restriction of access to all students and faculty should such

9    exclusionary conduct return.

10    37b.  Plaintiffs also seek judicial enforcement of USC's own antidiscrimination policy of

11    banning face masks or other means of "expression" that are intended to conceal the identities of

12    bad actors' during protests, consistent with the requirements and limitations of provisions of

13    California's "Leonard Law," which requires USC and other universities to protect their students'

14    rights to freedom of speech and other communication that the government is required to protect

15    but does not require forced segregation of Jewish students and faculty for such "protection."

16    What about USC's duty to treat Jewish students and faculty the same as other students and

17    faculty?

18    38. Injunctive relief is also necessary and appropriate at this time to protect USC's Jewish

19    students and faculty from future violence and harm.  Although the violent protests at USC

20    have diminished following the LAPD's purposely delayed intervention in May 2024, they have

21    not abated.  More importantly, USC has failed to repudiate the unlawful and discriminatory acts

22    that occurred in the Spring of 2024 and still occur at USC on a weekly basis, as evidenced by the

23    on-campus uprising and near takeover that occurred again in May 2025 that was quelled within

24    hours by prompt police action.

25    39. USC also encourages further violence by refusing to enforce its own antisemitic and

26    antidiscrimination policies.  Far from engaging in "academic freedom" or "mostly peaceful

27    protests," Campus Terrorists continue to engage in violent activity at USC, and continue to spew

28    and hurl hate speech and ethnic slurs against Jews, all the while wearing Khafias draped around

Exhibit A – Page 27

1   their faces, sunglasses and masks that by design are intended to conceal their identities from those

2   they attack and in particular, Jewish Students and faculty - for the purpose of continuing to

3   terrorize Jewish students and faculty members who are there to study.

4       40. At all times herein mentioned, UUSC made available certain of its programs, activities,

5   and campus areas when certain students and faculty that Plaintiffs were excluded from because of

6   their genuinely held religious beliefs. For example, Plaintiff DOE Faculty Member 2004 was

7   accosted in the public square outside of the encampment by thugs shouting violent chants of

8   "death to Jews," "death to Israel" and "death to America," spat on by "protestors" and denied

9   access by demands to disavow that the faculty member was a "Zionist" and did not support the

10   "Israeli death war machine." Plaintiff student - who uses the USC campus to study - faced the

11   same type of violent harassment in order gain access to the public areas of the USC campus that

12   non-Jewish students were given full access to by the Campus Terrorists. Given that violent

13   protests will likely return to USC's campus (as evidenced in part by the March 2025 uprising) that

14   will again restrict certain Jewish students and faculty members access to ordinarily available

15   programs, activities, and campus areas, Plaintiffs are likely to suffer an irreparable injury absent a

16   preliminary injunction.

17   **STATEMENT OF THE CASE**

18       41. Plaintiffs incorporate herein by this reference each and every allegation set forth in

19   paragraphs 1 through 40 of this Complaint as if fully set forth at length herein.

20       42. Defendants the University of Southern California, once considered among the most

21   most prestigious public institutions in the world, has deteriorated into a hotbed of anti-Semitism,

22   confirming for the public that USC's well-known historical antisemitism has not abated at all.

23   This rampant anti-Jewish environment burst into view on October 8, 2023, the day after Hamas

24   terrorists attacked Israel in a harrowing rampage that saw over 1000 innocent Jews, including

25   infants and the elderly, murdered, raped, and mutilated..

26       43. In the wake of these horrifying events, USC should have taken steps to ensure that its

27   Jewish students and faculty were safe and protected from harassment and undeterred in obtaining

28   full access to campus facilities. Instead, USC officials routinely turned their backs on Jewish

16

1    students and faculty, aiding and abetting a culture that has allowed calls for the annihilation of the

2    Jewish people, Nazi symbolism, and religious slurs to go unchecked and unabated. During the

3    siege by the Campus Terrorists and creation of the "Jew Exclusion Zone," USC went so far as to

4    tolerate Nazi swastikas that Jew-haters sprayed on USC property. (A true and correct copy of a

5    color photograph of a swastika on a USC entry gate taken by one of the Plaintiffs during the siege

6    and occupation of USC is attached hereto as Exhibit E) and incorporated herein by this

7    reference).

8          44. Matters turned especially ugly the following spring.

9          45. In the Spring of 2024 -- fearful of demonstrations that had sprung up at other campuses,

10   including Columbia, NYU, George Washington University and other East Coast repercussions

11   from "diversity and equity" leaders and the cutting off of university funding by the Hamas-

12   supporting Biden Administration -- the Trustees of the University of Southern California ("USC")

13   (referred to herein as "USC" or alternatively, the "Defendant University") decided to enact an

14   "appeasement policy" to deal with the problem and invited, encouraged, aided, abetted, permitted,

15   allowed, and subsequently negotiated with, enabled and coddled the violent sword and other

16   weapon-wielding, Jew-hating Hamas-supporting terrorist antisemites (the "Campus Terrorists")

17   who infiltrated and overtook its Los Angeles campus, setting up tents and occupying USC's

18   common areas and other property under the Defendant University's watchful eyes.

19         46. USC was aware of the hatred in encampments springing up at other campuses and the

20   pattern and practice devised by outside agitators that followed a pattern and practice of division

21   and havoc sowed by outside organizations and attitudes, including Co-Defendants JFP, JVP and

22   other antisemitic organizations that are now considered to be aligned with antisemitic and anti-

23   America terrorist groups – including most recently Hamas - that have offices on USC's campus.

24   These Hamas sponsored (and funded) organizations also regularly participate in USC sponsored

25   activities and promulgate antisemitic material via USC's official internet channel. (True and

26   correct copies of examples affirming USC's sponsorship of such activities are attached hereto as

27   Exhibit D).

28         47. Starting in late April 2024 and continuing several days into May 2024, USC invited,

17

Exhibit A – Page 29

1   permitted, coddled and allowed, through an adopted "appeasement policy," of allowing a group

2   of "activists" – antisemitic thugs by any other definition - to set up barricades in the center of

3   campus and establish an encampment that blocked access to critical educational infrastructure on

4   campus. (These "activists" are referred to periodically herein as the "Campus Terrorists")

5   48. The Campus Terrorists chanted anti-Semitic threats like "death to the Jews," "free

6   Palestine from the hand of Jews," "from the river to the sea, Palestine will be free," proudly

7   trumpeting their hatred of the Jewish people. But their actions went well beyond such chants or

8   even the pretense of "free speech" or "peaceful protests."

9   49. With the knowledge and acquiescence of USC officials, the campus terrorists enforced

10   what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them

11   from accessing the part of campus including classroom buildings and the main undergraduate

12   library. (The "Jew Exclusion Zone" is sometimes alternately referred to herein as the

13   "Encampment"). In many cases, the Campus Terrorists set up barriers and locked arms together

14   preventing those who refused to disavow Israel from passing through. (A true and correct

15   photographic depiction of the "Jew Exclusion Zone" is attached hereto as Exhibit A).

16   50. To enter the Jew Exclusion Zone, a person had to make a statement pledging their

17   allegiance to the Campus Terrorists' views. While this may have prevented a pro-Israel Christian

18   from entering the zone and permitted access for a Jewish person willing to comply with the

19   enforcers' demands, given the centrality of Jerusalem to the Jewish faith (see allegations below),

20   the practical effect was to deny the overwhelming majority of Jews access to the heart of the

21   campus.

22   51. The campus terrorists permitted passage to those who passed this Orwellian inquisition.

23   52. USC's administration knew about the Campus Terrorists' extreme actions, including the

24   exclusion of Jews. But in a remarkable display of cowardice, appeasement, encouragement and

25   illegality, the administration did nothing to stop it. USC Chancellor and President Carol Folt

26   publicly acknowledged that students had been physically blocked from accessing parts of the

27   campus but failed to call in LAPD until public outcry demanded it.

28   53. Yet even as the activists campus terrorists continued to enforce the Jew Exclusion Zone,

18

USC not only failed to marshal resources to intervene - it adopted a policy of facilitating the Jew Exclusion Zone, ordering, among other things, USC campus police and security to stand down, step aside and appease the Campus Terrorists.

54. Rather than instructing campus police and security to assist Jewish students in accessing campus resources, USC instead instructed them to discourage unapproved students from attempting to cross through the Encampment and other areas blocked by the Campus Terrorists.

55. USC's administration supported and further coddled the Campus Terrorists by providing them with megaphones, food, water bottles and other necessities of life so they could carry on with their reign of terrorism against Jewish Students and Faculty. The water bottles were subsequently used as weapons against any Jews seeking to enter the public buildings including within the Jew Exclusion Zone.

56. All told, the Jew Exclusion Zone existed on campus for more than two weeks and what seemed to be an eternity to Jewish students and faculty used to enjoying the benefits of a campus free from terrorism against Jews.  The Campus Terrorists , wreaking havoc on the lives of Jewish students who were and are simply trying to attend classes and study for exams and Jewish faculty who were trying to grade exams.

57. As more particularly set forth in this Complaint, each of the individual Plaintiffs was prevented from passing through the Jew Exclusion Zone during the existence of the Encampment, not to mention the exclusion of all of the USC Jewish students and faculty in the subclasses who failed or refused to denounce "Zionism" or their Jewish faith

58. USC boasts of its open inclusive environment that nurtures the growth and development of all faculty, students, administration and staff and assures students that it does not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity, citizenship national origin, or religious beliefs. USC also has a number of policies that

19

1   purport to implement these guarantees. But USC has failed to provide Jewish students, faculty,
2   and staff with the protection promised by such policies. Needless to say, Jews should not fear for
3   their safety when they walk around any public space, let alone the campus of a prominent
4   American research university.

5   59. Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered
6   access to USC's educational opportunities and to protect the Jewish community is not only
7   immoral - it is illegal.

8   60. Specifically, it violates numerous federal and state constitutional guarantees, including the
9   equal protection clause, the free exercise clause and the freedom of speech.

10   61. And it contravenes the basic guarantee of equal access to educational facilities that receive
11   federal funding, as well as numerous other statutory guarantees of equality and fair treatment

12   62. Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew
13   will again suffer from the discrimination and indignity they have endured. And because the
14   administrators at USC took actions (or did nothing) which amounts to sanctioning segregation,
15   they are clearly unconstitutional actions entitling Plaintiffs to hold the school's administrators
16   personally liable for their reprehensible failures. Plaintiffs will seek leave to amend this complaint
17   pending discovery to name these individuals as defendants when their identities are ascertained.

18   63. In 1790, George Washington wrote to the Hebrew congregation of Newport, Rhode Island
19   (which sought assurances about the place of Jews within American Society): "May the children of
20   the stock of Abraham, who dwell in this land, continue to merit and enjoy the goodwill of the
21   other Inhabitants; While everyone shall sit in safety under his own vine and victory, and there
22   shall be none to make him afraid" (Letter from George Washington to the Hebrew Congregation
23   in Newport, Rhode Island (Aug. 18, 1790), in Founders Online, National Archives,
24   https://perma.cc/VUR8-G3BC).

25   64. USC treated Jews disparately and discriminated against them. As a result, Plaintiffs
26   received a different educational experience than other USC students while elevating the Hamas
27   leaning Campus Terrorists to "heroes" under the guise of "academic freedom" or "protecting free
28

20

1  speech." USC's treatment of Jews and acquiescence to the Jew Exclusion Zones is repugnant to a

2  civilized society.

3  65. The Campus Terrorists' intent and the avowed purpose of the Encampment – clear to most

4  reasonable persons with common sense - was to create and sow division through acts of

5  disruption, chaos and dissension on the Defendant University's campus. Among other things, the

6  Campus Terrorists sought to and in fact did disrupt classes, overtook University buildings and

7  property, and most importantly, terrorized and victimized blameless Jewish Students and Faculty

8  in a rein of terror under the hoax, guise, and "cover" of engaging in peaceful protests to support

9  false and fictitious victims of the Israeli government's alleged "Palestinian Genocide." The hoax

10  was enabled by and perpetrated under the Defendant University's watchful eyes to such an extent

11  that the Jewish Students and Faculty were so fearful for their lives and safety that they could not

12  appear in the Defendant University's "town square" or anywhere else on campus without being

13  verbally or physically assaulted by the Campus Terrorists, as well as the Campus Terrorists'

14  student supporters were afforded a sense of security by the Defendant University's

15  "appeasement" policy of coddling the Campus Terrorists. Jewish Students and Faculty were

16  touched without their consent and spat on by the Campus Terrorists if they dared to cross into the

17  Encampment. Their fear was and still is genuine and palpable. The fear was and is made worse by

18  the Defendant University's encouragement of the offensive conduct for weeks on end before

19  finally taking steps of remediation.

