## APPENDIX A

### Comparison of Plaintiffs' Complaint to First Amended Complaint in
*Frankel v. Regents of Univ. of California*, No. 24-cv-04702 (C.D. Cal.)

| Cite | Plaintiffs' 7/9/2025 Complaint | Cite | *Frankel* at Dkt. 101 |
|---|---|---|---|
| ¶ 48 | The Campus Terrorists chanted anti-Semitic threats like "death to the Jews," "free Palestine from the hand of Jews," "from the river to the sea, Palestine will be free," proudly trumpeting their hatred of the Jewish people. But their actions went well beyond such chants or even the pretense of "free speech" or "peaceful protests." | ¶ 5 | The activists chanted antisemitic threats like "death to the Jews," "free Palestine from the hand of Jews," and "from the River to the Sea, Palestine will be free," proudly trumpeting their hatred of the Jewish people. But their actions went well beyond such chants. |
| ¶ 49 | With the knowledge and acquiescence of USC officials, the campus terrorists enforced what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them from accessing the part of campus including classroom buildings and the main undergraduate library. (The "Jew Exclusion Zone" is sometimes alternately referred to herein as the "Encampment"). In many cases, the Campus Terrorists set up barriers and locked arms together preventing those who refused to disavow Israel from passing through. | ¶ 6 | With the knowledge and acquiescence of UCLA officials, the activists enforced what was effectively a "Jew Exclusion Zone," segregating Jewish students and faculty and preventing them from accessing the heart of campus, including classroom buildings and the main undergraduate library. In many cases, the activists set up barriers and locked arms together, preventing those who refused to disavow Israel from passing through. |
| ¶ 50 | To enter the Jew Exclusion Zone, a person had to make a statement pledging their allegiance to the Campus Terrorists' views. While this may have prevented a pro-Israel Christian from entering the zone and permitted access for a Jewish person willing to comply with the enforcers' demands, given the centrality of Jerusalem to the Jewish faith (see allegations below), the practical effect was to deny the overwhelming majority of Jews access to the heart of the campus. | ¶ 7 | To enter the Jew Exclusion Zone, a person had to make a statement pledging their allegiance to the activists' views and have someone within the encampment "vouch" for the individual's fidelity to the activists' cause. While this may have prevented a pro-Israel Christian from entering the Zone and permitted access for a Jewish person willing to comply with the enforcers' demands, given the centrality of Jerusalem to the Jewish faith, the practical effect was to deny the overwhelming majority of Jews access to the heart of the campus. |

| | | | |
|---|---|---|---|
| ¶ 52 | USC's administration knew about the Campus Terrorists' extreme actions, including the exclusion of Jews. But in a remarkable display of cowardice, appeasement, encouragement and illegality, the administration did nothing to stop it. USC Chancellor and President Carol Folt publicly acknowledged that students had been physically blocked from accessing parts of the campus but failed to call in LAPD until public outcry demanded it. | ¶¶ 9, 10 | UCLA's administration knew about the activists' extreme actions, including the exclusion of Jews. But, in a remarkable display of cowardice, appeasement, and illegality, the administration not only did nothing to stop it, but actively facilitated it.<br><br>UCLA Chancellor Gene Block publicly acknowledged that "students on their way to class have been physically blocked from accessing parts of the campus." |
| ¶ 53 | Yet even as the activists campus terrorists continued to enforce the Jew Exclusion Zone, USC not only failed to marshal resources to intervene - it adopted a policy of facilitating the Jew Exclusion Zone, ordering, among other things, USC campus police and security to stand down, step aside and appease the Campus Terrorists. | ¶ 11 | Yet even as the activists continued to enforce the Jew Exclusion Zone, Defendants failed to marshal resources to intervene and affirmatively adopted a policy facilitating the Jew Exclusion Zone. Under this policy, officials ordered, among other things, UCLA campus police to stand down and step aside. They even directed security to set up the barricades establishing the encampment. |
| ¶ 54 | Rather than instructing campus police and security to assist Jewish students in accessing campus resources, USC instead instructed them to discourage unapproved students from attempting to cross through the Encampment and other areas blocked by the Campus Terrorists. | ¶ 13 | But rather than instruct this additional staff to assist Jewish students and faculty in accessing campus resources, UCLA instead instructed them to discourage unapproved persons from attempting to cross through the areas blocked by the activists and not to intervene to help Jewish students and faculty, even in the wake of violence from the encampment activists. |
| ¶ 56 | All told, the Jew Exclusion Zone existed on campus for more than two weeks and what seemed to be an eternity to Jewish students and faculty used to enjoying the benefits of a campus free from terrorism against Jews. The Campus Terrorists , wreaking havoc on the lives of Jewish students who were and are simply trying to attend classes and study for exams and Jewish faculty who were trying to grade exams. | ¶ 16 | All told, the Jew Exclusion Zone existed on campus for a full week, wreaking havoc on the lives of Jewish faculty and students who were simply trying to teach, attend classes, and study for exams. |