20  66. Alternatively, Jewish Students and Faculty were told by the Defendant University to work

21  remotely from home, or remain in their offices or dorms for their "own safety." Classes and

22  commencement exercises were cancelled as the Defendant University continued to appease,

23  coddle and negotiate with the Campus Terrorists. Jewish Students and Faculty, (including the

24  Plaintiffs herein) were not allowed to attend classes as usual or give lectures or grade papers on

25  site and could not walk safely to class or their offices on campus without being assaulted by the

26  Campus Terrorists. (See Exhibit A)

27  67. Meanwhile, other Hamas-leaning and supporting faculty members hired by Defendant

28

21

Exhibit A – Page 33

1  University to abide by DEI and other quotas continued to encourage students attending classes to
2  participate in the chaos and disruption created by the Campus Terrorists by offering such students
3  extra credit and better grades for participating, all with the knowledge and consent of the
4  Defendant University.

5  68. Plaintiffs are regularly exposed to pro Hamas propaganda and posters "calling all students,
6  faculty and staff to "attend" pro Hamas rallies on USC campus property, such as Bovard Hall.
7  These "Pro- Hamas" rallies, endangering plaintiffs, Jewish students and Jewish professors and
8  faculty, are encouraged by and acquiesced to by Defendant university. (See Exhibit D).

9  69. At all times herein mentioned, the Defendant University also knew or should have known
10  that nearly half of the Campus Terrorists creating, managing and equipping the Encampment and
11  causing the harm to Jewish Students and Faculty, creating the chaos and disruption and
12  overtaking the Defendant University's buildings and property, were and still are in fact paid
13  outside agitators rather than genuine students attending classes at the Defendant University.  The
14  Campus Terrorists and Co-Defendants JVP, SJP were and are supported and funded by wealthy
15  Democrat Party donors and radical Democrat Left Wing political action groups, including the
16  Rockefeller Brothers Fund, Tides Center, Soros Foundation and Popular Front for the Liberation
17  of Palestine ("PFLP"), all done under the Defendant University's watchful eye. (New York Post,
18  various articles, April – May 2024).

19  70. Far from "peaceful protests" and the "free speech" narrative promulgated by the
20  Democratic Party-controlled media, Democrat congressmen and the Democrat Party itself, the
21  dangerous hate-filled, violent, and antisemitic speech included rote comments repeated ad
22  nauseum through megaphones that were so offensive to any Jew that it offends them to hear it,
23  eliciting memories of the Holocaust and October 7, 2023 – slogans that include "Death to Israel"
24  (the only Jewish nation state in the world and a common refrain of Iranian fanatics and their
25  proxies), and not surprisingly, "Death to America." Violent, hate-filled speech is not only
26  offensive and hurtful, it is dangerous and not protected by the First Amendment.

27  71. Defendant knew about the antisemitic nature of these alleged student groups yet

28

22

1     encouraged them by providing offices on campus and soliciting funding on their behalf from the

2     United States under USAID and other agencies that the Trump Administration's "DOGE" unit

3     recently found was riffled with fraud, waste and abuse.

4     72. The purpose and intent of the Campus Terrorists was not to peacefully protest but to

5     terrorize, intimidate, assault, and shame Jewish Students and Faculty members and interfere with

6     their right to freely travel to and from classes, offices, and otherwise accessing other facilities at

7     the Defendant University by threats, intimidation, and coercion. All of this was done to harm

8     Jewish Students and Faculty members and create the equivalent of a hostile work and educational

9     environment, with the knowledge, consent, encouragement and blessings of the Defendant

10     University.

11     73. USC knew that soliciting and inviting radical left-leaning Jew-hating professors and

12     lecturers to campus would create chaos, dissention and the violence and harm that in fact

13     occurred in the Spring of 2024 and continues to this day.

14     74. USC allowed Anti-Semitic organizations to use its professional platforms and e-mail

15     addresses to spew Jew-hating anti-Zionist Hamas propaganda that USC knew or certainly should

16     have known would incite chaos, violence and property destruction that occurred on campus.

17     75. The Campus Terrorists' purpose was encouraged, and aided and abetted by the Defendant

18     University. The Defendant University invited Hamas-supporting groups to speak at USC

19     notwithstanding the rampant antisemitism spewed by such groups; encouraged Hamas-leaning

20     and -supporting faculty members to spew antisemitism and hatred of Jews and the State of Israel,

21     the only Jewish country in the world.

22     76. Defendant University allowed the Campus Terrorists to continue their anti-Semitic

23     campaign against the Defendant University's large Jewish student body and faculty unabated

24     until April 24, 2024, when the Defendant University finally allowed the Los Angeles Police

25     Department ("LAPD") to clear the Encampment and arrest 93 people on suspicion of trespassing,

26     reporting publicly that nearly half of the arrested mob members were not students attending USC

27     at all but rather paid and monied agitators funded by the democratic dark-money political action

28     groups identified herein above.

77. None of the offending students, Campus Terrorists, paid outside agitators or other responsible parties, arrested or otherwise, suffered any consequences. Despite Defendant University's belated call for the LAPD's belated intervention and the subsequent arrest of certain parties, the offending Campus Terrorists were all released without bail to launch their attack again, spurred on by outside agitators funded by the Rockefeller Center and other Jew-hating organizations, such as Tides and George Soros. And the Defendant University has refused to press charges or discipline offending students or faculty members, allowing antisemitism to exist, fester and continue like a malignant cancer and spread throughout the Defendant University's campus even after removal of the Jew Exclusion Zone. For example, as of May 7, 2024, Hamas-supporting protests were continuing at the Defendant University's campus, under the administration's watchful eyes, with Palestinian flags and students or outside supporters, sporting Palestinian flags and other terrorist garb, including green Hamas headbands, sunglasses and the traditional Keffiyeh – and of course, black and white Hamas facemasks and scarves to hide the Campus Terrorists' identities. It is common knowledge that hiding identities is a hallmark of terrorists and terrorism.

78. After the Jew Exclusion Zone was removed, students and outside vendors were and still are allowed to continue to send emails on University sponsored or permitted internet platforms to promulgate Hamas and terrorist propaganda and flyers against Jews, Jewish students and Faculty to encourage gullible students, faculty and other supporters to purchase Keffiyehs to wear and display at individual department graduation ceremonies, all with the knowledge and encouragement of the Defendant University. (Examples of such flyers and propaganda are attached hereto as Exhibit D and incorporated herein by this reference).

79. As of the filing of this Complaint, the Palestinian flag is still proudly displayed virtually anywhere on campus by Keffiyeh and mask-wearing thugs, within sight of Figueroa Street, aided and abetted by the founding, supporting and incoming new members of the Campus Terrorists with the knowledge, consent and encouragement of USC.

80. The Defendant University, one of America's leading universities, has for decades been

24

1    one of the worst centers of academic anti-Semitism in the United States. Since October 7, 2023,

2    when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated

3    1200 people – including infants, children, and the elderly – anti-Semitism at Defendant

4    University has been particularly severe and pervasive. Defendant University faculty and students

5    have openly lauded Hamas' October 7 atrocities as astounding, awesome, and great feats. Mobs

6    of pro-Hamas students and faculty have marched by the hundreds to Defendant University's

7    campus shouting antisemitic slogans, including calls for genocide, such as: Jews will not defeat

8    us; there is only one solution, intifada revolution; we will honor our martyrs; resistance is

9    justified; by any means necessary; from the river to the sea and in Arabic, from water to water

10    Galilee will be Arab.

11    ~~81.~~ These mobs have occupied Defendant University's buildings, promoted violence against

12    and restricted access to Jewish Students and Faculty members, caused cancellation of classes and

13    commencement exercises, and harassed and assaulted Jewish Students and Faculty members on

14    campus.

15    82. Jewish Students and Faculty members have been spat at and faculty physically assaulted,

16    threatened and targeted on campus and social media with epitaphs such as death to Jews.

17    Defendant University has helped promulgate antisemitism in its courses and dismissed and

18    intimidated students who object. What is most striking about all of this is Defendant University's

19    abject failure and deliberate refusal to act to stop and deter this outrageous antisemitic conduct

20    and discipline the students and faculty who perpetrated it. In fact, the Defendant University

21    encouraged the conduct by its appeasement policy in the face of hate speech, dangerous

22    misconduct in other actions that it knew or should have known would create the worst and most

23    insidious hostile antisemitic work environment.

24    83. The Defendant University's antisemitism manifests itself in a double standard insidious

25    to Jewish Students and Faculty members. Defendant University selectively enforces its policies to

26    avoid protecting Jewish Students and Faculty members from harassment, hires professors who

27    support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish Students and

28    Faculty pleas for protection. Defendant University permits students and faculty to advocate

1   without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in
2   the world.

3      84. Plaintiffs and other similarly situated Jewish Student and Faculty members, and numerous
4   others have explicitly and repeatedly warned Defendant University that its severe and pervasive
5   hostile anti-Semitic environment harms Jewish Students and Faculty members. In fact, Defendant
6   University has been aware of its anti-Semitism problem for years, but its response has been
7   utterly ineffective and clearly unreasonable in tolerating and even enabling antisemitism.
8   Defendant University has abjectly failed to enforce its policies and discipline those responsible
9   for turning USC campus into a severely hostile environment for its Jewish Students and Faculty
10  members, including the Individual Plaintiffs and other similarly situated Jewish Student and
11  Faculty members. When, in clear violation of Defendant University's policies, a mob of students
12  overtook a campus building to further their antisemitic agenda, Defendant University's response
13  was not to remove and discipline them, but to enable them to conceal their identities by supplying
14  them with supplies and ammunition that the mob subsequently used against LAPD.

15     85. Defendant University's longtime practice when it comes to antisemitism—of refusing to
16  enforce its own policies against discrimination and harassment—ensured that Hamas' October 7
17  terrorist attack would enormously intensify the anti-Jewish abuse on campus. Shockingly,
18  numerous students and faculty members at Defendant University have openly endorsed Hamas
19  and the horrific October 7 massacre of Israelis it perpetrated even though Hamas, since its
20  founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against
21  civilians; Hamas vows to kill and destroy Jews and Israel; the U.S. State Department has
22  designated Hamas as a Foreign Terrorist Organization; and Hamas repeatedly proclaims its
23  determination to repeat the October 7 atrocities until its genocidal aims are achieved. Many of
24  Defendant University's students and faculty support Hamas and condemn Israel for defending
25  itself against Hamas' terrorist attacks—but they are never heard to condemn, let alone rally
26  against, anyone other than Israel and the Jews.

27     86. Subjected to intense anti-Jewish vitriol, including from their own professors and

28

26

Exhibit A – Page 38

Defendant University, the Individual Plaintiffs and other Jewish Students and Faculty members have been deprived of the ability and opportunity to fully participate in Defendant University's educational and other programs and have been placed at severe emotional and physical risk. Defendant University's double standard extends to depriving Jewish Students and Faculty members equal time to express contrasting pro-Jewish views. More importantly, Jewish Students and Faculty are terrified about disclosing their pro-Israel stance for fear of violence or worse.

87. USC has permitted endemic antisemitism to exclude Jewish Students and Faculty members from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Defendant University, and has insidiously discriminated against them by, among other things, failing to protect them in the same way Defendant University has protected other groups all based on their race, ethnicity, religion, citizenship, and/or national origin. That Defendant University has done so for many years and continues to do so to this day further confirms that it has responded to antisemitism with at best deliberate indifference, that Defendant University cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

88. As alleged herein, Defendant University's actions, including its deliberate indifference to, and indeed enabling of, anti-Semitism on its campus, constitute an egregious violation of California's Bane, Unruh, and Ralph Civil Rights Acts (California Civil Code sections 51, 52.1 and 51.7) and created and continue to create a dangerous condition of public property. The "Jew Exclusion Zone" and continued antisemitism on USC's campus also violates federal civil rights laws, including 42 USC Sections 1981, 2000d (Title VI).

89. Defendant University must now be compelled to implement institutional, far-reaching, and concrete remedial measures. Defendant University must also pay damages to Plaintiffs—who have been robbed of a healthy and safe college and graduate school experience. The Plaintiff Faculty member and subclass were also deprived of the opportunity to work in an environment free of hostility toward Jews. Regrettably, no amount of damages can ever fully compensate Plaintiffs for the hostility they have been forced to endure as a consequence of Defendant University's unlawful conduct.

90. Defendant University's administration exported their inadequate management skills and style, including appeasing, enabling, encouraging, aiding, abetting, coddling and negotiating with the Campus Terrorists and allowing the Campus Terrorists to repeatedly build and rebuild the encampments to terrorize Jewish Students and Faculty. USC continues to encourage and enable the Campus Terrorists to this day, aided and abetted by JVP and SJP.