| | | | |
|---|---|---|---|
| ¶ 58 | USC boasts of its open inclusive environment that nurtures the growth and development of all faculty, students, administration and staff and assures students that it does not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity, citizenship national origin, or religious beliefs. USC also has a number of policies that purport to implement these guarantees. But USC has failed to provide Jewish students, faculty, and staff with the protection promised by such policies. Needless to say, Jews should not fear for their safety when they walk around any public space, let alone the campus of a prominent American research university. | ¶¶ 19, 20 | UCLA boasts of its "open and inclusive environment that nurtures the growth and development of all faculty, students, administration and staff," 1 and assures students that it does "not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity," "citizenship," "national origin," or "religious beliefs." 2 UCLA has a number of policies that purport to implement these guarantees.<br><br>But UCLA has failed to provide Jewish students, faculty, and staff with the protection promised by such policies. Jews should not fear for their safety when they walk around any public space, let alone the campus of a prominent American research university. |
| ¶ 59 | Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered access to USC's educational opportunities and to protect the Jewish community is not only immoral - it is illegal. | ¶ 21 | Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered access to UCLA's educational opportunities and to protect the Jewish community is not only immoral—it is illegal. |
| ¶ 60 | Specifically, it violates numerous federal and state constitutional guarantees, including the equal protection clause, the free exercise clause and the freedom of speech. | ¶ 22 | Specifically, it violates numerous federal and state constitutional guarantees, including the Equal Protection Clause, the Free Exercise Clause, and the freedom of speech. |
| ¶ 61 | And it contravenes the basic guarantee of equal access to educational facilities that receive federal funding, as well as numerous other statutory guarantees of equality and fair treatment | ¶ 23 | And it contravenes the basic guarantee of equal access to educational facilities that receive federal funding, as well as numerous other statutory guarantees of equality and fair treatment. |
| ¶ 62 | Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew will again suffer from the discrimination and indignity they have endured. And because the administrators at USC took actions (or did nothing) which amounts to | ¶ 36 | Plaintiffs are entitled not only to permanent injunctive relief, but also damages against the Regents and the individual Defendants. Indeed, because the UCLA administration's actions amount to sanctioning segregation, their clearly |

| | | | |
|---|---|---|---|
| | sanctioning segregation, they are clearly unconstitutional actions entitling Plaintiffs to hold the school's administrators personally liable for their reprehensible failures. | | unconstitutional actions entitle Plaintiffs to hold the school's administrators personally liable for their reprehensible failures. |
| ¶ 63 | In 1790, George Washington wrote to the Hebrew congregation of Newport, Rhode Island (which sought assurances about the place of Jews within American Society): "May the children of the stock of Abraham, who dwell in this land, continue to merit and enjoy the goodwill of the other Inhabitants; While everyone shall sit in safety under his own vine and victory, and there shall be none to make him afraid" (Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), in Founders Online, National Archives, https://perma.cc/VUR8-G3BC). | ¶ 37 | In 1790, President George Washington wrote to the Hebrew Congregation of Newport, Rhode Island, which had sought assurances about the place of Jews within American society. He wrote, "May the Children of the stock of Abraham, who dwell in this land, continue to merit and enjoy the good will of the other Inhabitants; while every one shall sit in safety under his own vine and figtree, and there shall be none to make him afraid."[3]<br><br>[3]Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), in Founders Online, National Archives, https://perma.cc/VUR8-G3BC. |
| ¶¶ 4, 5 | The material facts in this are not in dispute and summarized as follows: In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students and faculty - including the individual Plaintiffs and putative classes - were excluded from portions of the USC campus by violent thugs ("Campus Terrorists") who took over the campus because Jewish students and faculty refused to denounce their faith. This fact is so unimaginable and so repugnant and abhorrent to our constitutional guarantee of religious freedom that it bears repeating: ***Jewish students and faculty were excluded from portions of the USC campus by Campus Terrorists because they refused to denounce their faith.***<br><br>USC does not dispute the facts alleged hereinabove but asserts that USC has | ¶ 24 | On August 13, 2024, the Court found that the student Plaintiffs were entitled to a preliminary injunction to ensure that UCLA would no longer discriminate against Jews in making campus facilities available. The Court wrote: "In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*. UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish |

4

| | | | |
|---|---|---|---|
| | no responsibility to protect the religious freedom of its Jewish students because the "Encampment" or "Jew Exclusion Zone" alleged in this Complaint was not created, maintained, orchestrated and engineered by USC, or the "Campus Terrorists," but rather third party "lawful protesters," including USC's Co-Defendants, "JEWISH VOICES FOR PEACE" ("JVP") and "STUDENTS for JUSTICE in PALESTINE" ("SJP"). | | students because the exclusion was engineered by third-party protesters. |
| ¶ 8a | Under constitutional principles, USC may not allow services to some students when USC knows that other students are excluded on religious grounds, regardless of who engineered the "Jew Exclusion Zone." | ¶ 24 | But under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion." ECF 89 at 2 (emphasis in original). |
| ¶ 47 | Starting in late April 2024 and continuing several days into May 2024, USC invited, permitted, coddled and allowed, through an adopted "appeasement policy," of allowing a group of "activists" - antisemitic thugs by any other definition - to set up barricades in the center of campus and establish an encampment that blocked access to critical educational infrastructure on campus. | ¶ 4 | Starting on April 25, 2024, and continuing until May 2, 2024, UCLA allowed a group of activists to set up barricades in the center of campus and establish an encampment that blocked access to critical educational infrastructure on campus. |