## THE PARTIES

91. DOE JEWISH USC FACULTY MEMBER 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or sometimes "Jewish Professor") is and at all times herein mentioned was a Jewish professor employed by and at USC. Much like a victim of sexual abuse and assault, Jewish professor fears for Jewish professor's life, liberty, safety and health as well as the fear of a hostile work environment caused by the filing of this lawsuit - and in particular, the risk to Jewish professor's continued employment at USC if Jewish professor's identity is publicly disclosed, or if Plaintiff is "outed" by USC disclosed to Jewish Professor's boss or USC's human resources department. Accordingly, Jewish professor is suing herein as a doe plaintiff.

92. Jewish professor is suing herein individually and on behalf of all other USC Jewish faculty members who are similarly situated.

93. The following is Jewish professor's personal diary of the highly offensive, hateful, hurtful, unequal and obnoxious conduct Jewish professor and other similarly situated Jewish professors experienced and endured and continue to experience and endure at USC as a result of the Campus Terrorists' unlawful activity and as a result of USC's aiding, abetting, encouragement, enabling, and participation in what was effectively "mob rule" at USC and the creation of encampments and the Jew Exclusion Zone:

### Before October 7, 2023:

94. I was aware of the US Department of Education's Office for Civil Rights Title 6 investigation into allegations of anti-Semitism at USC after a Jewish student resigned from her position as student government vice president in August 2020. She was being

28

1    targeted for discrimination because of her perceived Jewish identity. I was also aware of the anti-
2    Semitic student and faculty organizations, speakers, professors, and other hate mongers USC
3    invited on campus to lecture and allowed to flourish and grow who lectured about and were
4    known to spread Hamas propaganda and other dogma and ideology. Among the other lies
5    promulgated by such hateful organizations, speakers, professors and other hate mongers is their
6    specious claim that Israel - and the Jews that inhabit only a fraction of the only democratic, multi
7    ethnic, religious and racial Jewish nation state in the world - are "oppressors" against the
8    "oppressed." I come from a family of Holocaust survivors and victims and as a consequence the
9    continued existence of a Jewish nation state and the Nation of Israel are very important to my
10   personal religious beliefs. For my part I sees no "distinction" between antisemitism and anti-
11   Zionism – it is Jew hating by any name.

12   **After October 7, 2023:**

13   95. After October 7, I personally witnessed several incidents of students and other
14   individuals removing posters of kidnapped Israeli civilians who are and were being held in
15   hostage in Gaza.

16   96. In February 2024, three student groups, including Students for Justice in Palestine
17   ("SJP") - held a vigil for Palestine and launched a "national divestment campaign," calling on
18   USC to divest from Israel and saying "we know that USC is very complicit in violence."

19   97. I have personal knowledge that complaints have been lodged against some
20   professors for allegedly promoting anti-Semitic and anti Zionist content online and a number of
21   Jewish students - particularly in the law and medical schools - have also publicly reported being
22   targeted with online harassment.

23   98. The level of anti-Semitism rose to unprecedented levels in April 2024, when USC
24   President Carol Folt announced the nomination of Muslim student Asna Tabassum ("Tabassum")
25   as USC's 2024 valedictorian. USC knew or certainly should have known as alleged above that
26   Tabassum's social media was replete with anti Israel propaganda and violent hate speech when an
27   e-mail was sent out by Provost Guzman to keep her as valedictorian yet not allow her to speak.

29

Exhibit A – Page 41

1  That was the turning point that led to the creation of campus anti Israel encampments and a level
2  of open Anti-Semitic vitriol that I have never previously experienced. Encampments – the
3  equivalent of "Jew Exclusion Zones" – sprung up all over the USC campus that required
4  disavowing "Zionism" and/or the "Palestinian Genocide" in order to pass. (A photo of one of the
5  "Encampments" depicting the "Jew Exclusion Zone" is attached hereto as Exhibit " ). The calls
6  for "death to Israel, death to America, and even death to Jews, on USC's campus were growing in
7  numbers and I could not get to my office without being barred and accosted by protesters asking
8  me, "Are you a Zionist?" "Do you support the Israeli death war machine?" On May 3, 2024, I
9  was walking toward my office at USC when a group a visibly angry, scary and frightening
10  "protestors" approached me and asked me if I "Supported the Zionist baby killing entity" and
11  then spat on me. I endured this for about 3 weeks before deciding that I would not return to
12  campus again until this came to an end. What is all the more disturbing is the number of faculty
13  members who openly protest with the students and some even cancelling their final exams so the
14  students can protest daily.

15      99. I did try to get to my office on May 2nd, 2024 only to be accosted again crossing
16  Truesdale Parkway by thugs asking repeatedly if I "supported the Zionist entity." I refused to
17  engage. On the way back to my car, I was approached by a woman asking if I wanted to
18  participate in a "bake sale for Palestine" to help feed the children that Israel is intentionally
19  starving. I kept walking and refused to engage.

20      100. I feared for my safety and life in April – May 2024 and still entertain these fears as
21  a result of the Campus Terrorists' actions, not knowing whether or when another Encampment or
22  Jew Exclusion Zone will pop up on campus as a result of USC's appeasement policy and the way
23  it dealt with the Campus Terrorists, the Jew Exclusion Zone and still deals with antisemitism on
24  campus. There appears to be a continuing and growing anti-Semitism and terrorist threat on
25  campus, which makes me and other Jewish professors anxious and apprehensive. All the while,
26  USC continues to acquiesce to the flow and to appease, aid, abet, tolerate and encourage what has
27  become an anti-Semitic mob on campus that is gaining mass appeal.

28

30

101.    The Holocaust in essence began at the universities in Germany when the Nazis prevented Jewish students from entering the campus and then forced out the Jewish professors. When our pathways are blocked and we are granted entry only when we attest that we do not support Israel, how are we free to both express their Jewish identity and perform our jobs at USC?

102.    Plaintiff DOE JEWISH USC STUDENT 1987, Individually And On Behalf Of All Others Similarly Situated (Plaintiff, Plaintiffs or "Jewish Student" or "Students," depending on the context) is and at all times herein mentioned was a Jewish student attending USC. Much like a victim of sexual abuse and assault, Jewish student fears for Jewish students life, liberty, safety and health as well as the hostile educational environment caused and created by the filing of this lawsuit. In particular, Jewish Student is fearful of the risk to her continued attendance at and graduation from USC if Jewish student's identity is publicly disclosed, or if Plaintiff is "outed" by USC.

103.    Plaintiff Jewish student is suing herein individually and on behalf of all others similarly situated.

104.    The following is Jewish student's personal diary of the highly offensive, hateful, hurtful and obnoxious conduct Jewish student and other similarly situated Jewish students experienced and endured and continue to experience and endure as a result of the Campus Terrorists and of USC's aiding, abetting, encouragement, enabling and participation in the antisemitic mob's rule at USC:

105.    I don't travel to campus very often because I'm a hybrid physical therapy student at USC's Health Science campus. But when I do commute, it is for several consecutive days and I'm there at 8:00 AM to 10:00 PM for 7 to 8 days, in class, studying, and practicing skills with classmates.

106.    It used to be very safe and we would travel to and from and walk all around campus, from the parking lot, to CHP building and the Hyatt Hotel for more studying and meals.

107.    On April 2nd, USC President Carol Folt announced Asna Tabassum ("Tabassum")

31

as the undergraduate valedictorian. As part of this honor, she was to give a speech at the upcoming commencement.. Upon recognition, it was mentioned that she was majoring in biomedical engineering and minoring in "resistance to genocide."

108.    On the surface this sounded great. An uprising against genocide of any group of people is a positive thing period. However, anti Israeli protesters have been using this term to justify the acts of October 7th. They claim that the act of rape, murder, torture and taking hostage was their "resistance to genocide."

109.    The "narrative" encouraged by USC and its faculty is offensive and hurtful to Jews and paints all Jews in one broad brush as favoring genocide with respect to Palestinians. I have Holocaust survivors in my family and the independent State of Israel and its continued existence is very important to me and significant with respect to my religious beliefs. I similarly see no distinction between anti-Semitism and anti Zionism - by any name it is the hatred of Jews and the Jewish State of Israel.

110.    The valedictorian (Tabassum) has published several statements advocating for "the complete abolishment of the state of Israel" on the grounds of "ethnic cleansing and apartheid."

111.    It is shocking that someone with such strong anti-Semitic beliefs would be chosen by USC's administration and the trustees for such a high honor as valedictorian. USC knew or certainly should have known the turmoil it was creating by such a poor choice. The community pushed back and voiced concern about what this anti-Semitic, venom-spewing and hate speaking and writing represents as valedictorian of 2024. This concern was likely fueled by both social media and the ongoing conflict in the Middle East. Regrettably and to the detriment of the other Jewish students and me, USC and the trustees and President Folt ignored the public uproar. Encampments and "Jew Exclusion Zones" were allowed to continue after April 29, 2024 and continued through at least May 5, 2025, as confirmed by an article published in "Deadline" by Bruce Haring, USC Pro-Palestinian Encampment Cleared Again By Police:

"Encampments at USC have now been established and taken down three times,

     resulting in restricted access to the university. Disturbances grew in the wake of

32

USC's decision not to let a pro-Palestinian [and pro-Hamas] valedictorian speak at its main graduation ceremony."

111.   On April 15, 2024, USC announced (in e-mail) that Asna was to remain valedictorian, but would no longer speak at commencement.

112.   While that should have been the end of it, when I began traveling to and from campus I had encountered several posters on our building doors that read and stated, "#Let Asna Speak." The posters had the same picture from the original newsletter that claimed she was valedictorian with her major and minor. In that moment, I recognized and grew fearful that I could no longer feel safe on campus without USC's intervention and the implementation of systemic and institutional changes.

113.   The anti-Semitism allowed to pervade USC is no longer a problem isolated to the undergraduate or the main campus - it is now spread to all aspects of USC life, philosophy and policy and it's frightening to Jewish students like me and others similarly situated.

114.   USC now suffers from a pandemic of hate with respect to Jewish students attending the university and Jewish faculty members alike, as well as other similarly situated Jewish Plaintiffs herein who can no longer freely exercise their faith and ethnicity, or act like or be themselves out of fear of reprisal. The anti-Semitism has also become systemic at USC's graduate campus.

115.   On April 17, 2024 I received another e-mail - this time from one of our own professors at the department of physical therapy. The email asked everyone in the department to sign a petition to allow Asna to speak. It also attached a message from Asna to the students of USC and the same picture of her from the original newsletter. She stated in her letter that USC's Provost had mistreated her and didn't give her a complete answer on why they would not allow her to speak. In fact, the Provost did not did explain it was due to security and safety of the community.

116.   On April 18, 2024 I received another e-mail from the same professor. It read "USC silent march for Asna. When USC silences Asna they are silencing all of us. Show up in support of Asna and demand USC let her speak at commencement. Wear a hoodie and mask to symbolize the institutional silencing Asna is experiencing."

33

117.    I am informed and believe that USC and the trustees knew or should have known about these hurtful emails, since they were sent using USC's official "edu," internet platform.

118.    I could not believe what I was reading. Now I'm being harassed by my own department - the community in which I'm supposed to dedicate my time and energy to has abandoned me and the whole Jewish community.

119.    I couldn't understand how USC and my department would support her after all the hate speech she published.

120.    I'm the only Jewish student in my entire class and I felt like I had to keep it a secret. I didn't want to have a target on my back or deal with anyone strong opinions during an already stressful week of finals.

121.    That same day, a classmate (who I knew was Jewish) asked me what my opinion was on the topic of USC's decision to take Asna's speech away. I felt unsafe once again even among friends. Do I speak my truth and hope we are on the same page or do I brush it under a rug and avoid the topic just to keep some sense of peace in my class? USC's decision still had a big impact on Jewish students lives.

122.    Unfortunately, to maintain a sense of normalcy and maintain relationships in school, I had to and still have to keep my opinions and identity to myself.

123.    Ironically USC prides itself on diversity, equity and inclusion. By failing to protect its Jewish students and leaving them to fend for themselves among the riots created by the Campus Terrorists," multiple Encampments, "Jew Exclusion Zone" and illegal occupation of school property USC failed to abide by its own standards.  What's worse, USC's internet platform continues to publish flyers and announcements promoting and advocating for antisemitic and Muslim causes and protests to the detriment of Jewish students or other ethnicities who do not support such causes.

124.    USC's failure to condemn anti-Semitism and its appeasement policy provides "cover" for hate mongers like Asna and justifies her antisemitic behavior. Accordingly, Jewish student's fear and anxiety is real and justified.

34

125.   Defendant USC is a California private benefit corporation controlled by its Board of Trustees.

125a.   Defendant JEWISH VOICES FOR PEACE ("JVP") is an unincorporated association and/or other entity that maintains a presence and operations on the USC campus and is alleged to have aided, abetted, encouraged, and participated in the creation, maintenance, and enforcement of the Jew Exclusion Zone described herein, and the exclusion of Plaintiffs from USC campus areas.

125b.   Defendant STUDENTS for JUSTICE in PALESTINE ("JFP") is an unincorporated association and/or other entity that maintains a presence and operations on the USC campus and is alleged to have aided, abetted, encouraged, and participated in the creation, maintenance, and enforcement of the Jew Exclusion Zone described herein, and the exclusion of Plaintiffs from USC campus areas.

125c.   Plaintiffs are ignorant of the true names or capacities of the defendants sued herein under the fictitious names of "DOES 1 through 50" who are named herein pursuant to Code of Civil Procedure section 474.  Plaintiffs will seek leave to amend this Complaint to include such defendants when their identities are ascertained.  These defendants include perpetrators of violence, coercion and intimidation in the Spring of 2024 occupation and siege as well as the organizations and individuals who funded the operation nationwide and at USC.  Regrettably, USC permitted most of the perpetrators of the violence to hide and conceal their identities to further terrorize Jewish students and faculty in flagrant violation of USC's own antidiscrimination policies and procedures.

125d.   Each of the defendants was the agent, joint venturer, and employee of each of the remaining defendants and in doing the things alleged in this Complaint was acting within the course and scope of said agency, employment and joint venture with the advance knowledge of each and every remaining defendant.

1

**CLASS ACTION ALLEGATIONS**

2   126.   This is a Class Action originally filed pursuant to the provisions of Code of Civil

3   Procedure section 382, which is patterned after Rule 23 of the Federal Rules of Civil Procedure.

4   Section 382 and Rule 23 both say substantially the same thing, namely:

5           "[W]hen the parties are numerous, and it is impracticable to bring them all before

6           the court, one or more may sue or defend for the benefit of all."

7   (California Code of Civil Procedure section 382).

8   127.   Plaintiff DOE USC FACULTY MEMBER 2004, Individually And On Behalf Of All

9   Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Professor"), sues in Jewish

10   professor's individual capacity as a Jewish USC professor who suffered damages, harm and was

11   stigmatized as a result of USC's conduct, and as a representative on behalf of all others similarly

12   situated Jewish professors.

13   128.   Plaintiff DOE JEWISH USC STUDENT 2004, Individually And On Behalf Of All Others

14   Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Student"), is a Jewish USC student who

15   sues in Jewish student's individual capacity as a Jewish USC professor who suffered damages,

16   harm and was stigmatized as a result of USC's conduct, and as a representative on behalf of all

17   others similarly situated Jewish students.

18   129.   Both subclasses are ascertainable and sufficiently numerous. Jewish Professor is informed

19   and believes that there are over 7,000 full-time Jewish USC faculty members and that a

20   substantial number of them are similarly to Jewish Professor. Plaintiff Jewish USC student is

21   informed and believes that there are over 3,000 full-time Jewish USC students and that a

22   substantial number of them are similarly situated to Jewish student.

23   130.   The Jewish professors and faculty members and Jewish students share the same common

24   interests of wanting to be safe and free from Campus Terrorists and antisemitism on campus and

25   safe and free from other harm including stigmatization, status discrimination, religious

26   discrimination, assault, battery and other general damages.

27   131.   Plaintiffs also have the common interest of enjoying their freedom of travel, access and

28   passage, and freedom to practice of their religion without discrimination or discriminatory

practices, or fear of reprisal from USC-sponsored Campus Terrorists. It remains to be seen what the Campus Terrorists would have done or would do in the future if USC again tolerated the creation of encampments or other "Jew Exclusion Zones."

131.    Judicial economy and efficiency will be served by treating and certifying this matter as a class action given the numerosity of plaintiffs in each subclass, common issues of fact and law and related common issues.

### RELIEF NEEDED

132.    As set forth above, USC knowingly allowed violent activists to establish a "Jew Exclusion Zone" on USC's campus for more than two weeks during the spring quarter in 2024, and aided, abetted, appeased, enabled, supported, condoned and appeased Co-Defendants JVP, SJP and the Campus Terrorists to construct it as well as the encampments, giving the appearance to Jewish students and faculty that the Campus Terrorists were in a favored position while Jews at USC were second class citizens.

133.    Defendants had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist in flagrant violation of Plaintiffs' constitutional rights.

134.    USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone. Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests still taking place at Columbia and other East Coast campuses as of the filing of this Complaint and the May 2025 on campus uprising.  This time, with the help of LAPD, USC quelled the potential harm after several hours instead of weeks.  But what about next time?

135.    Since Plaintiffs have been harmed by USC's previous allowance of the Jew Exclusion Zone and its continued failure to combat on-campus antisemitism, as evidenced in part by the DOJ's Antisemitism Task Force identifying USC as one of the 10 worst college campuses in the United States with respect to combating it, Plaintiffs seek an order from this court or injunction to

be able to continue their educational and professional pursuits on campus in peace and freedom. Plaintiffs need to know that they will be safe on campus, be free to exercise their religion, and receive equal protection of the laws. Accordingly, Plaintiffs need an order or injunction requiring USC to ensure that no other "Jew Exclusion Zone" will be allowed on USC's campus, both during the pendency of this case and beyond.

**USC's Sponsorship of JVP and JFP and Tolerance of Antisemitic Hostility Creates a Hostile and Dangerous Educational Environment**

136. The University of Southern California (USC), is an institution that receives substantial public funds and holds itself out as an inclusive and nondiscriminatory educational environment. Thus, USC has a legal and moral obligation to protect all students from harassment, intimidation, and discrimination based on their religion. By allowing groups such as Jewish Voices for Peace (JVP) and Students for Justice for Palestine (SJP) to operate freely on campus while those organizations promote Hamas-aligned rhetoric, engage in exclusionary protest activity, and foster hostility toward Jewish students and faculty, USC has created a dangerous and discriminatory environment in violation of California law and its own stated policies.

136b. These groups are not merely advocacy organizations. They are ideologically aligned with Hamas, a federally designated terrorist organization, and promote antisemitic propaganda. USC has supported them by granting official recognition, office space, and use of university email and web platforms. Jewish students have been spat on, verbally abused, blocked from campus areas, and told to disavow their religion to gain access to public university spaces, which includes members of JVP, SJP and on information and belief, USC faculty members.

136c. By continuing to support and sponsor these groups, USC has created a hostile educational environment in violation of the Unruh Civil Rights Act (Civ. Code § 51), Bane Act (Civ. Code § 52.1), and state constitutional guarantees, not to mention violation of the federal Civil Rights Act of 1964, now codified in 42 U.S.C. § 2000d, as well as 42 U.S.C. §1981. The failure to discipline

those responsible or to enforce existing anti-harassment policies also makes the University complicit.

### USC has a legal and moral duty

### to protect its students from discrimination and harassment

136c.   USC is not a passive bystander. By housing and supporting groups like Justice for Palestine (JFP) and Jewish Voices for Peace (JVP) — which openly promote antisemitic rhetoric, glorify Hamas, and incite hostility toward Jewish students — the university becomes an active enabler of discrimination. California law (Unruh Act, Bane Act, Ralph Act) and the California Constitution prohibit this.

- These are not neutral political groups. As alleged, JFP and JVP coordinate protests that exclude, intimidate, and target Jewish students for their religious identity or support of Israel.

- When USC provides institutional support—offices, event space, official status, email platforms—it is endorsing and legitimizing groups that foster a hostile and unsafe environment.

### The presence of JFP and JVP creates a hostile educational environment

136d.   In legal terms, Jewish students are deprived of the "full and equal benefits" of their education. In practical terms, they:

- Avoid entire areas of campus for fear of harassment;
- Are told to stay in dorms while JVP/JFP-aligned mobs roam freely;
- Are subject to litmus tests ("Are you a Zionist?") at exclusion checkpoints;
- Suffer emotional trauma, religious marginalization, and social isolation.

This is not academic disagreement—it's religiously motivated hostility, bordering on segregation.

39

**USC's support of JVP and JFP violates its own policies**

137e.   USC publicly claims to uphold:

- Diversity, equity, and inclusion (DEI),

- Zero tolerance for hate or harassment,

- Equal access to campus for all students regardless of religion.

Yet it selectively enforces those values by shielding groups like JVP and JFP from accountability, even when they threaten, intimidate, or assault Jewish students. That is not just hypocritical — it's a breach of USC's contractual and ethical obligations to its students.

**Why USC should care**

137f.   USC's continued support for extremist and designated terrorist groups:

- Exposes it to civil liability, as the instant lawsuit attests.

- Puts it under federal investigation, as with DOJ's March 2025 Antisemitism Task Force probe.

- Damages its reputation, alumni support, and accreditation standing.

- Sends a dangerous message to Jewish students: you are not protected here.

In short: Jewish students are harmed because USC tolerates and facilitates hate in the name of activism. And the university's role is not neutral — it has crossed the line from tolerance into complicity.

**CLAIMS FOR RELIEF**

**Count I**

**VIOLATION OF CALIFORNIA'S BANE ACT (Civil Code section 52.1)**

**AGAINST DEFENDANTS USC, JVP, SJP AND DOES 1 THROUGH 10**

138.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 137f as if fully set forth at length herein.

40

Exhibit A – Page 52

138a.    Under the Fourteenth Amendment to the United States Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

139.    The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

140.    USC's intentional actions of aiding and abetting the Campus Terrorists to violently occupy USC's common areas and create and maintain the "Jew Exclusion Zone," as alleged herein above, as well as segregating Jewish students and faculty members to deal with the siege, occupation and denial of access to the common areas has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish.

140a. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

141.    USC also intentionally adopted and promulgated a "separate but equal policy" that harmed Jewish students to their detriment while favoring Hamas-supporting on campus organizations like JVP and SJP as well as the Campus Terrorists who terrorized Jewish Students and Faculty by deliberately concealing their identities to coerce, intimidate and Jewish Students and Faculty without compunction or accountability,

141a.    USC furthered no legitimate or compelling state interest by engaging in this conduct.

142.    USC's failed to tailor their actions narrowly to serve any such interest.

**Parallels to 1939: When a University Aids in Religious Segregation, History Repeats**

41

142a.   The events at USC in April and May 2024—where Jewish students and faculty were blocked from campus areas unless they disavowed their beliefs—bear disturbing similarities to the segregation and exclusion of Jewish students in Nazi Germany in the late 1930s. There, Jewish students were expelled from classes, physically barred from attending campus, and told they no longer belonged in educational institutions.

142b.   In both cases, universities functioned not as safe spaces but as vehicles of religious exclusion. The use of threats, ideological loyalty tests, and mob violence—combined with institutional appeasement—created an environment of fear. USC's telling Jewish students to 'stay in their dorms or offices' instead of intervening mirrors the cowardice of institutions in pre-war Europe.

142c.   That a modern American university knowingly repeated this error is alarming. The Holocaust did not begin with gas chambers—it began when institutions allowed mobs to isolate and target Jews. The law must make clear that this kind of religious exclusion is not only unconstitutional, but intolerable in any civilized society.

143.    As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms.

143a.   As a direct and proximate result of the USC's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and prejudgment and post-judgment

42

1    interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be

2    harmed by USC's actions.

3    144b.   All times herein mentioned, USC aided and abetted paid outside agitators and violent

4    student protesters – including Co-defendants JVP and SJP -- to cause plaintiffs to reasonably

5
6    believe that if they exercised their right to practice their religious faith and failed to denounce

7    Zionist or baby killers and entered the Jew exclusion zone the violence would be committed

8    against them in light of the campus terrorists apparent ability to carry out their threats and

9    intimidation.

10   144c.   Jewish communities have a deep historical memory of being scapegoated, harassed, and

11   physically attacked, particularly when political tensions flare.  When expressions of hostility

12
     (even if politically motivated) appear unchecked, it can trigger genuine fear for personal safety.
13
14   The presence of terrorist organizations or their affiliates on USC's campus like JVP and JFP,

15   clear supporters of Hamas and designated terrorist groups by the United States government as of

16   March 2025 and USC's support of them and their violent activities on grounds of "academic

17   freedom" is a sham.  More importantly, it was and is serious concern to Jewish students and

18   faculty.

19
     144d.   When mass individuals shout aggressively racial epitaphs aggressively and threaten
20
21   assault and battery and commit actual battery on Jewish students and faculty, it creates fear,

22   intimidation and coercion, all acquiesced to, encouraged and supported by USC. Blocking entry,

23   isolating students, preventing people from accessing buildings or singling out students based on

24   identity (for example, calling for Zionists or Jews to leave or to not enter) resembles mob

25   behavior that can quickly become dangerous. When USC or any university fails to intervene in

26   hostile behavior it can signal to Jewish students that their safety is not a priority.  This perceived

27
     abandonment is frightening and demoralizing especially when Jews are systematically segregated
28

43

Exhibit A – Page 55

by the university as a matter of policy to dormitories and offices while non-Jews or Jews disavowing Zionism are permitted free access. Needless to say, it makes Jews feel like second class citizens while attending and working at a university that they formerly believed was a bastion of higher learning.

145.     At all times here in mentioned, the Campus Terrorists acted violently against Plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions, with the acquiescence, aid, and comfort provided by USC, JVP and SJP, interfering with Plaintiffs' civil rights by threats, intimidation and coercion, as more fully described above.

146.     Plaintiffs were harmed as a result of USC's and JVP's and SJP's actions and inaction, as more particularly alleged herein in paragraphs 1 though145 of this Complaint as if fully set forth at length herein.

147.     Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

**Count II**

**VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT**

**AGAINST DEFENDANTS USC, JVP, SJP, AND DOES 1 THROUGH 10**

**(Civil Code sections 51, 52)**

148.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 138 through 147 of this Complaint as if fully set forth at length herein.

149.     Under the Fourteenth Amendment to the United States Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

150.     The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

151.     USC has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political

44

organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the Jew Exclusion Zone and encampment, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

151.   As a result of the actions of USC, its Co-Defendants, JVP and SJP in conjunction and complicity with the Campus Terrorists, Plaintiffs were deprived and denied access to benefits other similarly situated non-Jewish students and faculty received.

152.   USC furthered no legitimate or compelling state interest by engaging in this conduct.

153.   USC failed to tailor their actions narrowly to serve any such interest.

154.   As a direct and proximate result of Defendants' actions and inaction, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in- person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms.

150a.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and pre-judgment and post-judgment interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be harmed by Defendants' conduct.

151.   All times herein mentioned USC aided and abetted paid outside agitators and student violent student protesters to cause plaintiffs to reasonably believe that if they exercised their right to practice their religious faith and failed to denounce Zionism and entered the "Jew Exclusion Zone that violence would be committed against them in light of the Campus Terrorists apparent ability to carry out their threats and intimidation.

152.    At all times here in mentioned, the campus terrorists acted violently against Plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions.

153.    Plaintiffs were harmed as a result of USC's actions and inaction, as more particularly alleged herein and herein above.

154.    USC's conduct was a substantial factor in causing Plaintiffs' harm.

155.    As a result of USC's actions and inactions described above, USC denied, aided and incited a denial of discrimination and made a distinction that denied full and equal accommodations, advantages, facilities, privileges and services to Plaintiff Students in violation of the Unruh Act.

156.    Plaintiffs' religion or religious beliefs were a substantial motivating reason for USC's conduct. Plaintiffs were harmed. USC's conduct was a substantial factor in causing Plaintiffs' harm.

**Count III**

**VIOLATION OF CALIFORNIA'S RALPH CIVIL RIGHTS ACT**

**AGAINST DEFENDANTS USC, JVP, SJP AND DOES 1 THROUGH 10**

**(Civil Code section 51.7)**

156a.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 148 through 156 of this Complaint as if fully set forth at length herein.

157.    At all times herein mentioned, USC, JVP, SJP and other currently unknown USC sanctioned bad actors aided, abetted, assisted, encouraged, and participated with the Campus Terrorists in the Spring 2024 siege, not to mention the Campus Terrorists' occupation of USC's property and creation and maintenance of the Encampments and "Jew Exclusion Zone." USC and the other defendants continued to appease the Campus Terrorists during their occupation and siege of USC's Town Square.

158.    The Campus Terrorists threatened to commit violent acts and destroy property and in fact did commit violent acts against Plaintiffs or their property and harmed them, as alleged herein above.

Exhibit A – Page 58

159.    As alleged herein above, a substantial motivating reason for USC's conduct and inaction was because of Plaintiffs' religious beliefs.

## Count IV

## NEGLIGENCE
## AGAINST USC ONLY AND DOES 15 THROUGH 20

160.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 156 through 159 as though fully set forth at length herein.

161.    At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws. USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

162.    Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024 in flagrant violation of Plaintiffs' constitutional rights.

163.    USC had the ability to disband the encampment, which violated stated USC's stated antidiscrimination and safety policies, but instead chose to allow it to persist.

164.    USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but instead reinforced the Jew Exclusion Zone and gave the violent protestors aid and comfort, as more particularly alleged in paragraphs 1 through 163 of this Complaint, including the segregation of Jewish students and faculty.

165.    Intimidating and violent "protest" groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this Complaint, as well as the uprising at USC itself in March 2025. While USC admittedly quelled the mob in March 2025 after several hours, a far cry from what happened in the Spring of 2024, USC has done nothing of substance or changed policies to stop these violent protests against Jewish students and faculty from returning

Exhibit A – Page 59

166.    As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed.

### Count V

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST USC ONLY)**

167.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 160 through 166 as though fully set forth at length herein.

168.    At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws. USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

169.    Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024.

170.    USC had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist.

171.    USC had the ability to order USC police and private security officers to help Jewish students and faculty obtain equal access to campus, but did not and instead reinforced the Jew Exclusion Zone.

172.    Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this Complaint, as well as the return of the Campus Terrorists in May 2025 that was quelled in less than four hours after USC called in the LAPD.

173.    As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed and suffered serious emotional distress, including suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, stress, humiliation, loss of self esteem, stigmatization and shame.

Exhibit A – Page 60

**Count VI**

**BREACH OF CONTRACT  (AGAINST USC ONLY)**

174.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 167 through 173 as though fully set forth at length herein.

175.   This cause of action arises from the University of Southern California's express and implied contractual obligations owed to the student Plaintiffs under its 2022 anti-discrimination policies, including those promulgated by its Office for Equity, Equal Opportunity, and Title IX ("EEO-TIX"). These policies form part of the binding agreement between USC and its students and faculty. Under California law, university policies may give rise to contractual obligations (see *Zumbrun v. University of Southern California*, 25 Cal.App.3d 1 (1972)).

176.   USC materially breached these promises when it permitted the establishment of a religiously discriminatory "Jew Exclusion Zone," restricted Jewish students and faculty from campus facilities based on their religious identity, and failed to enforce protections guaranteed in its own nondiscrimination rules. Plaintiffs were denied full access to academic and campus facilities unless they disavowed their sincerely held beliefs, including support for the Jewish state.

176a.   Plaintiffs suffered harm, including loss of educational opportunities, emotional distress, and unequal treatment, as a result of USC's breach of its contract with Plaintiffs. Plaintiffs seek damages and an injunction requiring USC to enforce its stated antidiscrimination policies.

176b.   At all times herein mentioned, USC had a contractual duty to all plaintiffs to provide a campus and educational and work experience free from having to experience daily, violent pro-Hamas activists perpetrating a siege, taking over and occupying USC property, creating encampments to bar Jews and denying access to USC property by Plaintiffs unless they disavowed Zionism and other facets of their Jewish faith.

176c.   Plaintiffs performed all of the contractual duties they were required to perform except for those excused by virtue of USC's non performance.

177.   USC breached its contract by failing to provide a safe campus that did not discriminate against Jews.  USC also violated its own policies on prohibited discrimination, harassment and retaliation effective as of January 1, 2022.  Among other things, USC admits that intentional

49

Exhibit A – Page 61

discrimination under USC's policy includes but is not limited to actions that result in the interference with, limitation of, or denial of access to a student's (or employee's) ability to participate in, access, or benefit from educational programs, services, or activities (or benefits of employment with respect to faculty members). USC's purposeful and intentional policy of segregating Jewish students and faculty to their dorms or offices, respectively, while allowing unfettered and free access to university accommodations and campus benefits by the Campus Terrorists, including JFP and JVP (and non-Jews or Jews who disavowed Zionism) constituted a flagrant violation of USC's own anti-discrimination policies and disparate treatment of Jews, who were relegated to second-class citizens by USC's policy.

177a. USC's policies also state that "hostile environment harassment" exists whenever verbal, physical, written, electronic or other conduct based on an individual's protector's protected characteristics is sufficiently severe, persistent, or pervasive such that it unreasonably interferes with, limits or denies that individual's ability to participate or benefit from the university's educational programs or activity, employment access, benefits, or opportunities or other university programs and activities (such as campus housing, official university listservs, university sponsored platforms when viewed both from a subjective and objective perspective). Plaintiffs were denied access to USC's town square by USC's tolerance of and acquiescence in the "Jew Exclusion Zone"

178. As a direct and proximate result USC's breach of its contract and its own policies, plaintiffs have been damaged in an amount to be shown at the time of trial in accordance with proof.

## Count VII

### ASSAULT
### AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 10

179. Plaintiffs incorporate by reference the allegations set forth in paragraphs 174 Through 178 as though fully set forth at length herein.

Exhibit A – Page 62

180.    At all time here and mentioned, for the reasons herein above, USC, JVP and SJP aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish students and faculty by excluding any Jewish students and faculty from entering the Jew Exclusion Zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

190.    At all times herein mentioned, Plaintiffs reasonably believed that they were about to be touched in a harmful or offensive manner. Towards that end, Plaintiff Jewish Professor 2004 was actually spat on by one or more of the Campus Terrorists. At all times herein mentioned, the Campus Terrorists that Defendants aided or abetted threatened to touch Plaintiffs in a harmful or offensive manner.

192.    At all times herein mentioned, it reasonably appeared to Plaintiffs that the Campus Terrorists were about to carry out the threat.

193.    Plaintiffs did not consent to the Campus Terrorists' offensive and threatening conduct.

194.    Plaintiffs were harmed as a result of Defendants' conduct and in particular, USC's inaction and favoring continued violent protests over protecting Jewish students and faculty from further harm.

195.    Defendants' conduct and USC's inaction was a substantial factor in bringing about such harm.

## Count VIII

## BATTERY AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 10

196.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 179 Through 195 as though fully set forth at length herein.

197.    At all time here and mentioned, for the reasons herein above, USC aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish Students and Faculty by excluding any Jewish

51

Exhibit A – Page 63

students and faculty from entering the Jew exclusion zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

198.    Plaintiffs are informed and believe and thereon allege that Campus Terrorists touched certain Jewish Student Plaintiffs or caused them to be touched with the intent to harm or offend them.

199.    USC knew that this would happen by virtue of its conduct, inaction and appeasement policy, and allowed it to happen by its inaction and stonewalling.

200.    Plaintiffs did not consent to the touching.

201.    Plaintiffs were harmed or offended by USC's conduct.

202.    A reasonable person in Plaintiffs' position would have been offended by the touching.

### Count IX

### DECLARATORY RELIEF

203.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 196 through 202 as though fully set forth at length herein.

203.    An actual controversy has arisen and now exists with respect to the dispute herein in that plaintiffs contend that USC has violated the First and Fourteenth amendments to the United states Constitution, the Ralph Civil Rights Act of 1976, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, and federal civil rights laws including 42 USC sections 1981 and 2000d - whereas USC disputes these contentions.

204.    Plaintiffs request and require this court to declare an adjudicate that the constitutional violations occurred and to issue a preliminary and permanent injunction prohibiting USC's unequal treatment of plainness in violation of Plaintiffs constitutional and statutory rights.

Exhibit A – Page 64

**Count X**

**42 USC SECTION 2000d et. seq.**

**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**AGAINST USC AND DOES 1 THROUGH 5**

205.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 203 through 204.

206.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

207.    USC receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.  Irrespective of whether USC is a private university, it received substantial federal grants and funding and was subject to the provisions of Title 6 of the Civil Rights Act of 1964, including its ban on unconstitutional actions taken by educational institutions and universities serving the interests of the public and ban against antisemitism and discrimination against Jews in particular.

208.    The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

209.    Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

210.    A policy is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

211.    USC treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities. USC furthered no legitimate or compelling state interest by engaging in this conduct.

211a. Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. Cf. *Shaare Tefila*, 481 U.S. at

53

616 (discrimination against Jews is discrimination based on race); see also 34 C.F.R. § 100.3(b)(1)(iv), (vi).

212. USC also excluded Plaintiffs from participation in USC programs, denied Plaintiffs the full benefits of USC programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

213.     As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

213a.   Plaintiffs also suffered intentional religious and racial discrimination, including disparate and unequal treatment 1and impact, as a result of the actions and inaction of Defendants USC, JFP and JVP and the Campus Terrorists.

214.     Under the 14th Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

215.     The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

216.     Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. Cf. *Shaare Tefila*, 481 U.S. at 616 (discrimination against Jews is discrimination based on race); see also 34 C.F.R. § 100.3(b)(1)(iv), (vi).

217.     Defendant excluded Plaintiffs from participation in USC programs, denied Plaintiffs the full benefits of USC programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

218.     As a result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

54

219.    Plaintiffs also suffered intentional religious and racial discrimination, including disparate and unequal treatment and impact, as a result of the actions and inaction of USC and the actions of the Campus Terrorists - including Defendants JFP and JVP.

220.    Defendant USC has deprived Plaintiffs of equal protection of the laws, as secured by the 14th Amendment, through a policy and practice that treats plaintiffs differently than similarly situated individuals because plaintiffs are ethnically and religiously Jewish.

221.    Defendant has knowingly allowed private individuals to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, defendants affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers not to intervene.

222.    The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

223.    Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

224.    A law or policy "targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533. 363. Defendant targeted Plaintiffs' Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

225.    A policy is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

226.    USC treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities. Defendant furthered no legitimate or compelling state interest by engaging in this conduct.

227.    Defendant failed to tailor its actions narrowly to serve any such interest.

228.     As a direct and proximate result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal

participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

229.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post judgment interest.

230.    Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count XI**

**42 USC SECTION 1981**

**VIOLATION OF 42 USC SECTION 1981**

**AGAINST USC AND DOES 1 THROUGH 5**

231.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 205 through 230

232.    42 U.S.C. § 1981 guarantees that all persons within the jurisdiction of the United States have the same right to make and enforce contracts as enjoyed by white citizens. This includes the making, performance, modification, and termination of contracts, as well as the enjoyment of all benefits and privileges of the contractual relationship. The statute specifically focuses on ensuring equal rights to make and enforce contracts without regard to race.  The statute applies equally to Plaintiffs as a result of their Jewish ancestry and racial identity.

233.    USC violated the guarantee afforded to Plaintiffs under section 1981 by excluding Plaintiffs from accessing university benefits – as alleged hereinabove – under the guise of Plaintiffs' "protection," as further alleged in Plaintiffs' claim for breach of contract.

234    Plaintiffs have suffered harm as a result of USC's violation of 42 section 1981 and require injunctive relief to prevent USC's continuing breach of its contractual duties.

**Count XII**

**VIOLATION OF CALIFORNIA EDUCATION CODE 220**

**AGAINST USC AND DOES 1 THROUGH 5**

235.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 231 through 234.

236.    California Education Code section 220 prohibits discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid

237.    At all times herein mentioned, USC received benefits from California and financial assistance, and enrolls pupils at USC who receive state student financial aid.

238.    Beginning in or about the Spring of 2024 and continuing to the present time, USC discriminated against Jewish students and faculty for the reasons alleged herein above.

239.    Plaintiffs have suffered harm as a result of USC's violation of California Education Code section 220 and require injunctive relief to prevent USC's continuing discrimination.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.  Declare that USC has violated the First and Fourteenth amendments to the United States Constitution, the California Constitution, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, the Ralph Civil Rights Act, Title 6 of the Civil Rights Act of 1964, 42 USC sections 1981 and 2000d and California Education Code section 220;

2.  Issue preliminary and permanent injunctive relief prohibiting USC's unequal treatment of Plaintiffs in violation of Plaintiffs' constitutional and statutory rights, banning face

57

masks or other disguises intended to terrorize, intimidate, coerce, and threaten Jewish students and faculty, and enact other measures to prevent further coercion, intimidation and violence perpetrated by bad actors from erupting on USC's campus;

3. Award Plaintiffs compensatory, punitive, and nominal damages for the loss of their rights under California state law (and under federal law to conform to proof);

4. Award plaintiffs the cost of this action, including statutory attorney's fees; and

5. Awards such other and further relief as the court deems equitable and just.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable

DATED: July 7, 2025

LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation


By:/s/*Michael E. Reznick*
    Michael E. Reznick

By:/s/*E. Jay Gotfredson*

Attorneys for Plaintiffs DOE JEWISH USC
FACULTY MEMBER 2004 and DOE JEWISH
USC STUDENT 1987, individually and on behalf of
all others similarly situated

58

# EXHIBIT A



7:38

You
5/3/24, 10:27 AM

All media

0:08 ——————————————○ -0:00







Case 2:25-cv-06375     Document 1-1     Filed 07/11/25     Page 64 of 89     Page ID #:76
Case 2:24-cv-05712-FLA-SSC     Document 77-1     Filed 03/18/25     Page 7 of 32     Page
ID #:878

# EXHIBIT B

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 65 of 89   Page ID #:77
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 8 of 32   Page
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 1 of 16   Page ID #:1346

𝒟

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*, | Case No. 2:24-cv-04702-MCS-PD |
| Plaintiffs, | **ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 48)** |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*, | |
| Defendants. | |

1

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 66 of 89   Page ID #:78
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 9 of 32   Page
ID #:880
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 2 of 16   Page ID #:1347

1       In the year 2024, in the United States of America, in the State of California, in

2  the City of Los Angeles, Jewish students were excluded from portions of the UCLA

3  campus because they refused to denounce their faith. This fact is so unimaginable and

4  so abhorrent to our constitutional guarantee of religious freedom that it bears repeating,

5  *Jewish students were excluded from portions of the UCLA campus because they refused*

6  *to denounce their faith.* UCLA does not dispute this. Instead, UCLA claims that it has

7  no responsibility to protect the religious freedom of its Jewish students because the

8  exclusion was engineered by third-party protesters. But under constitutional principles,

9  UCLA may not allow services to some students when UCLA knows that other students

10  are excluded on religious grounds, regardless of who engineered the exclusion.

11       In response to the exclusion of Jewish students from portions of UCLA's campus,

12  Plaintiffs Yitzchok Frankel, Joshua Ghayoum, and Eden Shemuelian moved for a

13  preliminary injunction against Defendants Regents of the University of California,

14  Michael V. Drake, Gene D. Block, Darnell Hunt, Michael Beck, Monroe Gorden, Jr.,

15  and Rick Braziel (hereinafter, "UCLA"). (Mot., ECF No. 48-1.) UCLA opposed,

16  (Opp'n, ECF No. 62), and Plaintiffs filed a reply, (Reply, ECF No. 64). Amici Agudath

17  Israel of America, Union of Orthodox Jewish Congregations of America, and Faculty

18  for Justice in Palestine at UCLA filed amicus briefs. (First Amicus Br., ECF No. 76;

19  Second Amicus Br., ECF No. 88.) The Court heard oral argument on July 29, 2024.

20  (Mins., ECF No. 77.) At the hearing, the Court ordered the parties to meet and confer

21  on the terms of a proposed preliminary injunction that would protect Plaintiffs' rights

22  while allowing UCLA the flexibility needed to administer the UCLA campus. (*Id.*)

23  Plaintiffs and UCLA filed separate responses to the order, but were unable to make

24  meaningful ground on a compromise position. (*See* Pls.' Resp., ECF No. 82; Defs.'

25  Resp., ECF No. 83.) The Court deems this matter appropriate for decision without

26  further oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

27  ///

28

2

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 67 of 89   Page ID #:79
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 10 of 32   Page
ID #:881
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 3 of 16   Page ID #:1348

## I.    BACKGROUND[1]

At the outset, the Court notes that this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counterprotest movements responding thereto.[2] This case is narrowly focused on the materially undisputed factual allegations presented to the Court in the complaint and motion papers.[3]

On April 25, 2024, a group of pro-Palestinian protesters occupied a portion of the UCLA campus known as Royce Quad and established an encampment. (Beck Decl. ¶ 5,

---

[1] Evidence in support of and in opposition to this motion includes the sworn declarations of Plaintiffs Frankel, Ghayoum, and Rassbach; Defendants Beck, Braziel, and Gorden; Plaintiffs' counsel Eric Rassbach; defense counsel Matthew Cowan; and third party Kamran Shamsa, as well as exhibits including various news articles, social media posts, emails, and documents. At later stages of this case, some of this evidence may be inadmissible for many reasons, including as hearsay. "A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1984)); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). The Court exercises its discretion to consider evidence that might otherwise be inadmissible in connection with the motion because Defendants do not place the key facts upon which this Order relies in material dispute.

[2] Nor is this case about the content or viewpoints contained in any protest or counterprotest slogans or other expressive conduct, which are generally protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[3] Amicus Faculty for Justice in Palestine at UCLA asserts several allegations in its brief that, if true, could support claims for violations of the constitutional or civil rights of pro-Palestinian activists. (Second Amicus Br. 7–12.) Those possible claims would be better addressed in a separately filed action.

3

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 68 of 89   Page ID #:80
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 11 of 32   Page
ID #:882
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 4 of 16   Page ID #:1349

1   ECF No. 62-3; Shemuelian Decl. Ex. 15, ECF No. 48-23.) Royce Quad is a major
2   thoroughfare and gathering place and borders several campus buildings, including
3   Powell Library and Royce Hall. (Shemuelian Decl. ¶¶ 49–52, ECF No. 48-8; Ghayoum
4   Decl. ¶¶ 16–18, ECF No. 48-4.) The encampment was rimmed with plywood and metal
5   barriers. (Frankel Decl. ¶¶ 29, 34, ECF No. 48-2; Ghayoum Decl. ¶ 37.) Protesters
6   established checkpoints and required passersby to wear a specific wristband to cross
7   them. (*See* Ghayoum Decl. ¶¶ 39–41.) News reporting indicates that the encampment's
8   entrances were guarded by protesters, and people who supported the existence of the
9   state of Israel were kept out of the encampment. (Rassbach Decl. Ex. 22, ECF No. 48-
10  59.)[4] Protesters associated with the encampment "directly interfered with instruction by
11  blocking students' pathways to classrooms." (Shemuelian Decl. Ex. 19, ECF No. 48-
12  27.)

13      Plaintiffs are three Jewish students who assert they have a religious obligation to
14  support the Jewish state of Israel. (Frankel Decl. ¶¶ 11–13; Ghayoum Decl. ¶ 11;
15  Shemuelian Decl. ¶¶ 11, 128.) Prior to the protests, Plaintiff Frankel often made use of
16  Royce Quad. (Frankel Decl. ¶¶ 23–25.) After protesters erected the encampment,
17  Plaintiff Frankel stopped using the Royce Quad because he believed that he could not
18  traverse the encampment without disavowing Israel. (*Id.* ¶¶ 26, 38, 41.) He also saw
19  protesters attempt to erect an encampment at the UCLA School of Law's Shapiro
20  courtyard on June 10, 2024. (*Id.* ¶ 45.) Similarly, Plaintiff Ghayoum was unable to
21  access Powell Library because he understood that traversing the encampment, which
22

23  [4] In its brief, Amicus Faculty for Justice in Palestine at UCLA disputes the facts
24  presented in the complaint and motion papers and asserts, inter alia, that no one "was
    denied entrance to the Palestinian solidarity encampment based on their identity."
25  (Second Amicus Br. 5.) This conclusory assertion is in tension with Plaintiffs' record
26  evidence, which UCLA declined to refute. Further, Amicus' assertion that no one was
    excluded from the encampment based on identity does not grapple with an important
27  nuance—that Plaintiffs here assert that supporting the Jewish state of Israel is their
28  sincerely held religious belief.

4

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 69 of 89   Page ID #:81
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 12 of 32   Page
ID #:883
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 5 of 16   Page ID #:1350

1   blocked entrance to the library, carried a risk of violence. (Ghayoum Decl. ¶¶ 34–38.)
2   He also canceled plans to meet a friend at Ackerman Union after four protesters stopped
3   him while he walked toward Janss Steps and repeatedly asked him if he had a wristband.
4   (*Id.* ¶¶ 39–45.) Plaintiff Ghayoum also could not study at Powell Library because
5   protesters from the encampment blocked his access to the library. (*Id.* ¶ 48.) And
6   Plaintiff Shemuelian also decided not to traverse Royce Quad because of her knowledge
7   that she would have to disavow her religious beliefs to do so. (Shemuelian Decl. ¶¶ 111,
8   118–20, 128.) The encampment led UCLA to effectively make certain of its programs,
9   activities, and campus areas available to other students when UCLA knew that some
10   Jewish students, including Plaintiffs, were excluded based of their genuinely held
11   religious beliefs.

12       The encampment persisted for a week, until the early morning of May 2, when
13   UCLA directed the UCLA Police Department and outside law enforcement agencies to
14   enter and clear the encampment. (Shemuelian Decl. Ex. 19.)

15       Since UCLA dismantled the encampment, protesters have continued to attempt
16   to disrupt campus. For example, on May 6, protesters briefly occupied areas of the
17   campus. (Braziel Decl. ¶ 28, ECF No. 62-5.) And on May 23, protesters established a
18   new encampment, "erecting barricades, establishing fortifications and blocking access
19   to parts of the campus and buildings," and "disrupting campus operations." (Shemuelian
20   Decl. Ex. 25, ECF No. 48-33; Rassbach Decl. Ex. 20, ECF No. 48-57; *see* Braziel Decl.
21   ¶ 29.)

22       Most recently, on June 10, protesters "set up an unauthorized and unlawful
23   encampment with tents, canopies, wooden shields, and water-filled barriers" on
24   campus. (Rassbach Decl. Ex. 21, ECF No. 48-58 (emphasis removed); *see* Braziel Decl.
25   ¶ 30.) These protesters "restricted access to the general public" and "disrupted nearby
26   final exams." (Rassbach Decl. Ex. 21. (emphasis removed).) Some students "miss[ed]
27   finals because they were blocked from entering classrooms," and others were
28   "evacuated in the middle" of finals. (Shemuelian Decl. Ex. 27, ECF No. 48-35.)

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 70 of 89   Page ID #:82
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 13 of 32   Page
ID #:884
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 6 of 16   Page ID #:1351

1       Based on these facts and other allegations, Plaintiffs assert claims for violations
2  of their federal constitutional rights, including violation of the Equal Protection Clause,
3  the Free Speech Clause, and the Free Exercise Clause; claims for violations of their
4  federal civil rights, including violations of Title VI of the Civil Rights Act of 1964,
5  conspiracy to interfere with civil rights, and failure to prevent conspiracy; claims for
6  violations of their state constitutional rights, including violation of the California Equal
7  Protection Clause and the California Free Exercise Clause; and claims for violations of
8  their state civil rights, including violations of section 220 of the California Education
9  Code, the Ralph Civil Rights Act of 1976, and the Bane Civil Rights Act. (Compl.
10  ¶¶ 320–430, ECF No. 1.)

11

12  **II.   STANDING**

13       UCLA raises a challenge to Plaintiffs' constitutional standing to sue. (Opp'n 8–
14  12.) Since the challenge pertains to the Court's jurisdiction, the Court addresses it first.
15  *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012)
16  ("A district court may not grant a preliminary injunction if it lacks subject matter
17  jurisdiction over the claim before it."), *aff'd*, 709 F.3d 1281 (9th Cir. 2013).

18

19     **A.   Legal Standard**

20       At the preliminary injunction stage, a plaintiff "'must make a clear showing of
21  each element of standing,' proving (1) an injury in fact that is 'concrete and
22  particularized' and 'actual or imminent'; (2) 'a causal connection between the injury
23  and the conduct complained of'; and that (3) 'the injury will likely be redressed by a
24  favorable decision.'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting
25  *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)). To have standing "for
26  injunctive relief . . . the threat of injury must be 'actual and imminent, not conjectural
27  or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018)
28  (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). In determining

Case 2:25-cv-06375    Document 1-1    Filed 07/11/25    Page 71 of 89    Page ID #:83
Case 2:24-cv-05712-FLA-SSC    Document 77-1    Filed 03/18/25    Page 14 of 32    Page
ID #:885
Case 2:24-cv-04702-MCS-PD    Document 89    Filed 08/13/24    Page 7 of 16    Page ID #:1352

1   standing to pursue injunctive relief, courts "presume the truth of [plaintiffs']
2   allegations" and "construe all of the allegations in [plaintiffs'] favor." *Id.* at 971.

3        UCLA's challenge to Plaintiffs' standing focuses on the first two elements. The
4   Court considers each in turn.

5

6        **B.    Imminent Likelihood of Future Injury**

7        UCLA argues that Plaintiffs lack standing because they fail to allege an imminent
8   likelihood of future injury. (Opp'n 8–11.) But, "[i]t is well settled that evidence of past
9   instances of enforcement is important in a standing inquiry." *LSO, Ltd. v. Stroh*, 205
10  F.3d 1146, 1155 (9th Cir. 2000) (citing *San Diego Gun Rights Comm. v. Reno*, 98 F.3d
11  1121, 1128 (9th Cir. 1996)); *accord American-Arab Anti-Discrimination Comm. v.*
12  *Thornburgh*, 970 F.2d 501, 507 (9th Cir. 1991)). While, "[p]ast wrongs are 'insufficient
13  by themselves to grant standing,' [they] are 'evidence bearing on whether there is a real
14  and immediate threat of repeated injury.'" *Wright v. Serv. Emps. Int'l Union Loc. 503*,
15  48 F.4th 1112, 1118 (9th Cir. 2022) (quoting *Davidson*, 889 F.3d at 967). "When a
16  plaintiff's standing is grounded entirely on the threat of repeated injury, a plaintiff must
17  show 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at
18  1119 (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111
19  (1983)). "Past exposure to illegal conduct does not in itself show a present case or
20  controversy regarding injunctive relief . . . if unaccompanied by any continuing, present
21  adverse effects." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th
22  Cir. 2020) (ellipsis in original) (quoting *Lyons*, 461 U.S. at 102). "Courts have also
23  considered the Government's failure to disavow" unconstitutional acts "as a factor in
24  favor of a finding of standing." *LSO, Ltd.*, 205 F.3d at 1155 (citing *Babbitt v. United*
25  *Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), *Bland v. Fessler*, 88 F.3d 729,
26  737 (9th Cir. 1996), and *American-Arab*, 970 F.2d at 508). When government action
27  "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of
28  standing." *Id.*

7

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 72 of 89   Page ID #:84
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 15 of 32   Page
Case 2:24-cv-04702-MCS-PD   Document 89 #:886   08/13/24   Page 8 of 16   Page ID #:1353

1       UCLA contends that its remedial actions following the Royce Quad encampment

2 make any "future injury speculative at best." (Opp'n 8–9.) These actions include the

3 creation of a new Office of Campus Safety and the transfer of day-to-day responsibility

4 for campus safety to an Emergency Operations Center. (Braziel Decl. ¶¶ 12–16, 21,

5 ECF No. 62-5.) The changes, while commendable, do not minimize the risk that

6 Plaintiffs "will again be wronged" by their exclusion from UCLA's ordinarily available

7 programs, activities, and campus areas based on their sincerely held religious beliefs

8 below "a sufficient likelihood." *Wright*, 48 F.4th at 1119 (internal quotation marks

9 omitted). First, since UCLA's changes, protesters have violated UCLA's protest rules

10 at least three times: on May 6, May 23, and June 10. (Braziel Decl. ¶¶ 28–30.) While

11 these events may not have been as disruptive as the Royce Quad encampment,

12 according to a UCLA email, the June 10 events "disrupted final exams," temporarily

13 blocked off multiple areas of campus, and persisted from 3:15 p.m. to the evening.

14 (Shemuelian Decl. ¶ 151 & Ex. 27.) Similarly, also according to UCLA emails, the May

15 6 and 23 events disrupted access to several campus areas. (*Id.* ¶¶ 145, 148 & Exs. 25–

16 26, ECF No. 48-33 to 34.) Further, any relative quiet on UCLA's campus the past few

17 months, (Braziel Decl. ¶ 26), is belied by the facts that fewer people are on a university

18 campus during the summer and that the armed conflict in Gaza continues, Fed R. Evid.

19 201(b)(1). Finally, while UCLA's focus on safety is compelling, UCLA has failed to

20 assuage the Plaintiffs' concerns that some Jewish students may be excluded from

21 UCLA's ordinarily available programs, activities, and campus areas based on their

22 sincerely held religious beliefs should exclusionary encampments return. In response to

23 these concerns raised at the hearing, UCLA did "not state[] affirmatively that" they

24 "will not" provide ordinarily available programs, activities, and campus areas to non-

25 Jewish students if protesters return and exclude Jewish students. *Bland*, 88 F.3d at 737.

26       It remains to be seen how effective UCLA's policy changes will be with a full

27 campus. While the May and June protests do not appear to have resulted in the same

28 religious-belief-based exclusion as the prior encampment that gives rise to the

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 73 of 89   Page ID #:85
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 16 of 32   Page
ID #:887
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 9 of 16   Page ID #:1354

1    Plaintiffs' free exercise concerns, the Court perceives an imminent risk that such

2    exclusion will return in the fall with students, staff, faculty, and non-UCLA community

3    members. As such, given that when government action "implicates First Amendment

4    rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d

5    at 1155, the Court finds that Plaintiffs have sufficiently shown an imminent likelihood

6    of future injury for standing purposes.

7

8    **C.   Causation**

9        UCLA also argues that Plaintiffs lack standing because "they have not pleaded

10   facts demonstrating that *UCLA* would be the *cause* of any future injury that they might

11   suffer, such that an injunction directed *at UCLA* would redress those alleged injuries."

12   (Opp'n 11–12.) "To show causation, the plaintiff must demonstrate a 'causal connection

13   between the injury and the conduct complained of—the injury has to be fairly traceable

14   to the challenged action of the defendant, and not the result of the independent action

15   of some third party not before the court." *Salmon Spawning & Recovery All. v.

16   Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*,

17   504 U.S. 555, 560–61 (1992)).

18       UCLA, however, misconstrues the Plaintiffs' injuries. The injuries are not simply

19   the exclusion of Plaintiffs from certain of UCLA's ordinarily available programs,

20   activities, and campus areas. The injuries result when Plaintiffs are excluded from

21   certain of UCLA's ordinarily available programs, activities, and campus areas *and*

22   UCLA *still provides* those programs, activities, and campus areas to other students

23   knowing that Plaintiffs and students like them are excluded based on their religious

24   exercise. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458

25   (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal

26   treatment' and subjects to the strictest scrutiny laws that target the religious for 'special

27   disabilities' based on their 'religious status.'" (alteration in original) (quoting *Church

28   of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)); *Carson*

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 74 of 89   Page ID #:86
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 17 of 32   Page
ID #:888
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 10 of 16   Page ID #:1355

1    *v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a State violates
2    the Free Exercise Clause when it excludes religious observers from otherwise available
3    public benefits."). The complaint is replete with allegations that Plaintiffs and other
4    students were denied access to ordinarily available programs, activities, and campus
5    areas based on their sincerely held religious beliefs. (*See, e.g.*, Compl. ¶¶ 16, 113, 115,
6    118, 121–22, 124, 134, 203, 249, 255, 278, 287, 348.) Taking these allegations as true,
7    as the Court must at this stage, and given that when government action "implicates First
8    Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO,*
9    *Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown causation
10   for standing purposes.

11         The Court rejects UCLA's standing challenge and proceeds to the merits of
12   Plaintiffs' motion.

13

14   **III.   PRELIMINARY INJUNCTION**

15         **A.   Legal Standard**

16         "A preliminary injunction is an extraordinary remedy never awarded as of right."
17   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a
18   preliminary injunction must establish that he is likely to succeed on the merits, that he
19   is likely to suffer irreparable harm in the absence of preliminary relief, that the balance
20   of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555
21   U.S. at 20. The Ninth Circuit also employs a "version of the sliding scale approach"
22   where "a stronger showing of one element may offset a weaker showing of another."
23   *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this
24   approach, an injunction may issue if the plaintiff shows that serious questions go to the
25   merits, the balance of hardships tips sharply toward the plaintiff, the plaintiff is likely
26   to suffer irreparable injury, and an injunction is in the public interest. *Fraihat v. U.S.*
27   *Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). A "serious question" is
28   one on which the movant "has a fair chance of success on the merits." *Sierra On-Line,*

10

Case 2:25-cv-06375  Document 1-1  Filed 07/11/25  Page 75 of 89  Page ID #:87
Case 2:24-cv-05712-FLA-SSC  Document 77-1  Filed 03/18/25  Page 18 of 32  Page
Case 2:24-cv-04702-MCS-PD  Document 89  Filed 08/13/24  Page 11 of 16  Page ID #:1356

1   *Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). "When, like here,

2   the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*,

3   81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

4

5   **B.   *Winter* Factors**

6   1.   Likelihood of Success on the Merits

7   Plaintiffs assert that they are likely to succeed on the merits of their federal equal

8   protection, free speech, free exercise, and Title VI claims. (Mot. 15–24.) Because

9   analysis of Plaintiffs' free exercise claim resolves this motion, the Court addresses only

10  that claim in the interest of judicial economy.

11  The Free Exercise Clause provides that "Congress shall make no

12  law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see also*

13  *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free

14  Exercise Clause extends to the states under the Fourteenth Amendment). The clause

15  "'protect[s] religious observers against unequal treatment' and subjects to the strictest

16  scrutiny laws that target the religious for 'special disabilities' based on their 'religious

17  status.'" *Trinity Lutheran*, 582 U.S. at 458 (alteration in original) (quoting *City of

18  Hialeah*, 508 U.S. at 533, 542). "[A] State violates the Free Exercise Clause when it

19  excludes religious observers from otherwise available public benefits." *Carson*, 596

20  U.S. at 778. "[A] law targeting religious beliefs as such is never permissible." *Trinity

21  Lutheran*, 582 U.S.at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533). In other free exercise

22  cases, challenged laws "must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S.

23  at 780 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 478 (2020)). "To

24  satisfy strict scrutiny, government action must advance interests of the highest order

25  and must be narrowly tailored in pursuit of those interests." *Id.* (internal quotation marks

26  omitted).

27  Here, UCLA made available certain of its programs, activities, and campus areas

28  when certain students, including Plaintiffs, were excluded because of their genuinely

11

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 76 of 89   Page ID #:88

Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 19 of 32   Page
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 12 of 16   Page ID #:1357
ID #:890

1   held religious beliefs. For example, Plaintiff Frankel could not walk through Royce

2   Quad because entering the encampment required disavowing the state of Israel. (Frankel

3   Decl. ¶¶ 11, 26, 38; *see* Rassbach Decl. Ex. 22.) Similarly, Plaintiff Ghayoum was

4   prevented from entering a campus area at a protester checkpoint, (Ghayoum Decl. ¶¶ 11,

5   39–45), and Plaintiff Shemuelian could not traverse Royce Quad, unlike other students,

6   (Shemuelian Decl. ¶ 111, 118–120, 128).

7          In other contexts, the Supreme Court has invalidated state acts that had the effect

8   of excluding individuals from public benefits based on their religious status. *See*

9   *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (holding a state cannot withhold

10  unemployment benefits from Seventh-day Adventist who refused to work on the

11  Sabbath); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709, 720 (1981)

12  (similar holding as to Jehovah's Witness who refused to participate in the production of

13  weapons). As such, Plaintiffs' exclusion from campus resources while other students

14  retained access raises serious questions going to the merits of their free exercise claim.

15  *See All. for Wild Rockies*, 632 F.3d at 1131.

16         UCLA argues that their acts focused on deescalating and preventing violence

17  satisfy strict scrutiny. (Opp'n 15–18.) This might be true, but the acts related to

18  deescalating and preventing violence are not the acts which led to the likely Free

19  Exercise Clause violation. As such, UCLA's strict scrutiny argument is not relevant to

20  the free exercise issue.

21

22                         2.    Likelihood of Irreparable Injury

23         "It is axiomatic that the loss of First Amendment freedoms, for even minimal

24  periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian*

25  *Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023)

26  (en banc) (cleaned up). "Irreparable harm is relatively easy to establish in a First

27  Amendment case" because the plaintiff "need only demonstrate the existence of a

28  colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch.*

                                           12

Case 2:25-cv-06375    Document 1-1    Filed 07/11/25    Page 77 of 89    Page ID #:89
Case 2:24-cv-05712-FLA-SSC    Document 77-1    Filed 03/18/25    Page 20 of 32    Page
Case 2:24-cv-04702-MCS-PD    Document 89    Filed 08/13/24    Page 13 of 16    Page ID #:1358

1    *on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (internal quotation marks omitted). For all
2    the reasons stated above, Plaintiffs have put forward a colorable claim that UCLA's acts
3    violated their Free Exercise Clause rights. Further, given the risk that protests will return
4    in the fall that will again restrict certain Jewish students' access to ordinarily available
5    programs, activities, and campus areas, the Court finds that Plaintiffs are likely to suffer
6    an irreparable injury absent a preliminary injunction.

### 3. Balancing the Equities and Public Interest

9    "Where the government is a party to a case in which a preliminary injunction is
10   sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*,
11   977 F.3d 935, 940–41 (9th Cir. 2020). As discussed above, Plaintiffs have demonstrated
12   serious questions as to the merits. "[I]t is always in the public interest to prevent the
13   violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695
14   F.3d 990, 1002 (9th Cir. 2012) (cleaned up). And the state "cannot reasonably assert
15   that it is harmed in any legally cognizable sense by being enjoined from constitutional
16   violations." *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir.
17   1983). As such, the Court finds that the balance of the equities tips sharply toward
18   Plaintiffs, and the public interest favors the issuance of an injunction.

### 4. Summary

21   For the reasons stated above, the Court finds that all the *Winter* factors favor
22   granting a preliminary injunction. Because the Court analyzes only the facts pertinent
23   to the federal free exercise claim, the Court issues a preliminary injunction addressing
24   only those risks. The Court's injunction is thus narrower than Plaintiffs' proposed
25   preliminary injunction.[5]

---

27   [5] The Court does not issue the injunction against Defendant Regents of The University
28   of California. "The Eleventh Amendment bars suits which seek either damages or

13

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 78 of 89   Page ID #:90
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 21 of 32   Page
ID #:892
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 14 of 16   Page ID #:1359

1        Under the Court's injunction, UCLA retains flexibility to administer the

2  university. Specifically, the injunction does not mandate any specific policies and

3  procedures UCLA must put in place, nor does it dictate any specific acts UCLA must

4  take in response to campus protests. Rather, the injunction requires only that, if any part

5  of UCLA's ordinarily available programs, activities, and campus areas become

6  unavailable to certain Jewish students, UCLA must stop providing those ordinarily

7  available programs, activities, and campus areas to any students. How best to make any

8  unavailable programs, activities, and campus areas available again is left to UCLA's

9  discretion.

10

11     **C.   Security**

12        "The court may issue a preliminary injunction . . . only if the movant gives

13  security in an amount that the court considers proper to pay the costs and damages

14  sustained by any party found to have been wrongfully enjoined or restrained." Fed. R.

15  Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of

16  security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)

17  (internal quotation marks omitted).

18       UCLA does not request a bond. (Defs.' Resp. 9.) Courts have issued preliminary

19  injunctions "without requiring security based on" likelihood of success of prevailing on

20  a First Amendment claim. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 966 (N.D.

21  ————————————————————

22  injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its

23  agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995) (citation omitted).
     "The Regents, a corporation created by the California constitution, is an arm of the state

24  for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning

25  of section 1983." *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir. 1992). That
     said, the injunction may issue as against the other defendants; immunity under the

26  Eleventh Amendment is not absolute, and under the *Ex parte Young* doctrine, immunity

27  does not apply when plaintiffs sue state officials in their official capacities for
     prospective injunctive relief. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73

28  (1996).

14

Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 79 of 89   Page ID #:91
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 22 of 32   Page
Case 2:24-cv-04702-MCS-PD   Document 89   Filed 08/13/24   Page 15 of 16   Page ID #:1360

1   Cal. 2023); *see also Weaver v. City of Montebello*, 370 F. Supp. 3d 1130, 1139 (C.D.
2   Cal. 2019). As such, the Court does not require security.

3

4       **D.   Stay**

5       UCLA requests a stay of any preliminary injunction pending appeal. (Defs.'
6   Resp. 8–9.) The request is denied for failure to comply with rules governing motion and
7   ex parte practice. *E.g.*, C.D. Cal. Rs. 6-1, 7-3, 7-4, 7-19; *Smith v. Premiere Valet Servs.,*
8   *Inc.*, No. 2:19-cv-09888-CJC-MAA, 2020 U.S. Dist. LEXIS 228465, at *42 (C.D. Cal.
9   Aug. 4, 2020) (collecting cases for the proposition that "a request for affirmative relief
10  is not proper when raised for the first time in an opposition"). Denial is without
11  prejudice to reraising the request in a properly noticed motion or ex parte application
12  after an appeal is taken, if any.

13

14  **IV.   CONCLUSION**

15      "If a movant makes a sufficient demonstration on all four *Winter* factors (three
16  when as here the third and fourth factors are merged), a court must not shrink from its
17  obligation to enforce [movant's] constitutional rights, regardless of the constitutional
18  right as issue." *Baird*, 81 F.4th at 1041 (cleaned up). Thus, the Court orders:

19      1.   Defendants Drake, Block, Hunt, Beck, Gordon, and Braziel
20  ("Defendants") are prohibited from offering any ordinarily available programs,
21  activities, or campus areas to students if Defendants know the ordinarily available
22  programs, activities, or campus areas are not fully and equally accessible to Jewish
23  students.

24      2.   Defendants are prohibited from knowingly allowing or facilitating the
25  exclusion of Jewish students from ordinarily available portions of UCLA's programs,
26  activities, and campus areas, whether as a result of a de-escalation strategy or otherwise.

27      3.   On or before August 15, 2024, Defendants shall instruct Student Affairs
28  Mitigator/Monitor ("SAM") and any and all campus security teams (including without

15

Case 2:25-cv-06375 Document 1-1 Filed 07/11/25 Page 80 of 89 Page ID #:92
Case 2:24-cv-05712-FLA-SSC Document 77-1 Filed 03/18/25 Page 23 of 32 Page
ID #:894
Case 2:24-cv-04702-MCS-PD Document 89 Filed 08/13/24 Page 16 of 16 Page ID #:1361

1   limitation UCPD and UCLA Security) that they are not to aid or participate in any

2   obstruction of access for Jewish students to ordinarily available programs, activities,

3   and campus areas.

4         4.     For purposes of this order, all references to the exclusion of Jewish

5   students shall include exclusion of Jewish students based on religious beliefs

6   concerning the Jewish state of Israel.

7         5.     Nothing in this order prevents Defendants from excluding Jewish students

8   from ordinarily available programs, activities, and campus areas pursuant to UCLA

9   code of conduct standards applicable to all UCLA students.

10        5.     Absent a stay of this injunction by the United States Court of Appeals for

11   the Ninth Circuit, this preliminary injunction shall take effect on August 15, 2024, and

12   remain in effect pending trial in this action or further order of this Court or the United

13   States Court of Appeals for the Ninth Circuit.

14

15   **IT IS SO ORDERED.**

16

17   Dated: August 13, 2024

*Mark C. Scarsi*

18                     MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

16

# EXHIBIT C

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



**EXECUTIVE ORDERS**

# Executive Order on Combating Anti-Semitism

—— **LAW & JUSTICE**    Issued on: **December 11, 2019**



By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Policy. My Administration is committed to combating the rise of anti-Semitism and anti-Semitic incidents in the United States and around the world. Anti-Semitic incidents have increased since 2013, and students, in particular, continue to face anti Semitic harassment in schools and on university and college campuses.

Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d et seq., prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving Federal financial assistance. While Title VI does not cover discrimination based on religion, individuals who face discrimination on the basis of race, color, or national origin do not lose protection under Title VI for also being a member of a group that shares common religious practices. Discrimination against Jews may give rise to a Title VI violation when the discrimination is based on an individual's race, color, or national origin.

It shall be the policy of the executive branch to enforce Title VI against prohibited forms
of discrimination rooted in anti-Semitism as vigorously as against all other forms of
discrimination prohibited by Title VI.

Sec. 2. Ensuring Robust Enforcement of Title VI. (a) In enforcing Title VI, and identifying
evidence of discrimination based on race, color, or national origin, all executive
departments and agencies (agencies) charged with enforcing Title VI shall consider the
following:

(i) the non-legally binding working definition of anti Semitism adopted on May 26, 2016,
by the International Holocaust Remembrance Alliance (IHRA), which states,
"Antisemitism is a certain perception of Jews, which may be expressed as hatred toward
Jews. Rhetorical and physical manifestations of antisemitism are directed toward
Jewish or non-Jewish individuals and/or their property, toward Jewish community
institutions and religious facilities"; and

(ii) the "Contemporary Examples of Anti-Semitism" identified by the IHRA, to the extent
that any examples might be useful as evidence of discriminatory intent.

(b) In considering the materials described in subsections (a)(i) and (a)(ii) of this section,
agencies shall not diminish or infringe upon any right protected under Federal law or
under the First Amendment. As with all other Title VI complaints, the inquiry into
whether a particular act constitutes discrimination prohibited by Title VI will require a
detailed analysis of the allegations.

Sec. 3. Additional Authorities Prohibiting Anti-Semitic Discrimination. Within 120 days
of the date of this order, the head of each agency charged with enforcing Title VI shall
submit a report to the President, through the Assistant to the President for Domestic
Policy, identifying additional nondiscrimination authorities within its enforcement
authority with respect to which the IHRA definition of anti-Semitism could be
considered.

Case 2:25-cv-06375    Document 1-1    Filed 07/11/25    Page 84 of 89    Page ID #:96
Case 2:24-cv-05712-FLA-SSC    Document 77-1    Filed 03/18/25    Page 27 of 32    Page
ID #:898

<u>Sec</u>. 4. <u>Rule of Construction</u>. Nothing in this order shall be construed to alter the evidentiary requirements pursuant to which an agency makes a determination that conduct, including harassment, amounts to actionable discrimination, or to diminish or infringe upon the rights protected under any other provision of law.

<u>Sec</u>. 5. <u>General Provisions</u>. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
December 11, 2019.

The White House

President Donald J. Trump                    News
Vice President Mike Pence                    Remarks

Exhibit A – Page 95

# EXHIBIT D



Case 2:25-cv-06375   Document 1-1   Filed 07/11/25   Page 87 of 89   Page ID #:99
Case 2:24-cv-05712-FLA-SSC   Document 77-1   Filed 03/18/25   Page 30 of 32   Page
ID #:901




Case 2:25-cv-06375    Document 1-1    Filed 07/11/25    Page 88 of 89   Page ID #:100
Case 2:24-cv-05712-FLA-SSC    Document 77-1    Filed 03/18/25    Page 31 of 32   Page
ID #:902

# EXHIBIT E

## USC photos

From:  Lisa Deborah Schneider (lansell@usc.edu)

To:  reznagoura@aol.com

Date:  Sunday, March 16, 2025 at 12:18 PM PDT

