E. Jay Gotfredson SBN 52428
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel: (818) 437-5630
reznagoura@aol.com
jay@gotfredsonassociates.com

Attorneys for Plaintiffs DOE JEWISH USC FACULTY MEMBER 2004 and DOE JEWISH USC STUDENT 1987, individually and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOE JEWISH USC FACULTY MEMBER 2004; DOE JEWISH USC STUDENT 1987,<br>Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, a private public-benefit nonprofit corporation; JEWISH VOICES FOR PEACE ("JVP"), a business organization, form unknown; STUDENTS FOR JUSTICE IN PALESTINE ("SJP"), a business organization, form unknown; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.: 2:25-cv-06375-FLA(SSCx)<br><br>Judge: The Honorable Fernando L. Aenlle-Rocha<br><br>**PLAINTIFFS' NOTICE OF REQUEST TO UNITED STATES DEPARTMENT OF JUSTICE FOR CONSIDERATION OF STATEMENT OF INTEREST PURSUANT TO 28 U.S.C. § 517** |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs have submitted to the United States Department of Justice a request that the Department consider filing a Statement of Interest pursuant to 28 U.S.C. § 517, or

undertaking such other participation as the Department determines appropriate, concerning federal civil-rights and equal-access issues presented in this action.

Title 28 U.S.C. § 517 authorizes the Attorney General to send the Solicitor General or another officer of the Department of Justice to attend to the interests of the United States in litigation pending in federal or state court, or otherwise to attend to an interest of the United States.

Plaintiffs' request advises the Department, among other matters, of the allegations and prospective relief sought in this action; the federal civil-rights interests implicated by allegations concerning equal access for Jewish students and faculty; the related federal proceedings concerning the Spring 2024 UCLA encampment in *Frankel v. Regents of the University of California*, C.D. Cal. Case No. 2:24-cv-04702-MCS-PD; the present procedural posture of this action; and the Court's September 24, 2025 Order/Referral to ADR.

The Court's September 24, 2025, Order selected ADR Procedure No. 1 and referred the matter to the Magistrate Judge assigned to this case for settlement proceedings, with the ADR proceeding to be completed by February 25, 2027. Plaintiffs have advised the Department that federal participation or clarification of the federal government's position concerning equal access and prospective relief potentially could assist the parties and the Court in evaluating a practical resolution during that process.

Plaintiffs' submission to the Department is attached hereto as **Exhibit A**.

**This Notice seeks no immediate relief from the Court.** Plaintiffs file it solely to advise the Court and the parties of the request made to the Department of Justice and to preserve a transparent record of that request while dispositive motions and court-ordered ADR remain pending.

Should the Department elect to participate, Plaintiffs will promptly notify the Court and comply with any applicable Federal Rules of Civil Procedure, Local Rules, or further order of this Court governing such participation.

Respectfully submitted,

DATED: August 17, 2026,

**LAW OFFICES OF MICHAEL E. REZNICK, APC**

By: /s/ *Michael E. Reznick*
**MICHAEL E. REZNICK, ESQ.**
Attorney for Plaintiffs

By:
**E. JAY GOTFREDSON, ESQ.**
Attorney for Plaintiffs

**EXHIBIT A**

**LAW OFFICES OF**

MICHAEL E. REZNICK
**E. JAY GOTFREDSON**
VICE-PRESIDENT
**JACOB DYLAN REZNICK**
EXECUTIVE ASSISTANT

A PROFESSIONAL CORPORATION
**LOS ANGELES • NEW YORK • CHICAGO**
283 OCHO RIOS WAY, OAK PARK, CA 91377; 295 MADISON AVE., 12TB: FLOOR NEW YORK CITY, NY 10017;
40 E. CHICAGO, Ste. 386 CHICAGO, IL 60611
Tel.: 818.437.5630
Email:reznagoura@aol.com www.michaelreznicklaw.com

August 17, 2026

**VIA FEDERAL EXPRESS/OVERNIGHT**
**DELIVERY AND ELECTRONIC TRANSMISSION**
Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
**ATTENTION: TASK FORCE TO COMBAT ANTI-SEMITISM /**
**APPROPRIATE CIVIL RIGHTS DIVISION OFFICIAL**
**COPY TO:**
United States Attorney's Office
Central District of California
Attn: Civil Division / Civil Rights Section
312 North Spring Street, Suite 1200
Los Angeles, California 90012

**RE: URGENT REQUEST FOR UNITED STATES STATEMENT OF INTEREST PURSUANT TO 28 U.S.C. § 517 AND/OR OTHER APPROPRIATE PARTICIPATION**

**PENDING CIVIL-RIGHTS ACTIONS CONCERNING EQUAL ACCESS FOR JEWISH STUDENTS AND FACULTY AT USC AND UNIVERSITY OF CALIFORNIA CAMPUSES**
**1. DOE JEWISH USC FACULTY MEMBER 2004, et al. v. UNIVERSITY OF SOUTHERN CALIFORNIA, et al.**
United States District Court, Central District of California
Case No. 2:25-cv-06375-FLA-SSC
**2. DOE JEWISH UCLA STUDENT 1958, et al. v. REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.**
Los Angeles Superior Court
Case No. 24STCV11971

Dear Assistant Attorney General and Counsel:

1. We represent Jewish students and faculty prosecuting the above-referenced civil-rights actions arising from exclusionary campus practices occurring during and following the Spring 2024 university encampments.

2. Plaintiffs respectfully request expedited review by the United States Department of Justice and consideration of a Statement of Interest pursuant to 28 U.S.C. § 517 in either or both actions, or such other participation as the Department determines appropriate.

3. This submission renews and supersedes counsel's December 2, 2025 request to the Department concerning substantially related matters. Counsel received no substantive response to that earlier submission. Plaintiffs therefore respectfully request that the present § 517 request be routed directly to the attorney or component authorized to evaluate litigation participation under 28 U.S.C. § 517.

4. This request is not made in a vacuum. The federal government has already identified antisemitism in American higher education, including at USC and UCLA, as presenting substantial federal civil-rights concerns.

5. Federal litigation arising from the Spring 2024 UCLA encampment has likewise already confronted the central equal-access issue presented here. In *Frankel v. Regents of the University of California*, C.D. Cal. Case No. 2:24-cv-04702-MCS-PD, the District Court entered preliminary injunctive relief addressing the exclusion of Jewish students from ordinarily available university facilities and programs.

6. The subsequent proceedings and resolution in *Frankel* underscore rather than diminish the federal interest in the remaining cases. Plaintiffs therefore respectfully request that DOJ review the *Frankel* proceedings, the operative pleadings in these actions, pertinent federal enforcement materials, and the present procedural posture of the USC and UCLA cases before materially overlapping civil-rights claims are resolved without the benefit of the position of the United States.

## I. STATUTORY BASIS FOR THE REQUEST

7. Title 28 U.S.C. § 517 provides:

"The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

8. Section 517 therefore provides an express mechanism for DOJ participation in both federal and state litigation when the interests of the United States are implicated.

9. Plaintiffs do not ask DOJ to assume prosecution of either case.

10. Plaintiffs do not ask DOJ to endorse every allegation, cause of action, or theory advanced by Plaintiffs.

11. Nor do Plaintiffs ask DOJ to prejudge disputed facts.

12. Plaintiffs ask something narrower and more appropriate: that DOJ review the operative pleadings, the *Frankel* proceedings, pertinent federal enforcement materials, and the procedural posture of these cases, and determine whether the United States should present its position concerning the federal civil-rights obligations of universities receiving federal financial assistance when Jewish students and faculty are denied equal access to university facilities, programs, and educational services.

## II. THE FEDERAL GOVERNMENT HAS ALREADY IDENTIFIED THE PROBLEM PRESENTED BY THESE CASES

13. On January 29, 2025, the President issued an Executive Order concerning additional measures to combat antisemitism.

14. As alleged in the operative USC pleading, the Executive Order announced the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal

tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

15. The USC pleading further alleges that on March 5, 2025, DOJ announced creation of a Task Force within the Civil Rights Division to investigate allegations of antisemitism on college campuses in the United States.

16. The pleading further alleges that by May 9, 2025, USC and UCLA were among universities identified for federal investigation.

17. The present request therefore does not ask DOJ to identify a novel federal concern. It asks DOJ to consider participation in pending litigation addressing the very type of university conduct the Executive Branch and Department already have identified as warranting federal attention.

## III. THE USC OPERATIVE PLEADING PRESENTS A DIRECT EQUAL-ACCESS QUESTION

18. The USC action is presently pending before the Honorable Fernando L. Aenlle-Rocha in the United States District Court for the Central District of California, Case No. 2:25-cv-06375-FLA-SSC.

19. USC removed the action to federal court on July 11, 2025, invoking federal-question jurisdiction as well as the Class Action Fairness Act. Its Notice of Removal recognizes federal claims under, inter alia, Title VI and 42 U.S.C. § 1981.

20. The operative pleading alleges that during the Spring 2024 encampment Jewish students and faculty were excluded from portions of USC's campus and ordinarily available university programs and facilities because of their Jewish identity and/or their refusal to disavow sincerely held beliefs associated with Judaism and Israel.

21. Importantly, the case does not merely allege that USC passively failed to control private demonstrators.

22. It alleges that USC's own response imposed the burden of the danger upon the Jewish persons who were being targeted.

23. The pleading alleges that Jewish students and faculty were told to "shelter in place," remain in dormitories or offices, or otherwise avoid portions of campus while other members of the university community continued to have access.

24. Even assuming those measures were motivated by legitimate safety concerns, Plaintiffs allege that the result was to impose restrictions upon the targeted group rather than neutrally upon the university community.

25. **That distinction is central to this request.**

26. If a portion of a university campus becomes genuinely unsafe, a university plainly may take reasonable safety measures.

27. Plaintiffs contend, however, that the lawful response cannot be to preserve access for the university population generally while telling members of the targeted protected group that they must leave, hide, remain in their rooms, or surrender access to university facilities.

28. The university had an obvious neutral alternative: close the affected area to everyone until equal and safe access could be restored.

## IV. FRANKEL HAS ALREADY PROVIDED A FEDERAL JUDICIAL ANSWER TO THE CENTRAL ACCESS QUESTION

29. *Frankel v. Regents of the University of California* concerned the Spring 2024 UCLA encampment and allegations that Jewish students were prevented from accessing ordinarily available UCLA programs, activities, and campus areas because of their sincerely held religious beliefs.

30. In granting preliminary injunctive relief, Judge Mark C. Scarsi stated:

"In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce

their faith."

31. More important for present purposes, the *Frankel* injunction established a straightforward equal-access principle.

32. The injunction preserved UCLA's discretion concerning how it administers its university. But it provided, in substance, that when ordinarily available UCLA programs, activities, or campus areas became unavailable to certain Jewish students, UCLA could not continue providing those ordinarily available programs, activities, or campus areas to other students until equal access was restored.

33. That is essentially the same nondiscrimination principle Plaintiffs seek to vindicate here.

34. The USC operative pleading expressly requests prospective relief requiring that, if an ordinarily available USC program, activity, or campus area becomes unavailable to a Jewish student or faculty member because of religion, the facility or program be suspended for all students and faculty until equal access is restored.

35. Thus, this is not a request for an unprecedented judicial experiment. A federal district court located only miles away has already confronted materially similar exclusionary conduct at UCLA and fashioned substantially the same equal-access remedy Plaintiffs seek against USC.

## V. THE UCLA ACTION MAKES THE CONNECTION TO FRANKEL EVEN MORE DIRECT

36. The pending UCLA action presents an even more immediate connection because it involves the same institutional defendant—the Regents of the University of California—and materially overlapping events at UCLA.

37. Plaintiffs allege that the Spring 2024 UCLA encampment erected barricades and checkpoints, restricted access to university facilities, subjected students to ideological screening concerning Israel and Zionism, and denied passage to Jewish students who refused to satisfy those demands.

38. Plaintiffs further allege that Regents officials and campus security knew students were being obstructed but that Jewish students were instead advised to avoid portions of campus for their "own safety."

39. The operative theory consequently is not limited to third-party misconduct. It concerns what UCLA itself did after learning that Jewish students were being denied equal access.

40. *Frankel* therefore is not merely analogous authority. It arose from the same UCLA encampment and addresses substantially the same equal-access problem.

41. Plaintiffs do not suggest that the disposition or settlement of *Frankel* establishes liability in these actions. It does not. Nor does the position of the United States in one lawsuit automatically determine its position in another.

42. But the relationship among these proceedings makes federal review particularly appropriate. The federal civil-rights principles implicated by materially overlapping exclusionary conduct should not depend upon which affected student reached the courthouse first, which attorney filed the case, or which judicial department received it.

## VI. THE PROBLEM EXTENDS BEYOND TWO CAMPUSES

43. The pleadings and materials supplied to DOJ demonstrate why the federal interest is broader than USC and UCLA.

44. The Spring 2024 encampment phenomenon was not confined to a single university.

45. Plaintiffs' allegations describe substantially similar encampments and exclusionary practices occurring across American universities and expressly identify recurrence as the reason prospective relief remains necessary.

46. The broader pattern matters because it demonstrates that the federal question is recurring and systemic rather than merely a historical dispute concerning a few weeks in Spring 2024.

47. The essential question can be stated without reference to Israel, Palestine, political ideology, or any particular protected group:

**When members of a protected group are threatened with exclusion from an educational institution, may the institution solve the problem by excluding the victims while leaving the persons responsible for the discriminatory conditions—and everyone else—in place?**

48. Plaintiffs respectfully submit that the federal answer should be uniform.

## VII. THESE CASES PRINCIPALLY SEEK COMPLIANCE WITH RULES THE UNIVERSITIES THEMSELVES PROFESS TO FOLLOW

49. The prospective relief sought is not principally a demand that the judiciary manage university campuses or suppress political expression.

50. Plaintiffs do not seek an injunction against criticism of Israel.

51. Plaintiffs do not seek an injunction against advocacy for Palestinians.

52. Plaintiffs do not seek to prohibit peaceful protest protected by the First Amendment.

53. Plaintiffs seek equal access and nondiscriminatory enforcement of existing university rules.

54. The USC pleading alleges that USC publicly represents that it maintains policies protecting equal access, prohibiting discrimination and harassment, and safeguarding students regardless of religion, yet selectively failed to enforce those protections during the encampment.

55. The requested principle is therefore straightforward:

**Enforce the rules equally.**

56. If protesters may peacefully demonstrate, they may demonstrate.

57. If university facilities remain open, Jewish students and faculty must receive the same access to them as everyone else.

58. If university officials conclude that safety requires closing a facility, close it neutrally until equal access can be restored.

59. What Plaintiffs contend federal civil-rights law does not permit is an accommodation under which discriminatory exclusion succeeds because its victims are told to stay away.

## VIII. THE PRESENT PROCEDURAL POSTURE MAKES DOJ REVIEW TIMELY

60. The USC litigation has now been pending in federal court for a substantial period.

61. Potentially dispositive Rule 12 motions remain pending.

62. Separately, by Order dated September 24, 2025, the District Court selected ADR Procedure No. 1 and referred the matter to the Magistrate Judge assigned to the case **for settlement proceedings**, with the ADR proceeding to be completed by February 25, 2027.

63. Plaintiffs understand that referral to concern settlement proceedings and do not suggest that it stays the litigation or transfers adjudication of the pending dispositive motions from the District Judge.

64. Plaintiffs do not criticize the District Court's management of its docket and do not ask DOJ to do so.

65. To the contrary, the pending ADR process creates a potentially valuable opportunity.

66. DOJ's participation—or even clarification of the federal government's position concerning equal access and appropriate prospective relief—could materially assist the parties and the Court in determining whether a practical resolution can be achieved without prolonged litigation.

67. The beginning of another academic year also makes prospective relief more than academic. The USC pleading expressly alleges a likelihood of recurrence and seeks prospective relief because Plaintiffs remain students and faculty members who require continuing access to university programs and facilities.

68. The issue should not have to await another encampment, another barricade, or another Jewish student being told that the solution to discriminatory exclusion is for the Jewish student to stay away from the affected campus area.

## IX. DOJ PARTICIPATION COULD FACILITATE A PRACTICAL RESOLUTION RATHER THAN EXPAND THE LITIGATION

69. Plaintiffs' objective should not be misunderstood.

70. They do not seek federal participation merely to add another adversary to these cases.

71. They seek a durable result.

72. If USC and the Regents will agree to enforce their existing nondiscrimination policies, maintain equal access to educational facilities and programs, and refrain from responding to

discriminatory exclusion by transferring the burden to the Jewish students and faculty being excluded, substantial prospective objectives of these actions potentially can be achieved without years of additional litigation.

73. The *Frankel* injunction demonstrates that such relief can be framed without placing courts in day-to-day control of university operations.

74. DOJ's participation could therefore facilitate, rather than frustrate, resolution. That possibility is particularly significant while USC is engaged in court-ordered ADR.

## X. REQUEST FOR DOJ ACTION

75. Plaintiffs respectfully request expedited review and consideration of:

(a) filing a Statement of Interest pursuant to 28 U.S.C. § 517 in the USC federal action;

(b) filing a Statement of Interest pursuant to § 517 in the pending Regents/UCLA state-court action;

(c) participating, if DOJ determines appropriate, in discussions directed toward prospective injunctive or consent-decree relief;

(d) seeking intervention, amicus participation, or other appropriate participation in either action if warranted;

(e) advising the respective courts of federal interests implicated by the pending claims;

(f) communicating with Plaintiffs' counsel concerning additional pleadings, evidence, orders, or docket materials DOJ wishes to review; and

(g) taking such other action as the Attorney General determines appropriate to protect the interests of the United States.

76. Plaintiffs respectfully request acknowledgment of receipt and, if practicable, identification of the DOJ attorney or component assigned to review this submission.

77. This request for acknowledgment is particularly important because counsel's December 2, 2025, submission produced no substantive response. Plaintiffs respectfully seek confirmation sufficient to ensure that the present request reaches the component responsible for evaluating litigation participation under § 517 rather than remaining an unassigned public-correspondence referral.

78. Counsel stands ready immediately to provide complete pleadings, pending motions, judicial orders, the *Frankel* record and settlement materials, declarations, photographs, university policies, and any other evidence requested by the Department.

79. The federal interest presented here is concrete, recurring, and substantial. The Executive Branch has identified antisemitism in higher education as a federal civil-rights concern; federal litigation has already addressed materially overlapping exclusionary practices at UCLA; and two pending actions now ask courts to determine whether universities may respond to discriminatory exclusion by imposing the resulting burden upon the members of the protected group being excluded.

80. Plaintiffs respectfully request that the Department review these cases **before potentially dispositive rulings or completion of court-ordered ADR foreclose an opportunity for the United States to present its position or facilitate a durable prospective resolution.**

Thank you for your consideration.

Respectfully submitted,

**LAW OFFICES OF MICHAEL E. REZNICK, APC**
By: /s/ *Michael E. Reznick*
**MICHAEL E. REZNICK, ESQ.**
Attorney for Plaintiffs

By: ______________________
**E. JAY GOTFREDSON, ESQ.**
Attorney for Plaintiffs

**PROPOSED ENCLOSURES**

1. USC operative Complaint and exhibits;
2. USC Notice of Removal;
3. September 24, 2025, USC Order/Referral to ADR;
4. UCLA operative pleading;
5. *Frankel* Preliminary Injunction Order;
6. January 29, 2025, Executive Order;

# EXHIBIT 1

Michael E. Reznick SBN 116126
E. Jay Gotfredson SBN 52428
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel: (818) 437-5630
*reznagoura@aol.com*
*jay@gotfredsonassociates.com*

**Electronically FILED by Superior Court of California, County of Los Angeles 7/09/2025 12:03 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Covarrubias, Deputy Clerk**

Attorneys for Plaintiffs DOE JEWISH USC FACULTY MEMBER 2004 and DOE JEWISH USC STUDENT 1987, individually and on behalf of all others similarly situated

SUPERIOR COURT OF THE STATE OF CALIFORNA

COUNTY OF LOS ANGELES

DOE JEWISH USC FACULTY MEMBER 2004; DOE JEWISH USC STUDENT 1987, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

UNIVERSITY OF SOUTHERN CALIFORNIA, a private public-benefit nonprofit corporation; JEWISH VOICES FOR PEACE ("JVP"), a business organization, form unknown; STUDENTS FOR JUSTICE IN PALESTINE ("SJP"), a business organization, form unknown; and DOES 1 through 50, inclusive,

Defendants.

CASE NO.: 25STCV20404

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**(1) VIOLATION OF THE BANE ACT [Civil Code §52.1]**
**(2) VIOLATION OF THE UNRUH ACT [California Civil Code § 51]**
**(3) VIOLATION OF THE RALPH ACT [California Civil Code § 51.7]**
**(4) NEGLIGENCE**
**(5) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(6) ASSAULT**
**(7) BATTERY**
**(8) BREACH OF CONTRACT**
**(9) DECLARATORY RELIEF**
**(10) VIOLATION OF TITLE VI CIVIL RIGHTS ACT OF 1964 [42 U.S.C. § 2000d]**
**(11) VIOLATION OF 42 U.S.C. § 1981**
**(12) VIOLATION ED CODE § 220**

**<u>DEMAND FOR JURY</u>**

**HISTORICAL BACKGROUND AND CONSTITUTIONAL PRINCIPLES**

1. On April 24, 2024, an occupation protest began at the University of Southern California ("USC") in Los Angeles, California. The protest was a part of pro-Palestinian protests on university campuses campaigning for divestment from Israel that began on the East Coast and spread throughout the United States. USC cancelled their main commencement ceremony over "safety concerns" about protests. The encampment was cleared by the Los Angeles Police Department on the morning of May 5, 2024.

2. Contrary to the false narrative promulgated by the so-called "Legacy Media," this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counter-protest movements responding thereto. Nor is this case about the content or viewpoints contained in any protest or counter protest slogans or other expressive conduct, which are generally protected by the 1st amendment. See *Virginia v. Black*, 538 US 343, 358 (2003) ("The hallmark of the protection of free speech is to allow free trade of ideas - even ideas that the overwhelming majority of people might find distasteful or discomforting").

3. But the Free Exercise Clause provides that "Congress shall make no law... prohibiting the ['free exercise of religion']." U.S. Const., amend. I; see also *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free Exercise Clause extends to the States under the Fourteenth Amendment). The clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status. (See *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status"). *Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a state violates the free exercise clause when it excludes religious observers from otherwise

available public benefits").

4. The material facts in this are not in dispute and summarized as follows:

> In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students and faculty - including the individual Plaintiffs and putative classes - were excluded from portions of the USC campus by violent thugs ("Campus Terrorists") who took over the campus because Jewish students and faculty refused to denounce their faith. This fact is so unimaginable and so repugnant and abhorrent to our constitutional guarantee of religious freedom that it bears repeating: ***Jewish students and faculty were excluded from portions of the USC campus by Campus Terrorists because they refused to denounce their faith.***

5. USC does not dispute the facts alleged hereinabove but asserts that USC has no responsibility to protect the religious freedom of its Jewish students because the "Encampment" or "Jew Exclusion Zone" alleged in this Complaint was not created, maintained, orchestrated and engineered by USC, or the "Campus Terrorists," but rather third party "lawful protesters," including USC's Co-Defendants, "JEWISH VOICES FOR PEACE" ("JVP") and "STUDENTS for JUSTICE in PALESTINE" ("SJP").

6. At all times herein mentioned, JVP and SJP were and are well-funded, radical left-wing, Jew-hating political organizations whom USC encouraged long before and well into the Spring of 2024 to spread Jewish hatred and violence on campus by supporting the message of antisemitism in sanctioned university classes, lectures, speeches and fundraisers. USC further allowed the Campus Terrorists, JVP, SJP and other like political organizations and supporters to roam freely on campus during class hours while shouting out hateful and violent antisemitic epitaphs and slogans like "Global Intifada," "Student Intifada," "From the River to the Sea, Palestine will be Free" and similar harmful rhetoric unabated at Jews under the guise of "lawful protests." Hatred

of Jews was and is still allowed to flourish at USC functions and on USC property and facilities, including the public square.

7. The institutionalized antisemitism that existed and still exists at USC against Jewish students and faculty culminated in the Campus Terrorists' creation of – and USC's tolerance for - a "Jew Exclusion Zone." USC's cowardly response to the Campus Terrorists' occupation and siege, as well as the Jew Exclusion Zone, was to order and direct Jewish students and faculty to remain in their dormitories and offices, respectfully, or "shelter in place," for their "protection." The Jew Exclusion Zone and USC's response to it amounted to sanctioned segregation of Jewish students and faculty, including the Plaintiffs herein.

7a. USC apparently learned nothing from history: Jewish students and faculty in Germany during the 1930s were similarly barred from attending universities for their "protection," and were segregated into separate classes early into the Nazi's reign of terror. By 1939, most Jewish students and faculty had been expelled entirely.

7b. Instead of combatting antisemitism on campus or taking punitive measures against the Campus Terrorists, such as calling the Campus Police or LAPD, arresting, expelling or suspending "bad actor" students and perpetrators of the siege, or disbursing the crowds, USC encouraged and enabled JVP, SJP and the Campus Terrorists to continue their antisemitic rants and occupation unabated for more than two weeks during finals, cancelling commencement exercises while paying "lip service" to the USC Jewish Community about how USC's segregation policy was "protecting" Jews from antisemitism on campus.

7c. Contrary to USC's assurances, Jews who took classes, studied or worked at USC were disparately impacted by USC's clear discriminatory policy of making Jews "second class citizens" during the Campus Terrorists' occupation and siege in April – May 2024, when compared to USC non-Jewish "citizens" or "citizens" sponsoring the "Palestinian Cause"

trumpeted by JVP, SVP and other pro-Hamas supporters on campus who were not lawfully protesting at all but violently wreaking havoc on Jewish students and faculty who were in the middle of taking and grading final exams.

7d. USC's tolerance of the siege not only discriminated against Jews at USC, it sent a message about how USC treats Jewish students and faculty all over the World. USC's licensing and support of JVP and SJP and allowing both groups to maintain offices on campus long before and during the siege only added to the "legitimacy" of these designated terrorist organizations and the institutionalized antisemitism on USC's campus.

8. USC's patent discrimination against Jews took many forms in the Spring of 2024, most notably its response to the Campus Terrorists reign of terror against Jewish students and faculty. Rather than ordering the USC Campus Police or calling in the Los Angeles Police Department ("LAPD") to disburse or arrest the violent protestors and Campus Terrorists operating the Jew Exclusion Zone, as well as others who were engaging in the violent takeover of university property, USC's answer to the Campus Terrorists' siege and Jew Exclusion Zone was to segregate the Jewish students and faculty and in particular, ordering them to remain in their respective dormitories and offices, appeasing and enabling the Campus Terrorists, JVP and JFP to the detriment of Plaintiffs.

8a Under constitutional principles, USC may not allow services to some students when USC knows that other students are excluded on religious grounds, regardless of who engineered the "Jew Exclusion Zone." It is a flagrant disregard of Plaintiffs' constitutional rights under the Free Exercise Clause.

9. JVP is the largest progressive Jewish anti-Zionist organization in the world. SJP is a similar well-funded radical left organization whose policies also include support and advocate for the destruction of the Jewish State of Israel and eradication of the Jewish People. JVP and SJP

are now designated as "terrorist organizations" by the United States Government. At the time of the siege in the Spring of 2024, JVP and SFP maintained offices at USC and were allowed and encouraged by USC's policies and the administration that implemented them to spew and foment intolerance of Jewish students and faculty.

10. At all times herein mentioned, USC licensed JVP, SFP and other left-wing on and off-campus organizations and protestors to infiltrate USC's property for the purpose of spewing, hurling and publishing in the public square and elsewhere on campus violent rhetoric designed to coerce, threaten, intimidate and harm Jews generally and in particular, those attending or working at USC like the Plaintiffs herein.

10a. Well-recognized slogans like "Global Intifada," Student Intifada," "From the River to the Sea" and other violent hate speech (which is well recognized as terrorist "lingo" designed and intended by terrorist organizations like Hamas to threaten, terrorize and intimidate Jews) have become as common in USC life as supporting Trojan Football. Jew haters were and are encouraged by USC's administration and hate speech is alive and well at USC and allowed to flourish under the guise of "anti-Zionism."

11. At all times herein mentioned, USC not only tolerated, encouraged, aided, abetted, and enabled JVP, SFP and other radical left-leaning protest groups and "Non-Governmental-Organizations" ("NGOs")) (which formerly scammed taxpayers through USAID and other phony liberal and radical left "fronts") by allowing the "Jew Exclusion Zone" to continue unabated for more than two weeks (during finals no less). From Plaintiffs' viewpoint, USC aligned itself with the Campus Terrorists by its actions and inaction before, during and after the siege rather than supporting its own Jewish students and faculty. Towards that end, USC invited and hired many of the Jew-hating organizers of the clearly violent protests in the Spring of 2024 to the USC campus to beforehand to lecture students about such controversial matters as the alleged

"genocide" being conducted by the Israeli government against Palestinians in Gaza.

11a USC also tolerated, enabled and further encouraged these so-called third party "protesters" after the Jew Exclusion Zone was created by providing them with megaphones, food, encouragement and water bottles that were used as projectiles against Jews in an attempt to further harm Jewish USC students, faculty and others who tried to seek entrance to property the Campus Terrorists took over without denouncing "Zionism." (True and correct depictions of the USC "Jew Exclusion Zone" are in the I Phone photographs attached hereto as Exhibit A).

12. The "third party protestors" in fact were an unruly and violent mob of antisemitic thugs (hereinafter referred to as the "Campus Terrorists"). While the Jew Exclusion Zone was licensed, tolerated and permitted to continue by USC and created and organized by Co-Defendants JVP and SJP and their followers, it was also funded, and orchestrated by a number of so-called outside agitators – including the George Soros, Tides Foundation and Rockefeller Brothers. The Campus Terrorists included and were comprised of not only Jew-hating students, JVP and SFP, but also faculty members and more importantly, outside, third-party "agitators" who do not even attend USC.

12a. USC not only facilitated the Jew Exclusion Zone - it allowed it to happen by acquiescing in the antisemitism with knowledge that the harm to Plaintiffs and destruction of property was virtually certain to occur. Among other things, USC knew or certainly should have known that the antisemitism and hatred of Jews that gave rise to the exclusion zone was being exported to West Coast universities and colleges from liberal "Ivy League" colleges funded and encouraged by well-organized hatemongers on the East Coast, radical left members of the Democratic Party and other donors who were funding the sieges, occupations and operations taking place at college campuses en masse in the Spring of 2024.

13. Regrettably, the Court may and should take judicial notice of the indisputable fact that the

campus uprisings, antisemitic behavior, takeovers of campus properties, including encampments to exclude Jewish students and faculty, continue to this day - emphasizing the need for injunctive relief or a consent decree to abate the antisemitism at USC. As recently as March 2025, USC was faced with another campus uprising by Jew-hating students, ostensible "protestors" and outside agitators. The March 2025 siege and occupation (reported by the national media) was quelled in a matter of hours by the new administration's decision to call in the LAPD, a stark contrast to what occurred in 2024 and a recognition and admission by USC that better policies in the Spring of 2024could and should have avoided the harm that predictably followed.

14. USC had plenty of historical precedent to rely on with respect to the potential of a violent uprising and takeover of Campus property occurring in the Spring of 2024 at the hands of antisemitic students, mobs, outside agitators and student-led organizations like JVP and SJP. In light of the recent history of uprisings and occupations that have been ongoing at other American universities in the wake of the October 7, 2023 and are continuing to this day, USC knew or should have known in the Spring of 2024 that on-campus Jew Exclusion Zones, campus uprisings to the detriment of Jewish students and faculty and violent anti-Jewish protests were in fact not an isolated incident but erupting nationwide. What started as a movement of antisemitic "protests" on East Coast campuses like Columbia, NYU and George Washington University about the ongoing Gaza conflict between Israel and Hamas turned into multiple instances of "Jewish Exclusion Zones" and similar ad hoc but well-funded "Encampments" that excluded Jewish students and faculty at college campuses across America. Discriminating against and excluding Jewish students festered like a malignant cancer, spreading across university campuses with almost daily reports of different new colleges and universities coming under attack.

15. And the attacks were clearly well-organized. Among other things, "tents" and other structures erected by the Campus Terrorists all looked the same and came from the same

expensive suppliers. The "protest signs" were all had the same font and production values and carried the same obnoxious Hamas propaganda and carefully designed slurs and slogans against Jews that are well known to most Americans by now, such as ""from the River to the sea, Palestine will be free," "freedom for Palestine," "divest from death," and related propaganda.

16. USC did nothing to discourage antisemitism on its campus but rather facilitated it and appeased the Campus Terrorists. Among other things, USC invited and tolerated Jew-hating and Hamas supported organizations like "Justice for Palestine" ("JFP") and "Student Voices for Peace" ("SJP") to set up offices on campus for the purpose of spewing Jewish hatred and Hamas sponsored antisemitic propaganda to USC students and faculty. USC also allowed alleged "protesters" to roam freely at the USC campus while concealing their identities with face masks, sunglasses and the traditional Keffiyeh scarves, denouncing Jews and advocating their harm, death, eradication, and destruction such that it became business as usual. Instead of calling the LAPD or campus security to step in and remove the trespassers and quell the clear disturbance on campus caused by the Jew Exclusion Zone, USC provided them with megaphones, food, and water bottles that were used as projectiles and weapons against Jewish students and others attempting to seek entrance to the Jew Exclusion Zone.

17. This Complaint and the pleadings originally filed by Plaintiffs in the aftermath of the October 7, 2023 Massacre are replete with allegations that Plaintiffs and other Jewish students and faculty were denied access or the same access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs. However, under constitutional principles, USC cannot allow services to some students when USC knows that other students are excluded on religious grounds - regardless of who engineered the exclusion.

18. Jews were told to "shelter in place" and stay in their dorms or offices if they did not like or could not tolerate it. USC aided, abetted, encouraged, tolerated, and implemented as policy the

Terrorist Mob's "Jew Exclusion Zone." Under any legal theory, USC's reprehensible conduct is actionable and should not be tolerated by society or this Court.

19. Segregating Jewish students and faculty, as alleged herein – is discriminatory based on religion or perceived ethnicity. Even if intended as a safety measure, singling out Jewish students and faculty is stigmatizing and discriminatory to them, not protective.

20. The 14th Amendment's Equal Protection Clause prohibits government entities and public and private universities from treating individuals differently based on protected characteristics such as religion, race or ethnicity, unless there is a compelling reason and the policy is narrowly tailored.

21. The 1st Amendment protects the free exercise of religion. If a public or private university treats Jewish students differently because of their religious identity, it constitutes religious discrimination. Singling them out implies that their religious identity is inherently a security risk, which is inherently unconstitutional. USC's actions must be neutral and not target a specific group. Creating policies that only apply to Jewish students and faculty (for example, ordering them to "shelter in place," moving them to different dormitories, classes, offices, labs or areas for their "protection" rather than doing the same for all students and faculty miss the mark because they fail the neutrality test.

22. Protective measures must apply equally to all students and faculty at risk of harm, not just t specific religious or ethnic groups. The United States has a legal history (e.g., *Brown v. Board of Education*) that establishes that segregation – even if labeled "protective," is inherently "unequal." Past cases have shown that "separate but safe" is not a valid justification under constitutional scrutiny.

23. Another Southern California university that the Jew-hating cancer spread to in the Spring of 2024 – which continues through the present time -- is the University of California Los Angeles

("UCLA"). In a case filed by Jewish students against UCLA for similarly permitting, encouraging and tolerating the creation, establishment and maintenance of a virtually identical "Jew Exclusion Zone" on UCLA's Westwood campus, the United States District Court, Honorable Mark C. Scarsi, issued an injunction on August 13, 2024 in favor of Jewish students against UCLA, enjoining any further antisemitic action and inaction by UCLA in *Frankel v. Regents of the University of California*, United States District Court No. 2:24-cv-04702-MCS-PD ("Frankel"). (A true and correct copy of the Court's "Order Re: Motion for Preliminary Injunction (ECF No. 48) is attached hereto as Exhibit B and incorporated herein by this reference).

24. Plaintiffs assert that the instant case and *Frankel v. Regents of the University of California* are "related cases" in the sense that both cases arise out of the same set of facts, transaction or occurrence – namely, both USC's and UCLA's failure to combat the spread of a pattern and practice of rampant antisemitism on campus and administrators enabling Campus Terrorists sponsored by Hamas – a designated foreign terrorist organization since 1997 -- to create unconstitutional "Jew Exclusion Zones" and perpetrate and cause other harmful conduct against Jewish students and faculty on American college campuses.

25. On November 5, 2024, Donald J. Trump was elected in a mandate to replace Joseph R. Biden as President of the United States ("President Trump"). On January 29, 2025, President Trump issued an executive order identifying additional measures that his government intends to take to combat anti-Semitism (the "Executive Order"). (A true and correct copy of the Executive Order is attached hereto as Exhibit C). Among other things, the Executive Order states that:

> "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

*Id.*

26. The Executive Order also reaffirmed President Trump's prior executive order against antisemitism and noted that the Biden administration effectively nullified his prior order to protect American Jews to the same extent to which all other American citizens are protected. The [new] Executive Order reaffirms [President Trump's prior order against antisemitism] and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. The executive order correctly notes that these attacks unleashed an unprecedented wave of vile antisemitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. The order recognized that "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; And intimidation, harassment, and physical threats and assault. A [House of Representatives] report calls the federal government's failure to fight anti-Semitism and protect Jewish students quote 'astounding." This failure is unacceptable and ends today."

27. On March 5, 2025, the United States Department of Justice ("DOJ") announced the creation of a "Task Force"within the DOJ's Civil Rights Division to investigate claims of anti-Semitism against 10 college campuses in the United States ***including UCLA and USC***.

28. As of May 5, 2025, USC and UCLA were two of the 10 colleges in the United States targeted by the DOJ for federal investigation by the Task Force under allegations that they have not properly addressed campus antisemitism and in particular, failed to protect Jewish students from harm. Plaintiffs have notified the Task Force about their pending action and are seeking either intervention or a statement of interest from the Department of Justice's Task Force.

29. The current Trump Administration is once again enforcing the United States' policy of designating "Hamas" as a foreign "terrorist group" under federal law. The Trump Administration has also stated that it will not negotiate with Hamas, other terrorist groups and Hamas supporters, a lesson that USC refuses to learn. USC's Co-Defendants - "Jewish Voices for Peace" ("JVP") and "Students for Justice in Palestine" ("SFP") - are sponsored and funded by Hamas, as well as Hamas supporting organizations in the United States and around the World. Most recently, the

United States government disclosed and reported that Hamas and organizations like JVP and SJP received substantial funding from USAID, the recently disbanded conduit through which taxpayers unwittingly paid for the support of radical left-wing causes, including the antisemitic behavior and protests spreading like fire across American university campuses.

30. At all times herein mentioned, JVP and SJP maintained and operated (and on information and belief, still maintain and operate offices on USC's campus. JVP and SJP also used and continue to use USC's internet platforms to promulgate their Jew-hating propaganda with the knowledge, consent, acquiescence and encouragement of USC.

31. USC further encouraged the antisemitism and entirely predictable "Jew Exclusion Zone" on its own campus by inviting and hiring radical, left-leaning Hamas supporting guest and tenured professors to lecture students in USC-sponsored classes about the "war crimes" of Jews and the State of Israel. Instead of teaching courses on the subject matter for which they were hired, they spewed antisemitic hate against Jews, Israel and Americans. Many of these pro-Hamas lecturers and professors also canceled classes and gave extra credit to students who participated in the Jew Exclusion Zone and "protests for Palestine" or against "Genocide." (USC's direct connection to these violent political organizations and support of Hamas and Palestinian causes is confirmed by the flyers supporting "disinvestment" from Israel published on USC internet platforms that are attached hereto as Exhibit D)

32. This case is not about "free speech," "academic freedom" or the First Amendment rights of JVP, JFP, Hamas or any other left-leaning, radical speaker or "lawful peaceful protests" but rather about the religious freedom of Plaintiffs and USC's encouragement of the disparate treatment and harm Plaintiffs suffered. USC not only condoned, allowed, aided, abetted, tolerated and encouraged the Jew Exclusion Zone, trespass and destruction of property on its campus and open space, it became USC's standard operating procedure and policy for weeks on end until President Carol Folt – in response to public pressure rather than the Trustees - belatedly made the decision to call in the LAPD.

33. The individual Plaintiffs as well as the two putative "subclasses" (Jewish USC students

and Jewish USC faculty members) have sincerely held religious beliefs and obligations to support the Jewish state of Israel. Unlike the Legacy Media and far left-leaning radical Hamas supporting mobs like the Campus Terrorists and unruly mob complained about herein who commandeered the Jew Exclusion Zone, trespassed and took over public USC property during April – May 2024 and still continue to this day, as alleged herein, Plaintiffs assert that there is no genuine distinction between "antisemitism" and "anti-Zionism." It is hatred of Jews by any other name. USC not only condones such hatred it sponsors it.

34. USC has taken no remedial action whatsoever against the thugs who created the Jew Exclusion Zone, or any actions against the Campus Terrorists alleged herein. USC has not expelled nor barred from the USC campus the local divisions of JVP and SJP, despite knowledge that they support and are sponsored and funded by Hamas, Hamas supporters and other known and are now publicly designated "terrorist groups."

35. While violent protests at USC have been reduced since the LAPD belatedly intervened in May 2024, USC has not disavowed anything that occurred and has not made any policy changes or done anything to assuage Plaintiffs concerns that some Jewish students or faculty may be excluded from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should other "Jew Exclusion Zones" or exclusionary encampments return. Conversely, USC has not stated anywhere publicly or otherwise that it will not provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students.

36. Courts consider a party's failure to disavow "unconstitutional acts" as a factor in favor of finding standing and the likelihood of imminent likelihood of future injury justifying injunctive relief. *Bland v. Fessler*, 83 F.3d 729, 737 (9th Cirt. 1986). USC has done nothing to minimize the risk that Plaintiffs will again be wronged by their exclusion from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs.

37. Accordingly, injunctive relief is necessary and appropriate at this time to remedy and combat USC's wrongs and future wrongs. Injunctive relief or a consent decree is also necessary and appropriate and to force USC to institute policies that include actions to prevent future

wrongs and protect Jewish students and professors. Plaintiffs seek a permanent injunction or "consent decree" in this case similar to the one issued by the Court in *Frankel v. Regents* that simply provides that if any ordinarily available USC programs, activities, or campus areas become unavailable to any Jewish student of faculty member of the basis of religion, then such programs, activities, or campus areas must be suspended for all students and faculty. Such relief in this case is necessary to prevent further irreparable harm to Jewish students and faculty and ensure equal access for and non-discrimination against Jews on USC's campus. Notably USC has not committed to the equal restriction of access to all students and faculty should such exclusionary conduct return.

37b. Plaintiffs also seek judicial enforcement of USC's own antidiscrimination policy of banning face masks or other means of "expression" that are intended to conceal the identities of bad actors' during protests, consistent with the requirements and limitations of provisions of California's "Leonard Law," which requires USC and other universities to protect their students' rights to freedom of speech and other communication that the government is required to protect but does not require forced segregation of Jewish students and faculty for such "protection." What about USC's duty to treat Jewish students and faculty the same as other students and faculty?

38. Injunctive relief is also necessary and appropriate at this time to protect USC's Jewish students and faculty from future violence and harm. Although the violent protests at USC have diminished following the LAPD's purposely delayed intervention in May 2024, they have not abated. More importantly, USC has failed to repudiate the unlawful and discriminatory acts that occurred in the Spring of 2024 and still occur at USC on a weekly basis, as evidenced by the on-campus uprising and near takeover that occurred again in May 2025 that was quelled within hours by prompt police action.

39. USC also encourages further violence by refusing to enforce its own antisemitic and antidiscrimination policies. Far from engaging in "academic freedom" or "mostly peaceful protests," Campus Terrorists continue to engage in violent activity at USC, and continue to spew and hurl hate speech and ethnic slurs against Jews, all the while wearing Khafias draped around

their faces, sunglasses and masks that by design are intended to conceal their identities from those they attack and in particular, Jewish Students and faculty - for the purpose of continuing to terrorize Jewish students and faculty members who are there to study.

40. At all times herein mentioned, UUSC made available certain of its programs, activities, and campus areas when certain students and faculty that Plaintiffs were excluded from because of their genuinely held religious beliefs. For example, Plaintiff DOE Faculty Member 2004 was accosted in the public square outside of the encampment by thugs shouting violent chants of "death to Jews," "death to Israel" and "death to America," spat on by "protestors" and denied access by demands to disavow that the faculty member was a "Zionist" and did not support the "Israeli death war machine." Plaintiff student - who uses the USC campus to study - faced the same type of violent harassment in order gain access to the public areas of the USC campus that non-Jewish students were given full access to by the Campus Terrorists. Given that violent protests will likely return to USC's campus (as evidenced in part by the March 2025 uprising) that will again restrict certain Jewish students and faculty members access to ordinarily available programs, activities, and campus areas, Plaintiffs are likely to suffer an irreparable injury absent a preliminary injunction.

## STATEMENT OF THE CASE

41. Plaintiffs incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 40 of this Complaint as if fully set forth at length herein.

42. Defendants the University of Southern California, once considered among the most most prestigious public institutions in the world, has deteriorated into a hotbed of anti-Semitism, confirming for the public that USC's well-known historical antisemitism has not abated at all. This rampant anti-Jewish environment burst into view on October 8, 2023, the day after Hamas terrorists attacked Israel in a harrowing rampage that saw over 1000 innocent Jews, including infants and the elderly, murdered, raped, and mutilated..

43. In the wake of these horrifying events, USC should have taken steps to ensure that its Jewish students and faculty were safe and protected from harassment and undeterred in obtaining full access to campus facilities. Instead, USC officials routinely turned their backs on Jewish

students and faculty, aiding and abetting a culture that has allowed calls for the annihilation of the Jewish people, Nazi symbolism, and religious slurs to go unchecked and unabated. During the siege by the Campus Terrorists and creation of the "Jew Exclusion Zone," USC went so far as to tolerate Nazi swastikas that Jew-haters sprayed on USC property. (A true and correct copy of a color photograph of a swastika on a USC entry gate taken by one of the Plaintiffs during the siege and occupation of USC is attached hereto as Exhibit E) and incorporated herein by this reference).

44. Matters turned especially ugly the following spring.

45. In the Spring of 2024 -- fearful of demonstrations that had sprung up at other campuses, including Columbia, NYU, George Washington University and other East Coast repercussions from "diversity and equity" leaders and the cutting off of university funding by the Hamas-supporting Biden Administration -- the Trustees of the University of Southern California ("USC") (referred to herein as "USC" or alternatively, the "Defendant University") decided to enact an "appeasement policy" to deal with the problem and invited, encouraged, aided, abetted, permitted, allowed, and subsequently negotiated with, enabled and coddled the violent sword and other weapon-wielding, Jew-hating Hamas-supporting terrorist antisemites (the "Campus Terrorists") who infiltrated and overtook its Los Angeles campus, setting up tents and occupying USC's common areas and other property under the Defendant University's watchful eyes.

46. USC was aware of the hatred in encampments springing up at other campuses and the pattern and practice devised by outside agitators that followed a pattern and practice of division and havoc sowed by outside organizations and attitudes, including Co-Defendants JFP, JVP and other antisemitic organizations that are now considered to be aligned with antisemitic and anti-America terrorist groups – including most recently Hamas - that have offices on USC's campus. These Hamas sponsored (and funded) organizations also regularly participate in USC sponsored activities and promulgate antisemitic material via USC's official internet channel. (True and correct copies of examples affirming USC's sponsorship of such activities are attached hereto as Exhibit D).

47. Starting in late April 2024 and continuing several days into May 2024, USC invited,

permitted, coddled and allowed, through an adopted "appeasement policy," of allowing a group of "activists" – antisemitic thugs by any other definition - to set up barricades in the center of campus and establish an encampment that blocked access to critical educational infrastructure on campus. (These "activists" are referred to periodically herein as the "Campus Terrorists")

48. The Campus Terrorists chanted anti-Semitic threats like "death to the Jews," "free Palestine from the hand of Jews," "from the river to the sea, Palestine will be free," proudly trumpeting their hatred of the Jewish people. But their actions went well beyond such chants or even the pretense of "free speech" or "peaceful protests."

49. With the knowledge and acquiescence of USC officials, the campus terrorists enforced what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them from accessing the part of campus including classroom buildings and the main undergraduate library. (The "Jew Exclusion Zone" is sometimes alternately referred to herein as the "Encampment"). In many cases, the Campus Terrorists set up barriers and locked arms together preventing those who refused to disavow Israel from passing through. (A true and correct photographic depiction of the "Jew Exclusion Zone" is attached hereto as Exhibit A).

50. To enter the Jew Exclusion Zone, a person had to make a statement pledging their allegiance to the Campus Terrorists' views. While this may have prevented a pro-Israel Christian from entering the zone and permitted access for a Jewish person willing to comply with the enforcers' demands, given the centrality of Jerusalem to the Jewish faith (see allegations below), the practical effect was to deny the overwhelming majority of Jews access to the heart of the campus.

51. The campus terrorists permitted passage to those who passed this Orwellian inquisition.

52. USC's administration knew about the Campus Terrorists' extreme actions, including the exclusion of Jews. But in a remarkable display of cowardice, appeasement, encouragement and illegality, the administration did nothing to stop it. USC Chancellor and President Carol Folt publicly acknowledged that students had been physically blocked from accessing parts of the campus but failed to call in LAPD until public outcry demanded it.

53. Yet even as the activists campus terrorists continued to enforce the Jew Exclusion Zone,

USC not only failed to marshal resources to intervene - it adopted a policy of facilitating the Jew Exclusion Zone, ordering, among other things, USC campus police and security to stand down, step aside and appease the Campus Terrorists.

54. Rather than instructing campus police and security to assist Jewish students in accessing campus resources, USC instead instructed them to discourage unapproved students from attempting to cross through the Encampment and other areas blocked by the Campus Terrorists.

55. USC's administration supported and further coddled the Campus Terrorists by providing them with megaphones, food, water bottles and other necessities of life so they could carry on with their reign of terrorism against Jewish Students and Faculty. The water bottles were subsequently used as weapons against any Jews seeking to enter the public buildings including within the Jew Exclusion Zone.

56. All told, the Jew Exclusion Zone existed on campus for more than two weeks and what seemed to be an eternity to Jewish students and faculty used to enjoying the benefits of a campus free from terrorism against Jews. The Campus Terrorists , wreaking havoc on the lives of Jewish students who were and are simply trying to attend classes and study for exams and Jewish faculty who were trying to grade exams.

57. As more particularly set forth in this Complaint, each of the individual Plaintiffs was prevented from passing through the Jew Exclusion Zone during the existence of the Encampment, not to mention the exclusion of all of the USC Jewish students and faculty in the subclasses who failed or refused to denounce "Zionism" or their Jewish faith

58. USC boasts of its open inclusive environment that nurtures the growth and development of all faculty, students, administration and staff and assures students that it does not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity, citizenship national origin, or religious beliefs. USC also has a number of policies that

purport to implement these guarantees. But USC has failed to provide Jewish students, faculty, and staff with the protection promised by such policies. Needless to say, Jews should not fear for their safety when they walk around any public space, let alone the campus of a prominent American research university.

59. Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered access to USC's educational opportunities and to protect the Jewish community is not only immoral - it is illegal.

60. Specifically, it violates numerous federal and state constitutional guarantees, including the equal protection clause, the free exercise clause and the freedom of speech.

61. And it contravenes the basic guarantee of equal access to educational facilities that receive federal funding, as well as numerous other statutory guarantees of equality and fair treatment

62. Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew will again suffer from the discrimination and indignity they have endured. And because the administrators at USC took actions (or did nothing) which amounts to sanctioning segregation, they are clearly unconstitutional actions entitling Plaintiffs to hold the school's administrators personally liable for their reprehensible failures. Plaintiffs will seek leave to amend this complaint pending discovery to name these individuals as defendants when their identities are ascertained.

63. In 1790, George Washington wrote to the Hebrew congregation of Newport, Rhode Island (which sought assurances about the place of Jews within American Society): "May the children of the stock of Abraham, who dwell in this land, continue to merit and enjoy the goodwill of the other Inhabitants; While everyone shall sit in safety under his own vine and victory, and there shall be none to make him afraid" (Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), in Founders Online, National Archives, https://perma.cc/VUR8-G3BC).

64. USC treated Jews disparately and discriminated against them. As a result, Plaintiffs received a different educational experience than other USC students while elevating the Hamas leaning Campus Terrorists to "heroes" under the guise of "academic freedom" or "protecting free

speech." USC's treatment of Jews and acquiescence to the Jew Exclusion Zones is repugnant to a civilized society.

65. The Campus Terrorists' intent and the avowed purpose of the Encampment – clear to most reasonable persons with common sense - was to create and sow division through acts of disruption, chaos and dissension on the Defendant University's campus. Among other things, the Campus Terrorists sought to and in fact did disrupt classes, overtook University buildings and property, and most importantly, terrorized and victimized blameless Jewish Students and Faculty in a rein of terror under the hoax, guise, and "cover" of engaging in peaceful protests to support false and fictitious victims of the Israeli government's alleged "Palestinian Genocide." The hoax was enabled by and perpetrated under the Defendant University's watchful eyes to such an extent that the Jewish Students and Faculty were so fearful for their lives and safety that they could not appear in the Defendant University's "town square" or anywhere else on campus without being verbally or physically assaulted by the Campus Terrorists, as well as the Campus Terrorists' student supporters were afforded a sense of security by the Defendant University's "appeasement" policy of coddling the Campus Terrorists. Jewish Students and Faculty were touched without their consent and spat on by the Campus Terrorists if they dared to cross into the Encampment. Their fear was and still is genuine and palpable. The fear was and is made worse by the Defendant University's encouragement of the offensive conduct for weeks on end before finally taking steps of remediation.

66. Alternatively, Jewish Students and Faculty were told by the Defendant University to work remotely from home, or remain in their offices or dorms for their "own safety." Classes and commencement exercises were cancelled as the Defendant University continued to appease, coddle and negotiate with the Campus Terrorists. Jewish Students and Faculty, (including the Plaintiffs herein) were not allowed to attend classes as usual or give lectures or grade papers on site and could not walk safely to class or their offices on campus without being assaulted by the Campus Terrorists. (See Exhibit A)

67. Meanwhile, other Hamas-leaning and supporting faculty members hired by Defendant

University to abide by DEI and other quotas continued to encourage students attending classes to participate in the chaos and disruption created by the Campus Terrorists by offering such students extra credit and better grades for participating, all with the knowledge and consent of the Defendant University.

68. Plaintiffs are regularly exposed to pro Hamas propaganda and posters "calling all students, faculty and staff to "attend" pro Hamas rallies on USC campus property, such as Bovard Hall. These "Pro- Hamas" rallies, endangering plaintiffs, Jewish students and Jewish professors and faculty, are encouraged by and acquiesced to by Defendant university. (See Exhibit D).

69. At all times herein mentioned, the Defendant University also knew or should have known that nearly half of the Campus Terrorists creating, managing and equipping the Encampment and causing the harm to Jewish Students and Faculty, creating the chaos and disruption and overtaking the Defendant University's buildings and property, were and still are in fact paid outside agitators rather than genuine students attending classes at the Defendant University. The Campus Terrorists and Co-Defendants JVP, SJP were and are supported and funded by wealthy Democrat Party donors and radical Democrat Left Wing political action groups, including the Rockefeller Brothers Fund, Tides Center, Soros Foundation and Popular Front for the Liberation of Palestine ("PFLP"), all done under the Defendant University's watchful eye. (New York Post, various articles, April – May 2024).

70. Far from "peaceful protests" and the "free speech" narrative promulgated by the Democratic Party-controlled media, Democrat congressmen and the Democrat Party itself, the dangerous hate-filled, violent, and antisemitic speech included rote comments repeated ad nauseum through megaphones that were so offensive to any Jew that it offends them to hear it, eliciting memories of the Holocaust and October 7, 2023 – slogans that include "Death to Israel" (the only Jewish nation state in the world and a common refrain of Iranian fanatics and their proxies), and not surprisingly, "Death to America." Violent, hate-filled speech is not only offensive and hurtful, it is dangerous and not protected by the First Amendment.

71. Defendant knew about the antisemitic nature of these alleged student groups yet

encouraged them by providing offices on campus and soliciting funding on their behalf from the United States under USAID and other agencies that the Trump Administration's "DOGE" unit recently found was riffled with fraud, waste and abuse.

72. The purpose and intent of the Campus Terrorists was not to peacefully protest but to terrorize, intimidate, assault, and shame Jewish Students and Faculty members and interfere with their right to freely travel to and from classes, offices, and otherwise accessing other facilities at the Defendant University by threats, intimidation, and coercion. All of this was done to harm Jewish Students and Faculty members and create the equivalent of a hostile work and educational environment, with the knowledge, consent, encouragement and blessings of the Defendant University.

73. USC knew that soliciting and inviting radical left-leaning Jew-hating professors and lecturers to campus would create chaos, dissention and the violence and harm that in fact occurred in the Spring of 2024 and continues to this day.

74. USC allowed Anti-Semitic organizations to use its professional platforms and e-mail addresses to spew Jew-hating anti-Zionist Hamas propaganda that USC knew or certainly should have known would incite chaos, violence and property destruction that occurred on campus.

75. The Campus Terrorists' purpose was encouraged, and aided and abetted by the Defendant University. The Defendant University invited Hamas-supporting groups to speak at USC notwithstanding the rampant antisemitism spewed by such groups; encouraged Hamas-leaning and -supporting faculty members to spew antisemitism and hatred of Jews and the State of Israel, the only Jewish country in the world.

76. Defendant University allowed the Campus Terrorists to continue their anti-Semitic campaign against the Defendant University's large Jewish student body and faculty unabated until April 24, 2024, when the Defendant University finally allowed the Los Angeles Police Department ("LAPD") to clear the Encampment and arrest 93 people on suspicion of trespassing, reporting publicly that nearly half of the arrested mob members were not students attending USC at all but rather paid and monied agitators funded by the democratic dark-money political action groups identified herein above.

77. None of the offending students, Campus Terrorists, paid outside agitators or other responsible parties, arrested or otherwise, suffered any consequences. Despite Defendant University's belated call for the LAPD's belated intervention and the subsequent arrest of certain parties, the offending Campus Terrorists were all released without bail to launch their attack again, spurred on by outside agitators funded by the Rockefeller Center and other Jew-hating organizations, such as Tides and George Soros. And the Defendant University has refused to press charges or discipline offending students or faculty members, allowing antisemitism to exist, fester and continue like a malignant cancer and spread throughout the Defendant University's campus even after removal of the Jew Exclusion Zone. For example, as of May 7, 2024, Hamas-supporting protests were continuing at the Defendant University's campus, under the administration's watchful eyes, with Palestinian flags and students or outside supporters, sporting Palestinian flags and other terrorist garb, including green Hamas headbands, sunglasses and the traditional Keffiyeh – and of course, black and white Hamas facemasks and scarves to hide the Campus Terrorists' identities. It is common knowledge that hiding identities is a hallmark of terrorists and terrorism.

78. After the Jew Exclusion Zone was removed, students and outside vendors were and still are allowed to continue to send emails on University sponsored or permitted internet platforms to promulgate Hamas and terrorist propaganda and flyers against Jews, Jewish students and Faculty to encourage gullible students, faculty and other supporters to purchase Keffiyehs to wear and display at individual department graduation ceremonies, all with the knowledge and encouragement of the Defendant University. (Examples of such flyers and propaganda are attached hereto as Exhibit D and incorporated herein by this reference).

79. As of the filing of this Complaint, the Palestinian flag is still proudly displayed virtually anywhere on campus by Keffiyeh and mask-wearing thugs, within sight of Figueroa Street, aided and abetted by the founding, supporting and incoming new members of the Campus Terrorists with the knowledge, consent and encouragement of USC.

80. The Defendant University, one of America's leading universities, has for decades been

one of the worst centers of academic anti-Semitism in the United States. Since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated 1200 people – including infants, children, and the elderly – anti-Semitism at Defendant University has been particularly severe and pervasive. Defendant University faculty and students have openly lauded Hamas' October 7 atrocities as astounding, awesome, and great feats. Mobs of pro-Hamas students and faculty have marched by the hundreds to Defendant University's campus shouting antisemitic slogans, including calls for genocide, such as: Jews will not defeat us; there is only one solution, intifada revolution; we will honor our martyrs; resistance is justified; by any means necessary; from the river to the sea and in Arabic, from water to water Galilee will be Arab.

~~81.~~ These mobs have occupied Defendant University's buildings, promoted violence against and restricted access to Jewish Students and Faculty members, caused cancellation of classes and commencement exercises, and harassed and assaulted Jewish Students and Faculty members on campus.

82. Jewish Students and Faculty members have been spat at and faculty physically assaulted, threatened and targeted on campus and social media with epitaphs such as death to Jews. Defendant University has helped promulgate antisemitism in its courses and dismissed and intimidated students who object. What is most striking about all of this is Defendant University's abject failure and deliberate refusal to act to stop and deter this outrageous antisemitic conduct and discipline the students and faculty who perpetrated it. In fact, the Defendant University encouraged the conduct by its appeasement policy in the face of hate speech, dangerous misconduct in other actions that it knew or should have known would create the worst and most insidious hostile antisemitic work environment.

83. The Defendant University's antisemitism manifests itself in a double standard insidious to Jewish Students and Faculty members. Defendant University selectively enforces its policies to avoid protecting Jewish Students and Faculty members from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish Students and Faculty pleas for protection. Defendant University permits students and faculty to advocate

without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.

84. Plaintiffs and other similarly situated Jewish Student and Faculty members, and numerous others have explicitly and repeatedly warned Defendant University that its severe and pervasive hostile anti-Semitic environment harms Jewish Students and Faculty members. In fact, Defendant University has been aware of its anti-Semitism problem for years, but its response has been utterly ineffective and clearly unreasonable in tolerating and even enabling antisemitism. Defendant University has abjectly failed to enforce its policies and discipline those responsible for turning USC campus into a severely hostile environment for its Jewish Students and Faculty members, including the Individual Plaintiffs and other similarly situated Jewish Student and Faculty members. When, in clear violation of Defendant University's policies, a mob of students overtook a campus building to further their antisemitic agenda, Defendant University's response was not to remove and discipline them, but to enable them to conceal their identities by supplying them with supplies and ammunition that the mob subsequently used against LAPD.

85. Defendant University's longtime practice when it comes to antisemitism—of refusing to enforce its own policies against discrimination and harassment—ensured that Hamas' October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus. Shockingly, numerous students and faculty members at Defendant University have openly endorsed Hamas and the horrific October 7 massacre of Israelis it perpetrated even though Hamas, since its founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against civilians; Hamas vows to kill and destroy Jews and Israel; the U.S. State Department has designated Hamas as a Foreign Terrorist Organization; and Hamas repeatedly proclaims its determination to repeat the October 7 atrocities until its genocidal aims are achieved. Many of Defendant University's students and faculty support Hamas and condemn Israel for defending itself against Hamas' terrorist attacks—but they are never heard to condemn, let alone rally against, anyone other than Israel and the Jews.

86. Subjected to intense anti-Jewish vitriol, including from their own professors and

Defendant University, the Individual Plaintiffs and other Jewish Students and Faculty members have been deprived of the ability and opportunity to fully participate in Defendant University's educational and other programs and have been placed at severe emotional and physical risk. Defendant University's double standard extends to depriving Jewish Students and Faculty members equal time to express contrasting pro-Jewish views. More importantly, Jewish Students and Faculty are terrified about disclosing their pro-Israel stance for fear of violence or worse.

87. USC has permitted endemic antisemitism to exclude Jewish Students and Faculty members from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Defendant University, and has insidiously discriminated against them by, among other things, failing to protect them in the same way Defendant University has protected other groups all based on their race, ethnicity, religion, citizenship, and/or national origin. That Defendant University has done so for many years and continues to do so to this day further confirms that it has responded to antisemitism with at best deliberate indifference, that Defendant University cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

88. As alleged herein, Defendant University's actions, including its deliberate indifference to, and indeed enabling of, anti-Semitism on its campus, constitute an egregious violation of California's Bane, Unruh, and Ralph Civil Rights Acts (California Civil Code sections 51, 52.1 and 51.7) and created and continue to create a dangerous condition of public property. The "Jew Exclusion Zone" and continued antisemitism on USC's campus also violates federal civil rights laws, including 42 USC Sections 1981, 2000d (Title VI).

89. Defendant University must now be compelled to implement institutional, far-reaching, and concrete remedial measures. Defendant University must also pay damages to Plaintiffs—who have been robbed of a healthy and safe college and graduate school experience. The Plaintiff Faculty member and subclass were also deprived of the opportunity to work in an environment free of hostility toward Jews. Regrettably, no amount of damages can ever fully compensate Plaintiffs for the hostility they have been forced to endure as a consequence of Defendant University's unlawful conduct.

90. Defendant University's administration exported their inadequate management skills and style, including appeasing, enabling, encouraging, aiding, abetting, coddling and negotiating with the Campus Terrorists and allowing the Campus Terrorists to repeatedly build and rebuild the encampments to terrorize Jewish Students and Faculty. USC continues to encourage and enable the Campus Terrorists to this day, aided and abetted by JVP and SJP.

**THE PARTIES**

91. DOE JEWISH USC FACULTY MEMBER 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or sometimes "Jewish Professor") is and at all times herein mentioned was a Jewish professor employed by and at USC. Much like a victim of sexual abuse and assault, Jewish professor fears for Jewish professor's life, liberty, safety and health as well as the fear of a hostile work environment caused by the filing of this lawsuit - and in particular, the risk to Jewish professor's continued employment at USC if Jewish professor's identity is publicly disclosed, or if Plaintiff is "outed" by USC disclosed to Jewish Professor's boss or USC's human resources department. Accordingly, Jewish professor is suing herein as a doe plaintiff.

92. Jewish professor is suing herein individually and on behalf of all other USC Jewish faculty members who are similarly situated.

93. The following is Jewish professor's personal diary of the highly offensive, hateful, hurtful, unequal and obnoxious conduct Jewish professor and other similarly situated Jewish professors experienced and endured and continue to experience and endure at USC as a result of the Campus Terrorists' unlawful activity and as a result of USC's aiding, abetting, encouragement, enabling, and participation in what was effectively "mob rule" at USC and the creation of encampments and the Jew Exclusion Zone:

**Before October 7, 2023:**

94. I was aware of the US Department of Education's Office for Civil Rights Title 6 investigation into allegations of anti-Semitism at USC after a Jewish student resigned from her position as student government vice president in August 2020. She was being

targeted for discrimination because of her perceived Jewish identity. I was also aware of the anti-Semitic student and faculty organizations, speakers, professors, and other hate mongers USC invited on campus to lecture and allowed to flourish and grow who lectured about and were known to spread Hamas propaganda and other dogma and ideology. Among the other lies promulgated by such hateful organizations, speakers, professors and other hate mongers is their specious claim that Israel - and the Jews that inhabit only a fraction of the only democratic, multi ethnic, religious and racial Jewish nation state in the world - are "oppressors" against the "oppressed." I come from a family of Holocaust survivors and victims and as a consequence the continued existence of a Jewish nation state and the Nation of Israel are very important to my personal religious beliefs. For my part I sees no "distinction" between antisemitism and anti-Zionism – it is Jew hating by any name.

**<u>After October 7, 2023</u>:**

95. After October 7, I personally witnessed several incidents of students and other individuals removing posters of kidnapped Israeli civilians who are and were being held in hostage in Gaza.

96. In February 2024, three student groups, including Students for Justice in Palestine ("SJP") - held a vigil for Palestine and launched a "national divestment campaign," calling on USC to divest from Israel and saying "we know that USC is very complicit in violence."

97. I have personal knowledge that complaints have been lodged against some professors for allegedly promoting anti-Semitic and anti Zionist content online and a number of Jewish students - particularly in the law and medical schools - have also publicly reported being targeted with online harassment.

98. The level of anti-Semitism rose to unprecedented levels in April 2024, when USC President Carol Folt announced the nomination of Muslim student Asna Tabassum ("Tabassum") as USC's 2024 valedictorian. USC knew or certainly should have known as alleged above that Tabassum's social media was replete with anti Israel propaganda and violent hate speech when an e-mail was sent out by Provost Guzman to keep her as valedictorian yet not allow her to speak.

That was the turning point that led to the creation of campus anti Israel encampments and a level of open Anti-Semitic vitriol that I have never previously experienced. Encampments – the equivalent of "Jew Exclusion Zones" – sprung up all over the USC campus that required disavowing "Zionism" and/or the "Palestinian Genocide" in order to pass. (A photo of one of the "Encampments" depicting the "Jew Exclusion Zone" is attached hereto as Exhibit " ). The calls for "death to Israel, death to America, and even death to Jews, on USC's campus were growing in numbers and I could not get to my office without being barred and accosted by protesters asking me, "Are you a Zionist?" "Do you support the Israeli death war machine?" On May 3, 2024, I was walking toward my office at USC when a group a visibly angry, scary and frightening "protestors" approached me and asked me if I "Supported the Zionist baby killing entity" and then spat on me. I endured this for about 3 weeks before deciding that I would not return to campus again until this came to an end. What is all the more disturbing is the number of faculty members who openly protest with the students and some even cancelling their final exams so the students can protest daily.

99. I did try to get to my office on May 2nd, 2024 only to be accosted again crossing Truesdale Parkway by thugs asking repeatedly if I "supported the Zionist entity." I refused to engage. On the way back to my car, I was approached by a woman asking if I wanted to participate in a "bake sale for Palestine" to help feed the children that Israel is intentionally starving. I kept walking and refused to engage.

100. I feared for my safety and life in April – May 2024 and still entertain these fears as a result of the Campus Terrorists' actions, not knowing whether or when another Encampment or Jew Exclusion Zone will pop up on campus as a result of USC's appeasement policy and the way it dealt with the Campus Terrorists, the Jew Exclusion Zone and still deals with antisemitism on campus. There appears to be a continuing and growing anti-Semitism and terrorist threat on campus, which makes me and other Jewish professors anxious and apprehensive. All the while, USC continues to acquiesce to the flow and to appease, aid, abet, tolerate and encourage what has become an anti-Semitic mob on campus that is gaining mass appeal.

101. The Holocaust in essence began at the universities in Germany when the Nazis prevented Jewish students from entering the campus and then forced out the Jewish professors. When our pathways are blocked and we are granted entry only when we attest that we do not support Israel, how are we free to both express their Jewish identity and perform our jobs at USC?

102. Plaintiff DOE JEWISH USC STUDENT 1987, Individually And On Behalf Of All Others Similarly Situated (Plaintiff, Plaintiffs or "Jewish Student" or "Students," depending on the context) is and at all times herein mentioned was a Jewish student attending USC. Much like a victim of sexual abuse and assault, Jewish student fears for Jewish students life, liberty, safety and health as well as the hostile educational environment caused and created by the filing of this lawsuit. In particular, Jewish Student is fearful of the risk to her continued attendance at and graduation from USC if Jewish student's identity is publicly disclosed, or if Plaintiff is "outed" by USC.

103. Plaintiff Jewish student is suing herein individually and on behalf of all others similarly situated.

104. The following is Jewish student's personal diary of the highly offensive, hateful, hurtful and obnoxious conduct Jewish student and other similarly situated Jewish students experienced and endured and continue to experience and endure as a result of the Campus Terrorists and of USC's aiding, abetting, encouragement, enabling and participation in the antisemitic mob's rule at USC:

105. I don't travel to campus very often because I'm a hybrid physical therapy student at USC's Health Science campus. But when I do commute, it is for several consecutive days and I'm there at 8:00 AM to 10:00 PM for 7 to 8 days, in class, studying, and practicing skills with classmates.

106. It used to be very safe and we would travel to and from and walk all around campus, from the parking lot, to CHP building and the Hyatt Hotel for more studying and meals.

107. On April 2nd, USC President Carol Folt announced Asna Tabassum ("Tabassum")

as the undergraduate valedictorian. As part of this honor, she was to give a speech at the upcoming commencement.. Upon recognition, it was mentioned that she was majoring in biomedical engineering and minoring in "resistance to genocide."

108. On the surface this sounded great. An uprising against genocide of any group of people is a positive thing period. However, anti Israeli protesters have been using this term to justify the acts of October 7th. They claim that the act of rape, murder, torture and taking hostage was their "resistance to genocide."

109. The "narrative" encouraged by USC and its faculty is offensive and hurtful to Jews and paints all Jews in one broad brush as favoring genocide with respect to Palestinians. I have Holocaust survivors in my family and the independent State of Israel and its continued existence is very important to me and significant with respect to my religious beliefs. I similarly see no distinction between anti-Semitism and anti Zionism - by any name it is the hatred of Jews and the Jewish State of Israel.

110. The valedictorian (Tabassum) has published several statements advocating for "the complete abolishment of the state of Israel" on the grounds of "ethnic cleansing and apartheid."

111. It is shocking that someone with such strong anti-Semitic beliefs would be chosen by USC's administration and the trustees for such a high honor as valedictorian. USC knew or certainly should have known the turmoil it was creating by such a poor choice. The community pushed back and voiced concern about what this anti-Semitic, venom-spewing and hate speaking and writing represents as valedictorian of 2024. This concern was likely fueled by both social media and the ongoing conflict in the Middle East. Regrettably and to the detriment of the other Jewish students and me, USC and the trustees and President Folt ignored the public uproar. Encampments and "Jew Exclusion Zones" were allowed to continue after April 29, 2024 and continued through at least May 5, 2025, as confirmed by an article published in "Deadline" by Bruce Haring, USC Pro-Palestinian Encampment Cleared Again By Police:

"Encampments at USC have now been established and taken down three times,

resulting in restricted access to the university. Disturbances grew in the wake of

USC's decision not to let a pro-Palestinian [and pro-Hamas] valedictorian speak at its main graduation ceremony."

111. On April 15, 2024, USC announced (in e-mail) that Asna was to remain valedictorian, but would no longer speak at commencement.

112. While that should have been the end of it, when I began traveling to and from campus I had encountered several posters on our building doors that read and stated, "#Let Asna Speak." The posters had the same picture from the original newsletter that claimed she was valedictorian with her major and minor. In that moment, I recognized and grew fearful that I could no longer feel safe on campus without USC's intervention and the implementation of systemic and institutional changes.

113. The anti-Semitism allowed to pervade USC is no longer a problem isolated to the undergraduate or the main campus - it is now spread to all aspects of USC life, philosophy and policy and it's frightening to Jewish students like me and others similarly situated.

114. USC now suffers from a pandemic of hate with respect to Jewish students attending the university and Jewish faculty members alike, as well as other similarly situated Jewish Plaintiffs herein who can no longer freely exercise their faith and ethnicity, or act like or be themselves out of fear of reprisal. The anti-Semitism has also become systemic at USC's graduate campus.

115. On April 17, 2024 I received another e-mail - this time from one of our own professors at the department of physical therapy. The email asked everyone in the department to sign a petition to allow Asna to speak. It also attached a message from Asna to the students of USC and the same picture of her from the original newsletter. She stated in her letter that USC's Provost had mistreated her and didn't give her a complete answer on why they would not allow her to speak. In fact, the Provost did not did explain it was due to security and safety of the community.

116. On April 18, 2024 I received another e-mail from the same professor. It read "USC silent march for Asna. When USC silences Asna they are silencing all of us. Show up in support of Asna and demand USC let her speak at commencement. Wear a hoodie and mask to symbolize the institutional silencing Asna is experiencing."

117. I am informed and believe that USC and the trustees knew or should have known about these hurtful emails, since they were sent using USC's official "edu," internet platform.

118. I could not believe what I was reading. Now I'm being harassed by my own department - the community in which I'm supposed to dedicate my time and energy to has abandoned me and the whole Jewish community.

119. I couldn't understand how USC and my department would support her after all the hate speech she published.

120. I'm the only Jewish student in my entire class and I felt like I had to keep it a secret. I didn't want to have a target on my back or deal with anyone strong opinions during an already stressful week of finals.

121. That same day, a classmate (who I knew was Jewish) asked me what my opinion was on the topic of USC's decision to take Asna's speech away. I felt unsafe once again even among friends. Do I speak my truth and hope we are on the same page or do I brush it under a rug and avoid the topic just to keep some sense of peace in my class? USC's decision still had a big impact on Jewish students lives.

122. Unfortunately, to maintain a sense of normalcy and maintain relationships in school, I had to and still have to keep my opinions and identity to myself.

123. Ironically USC prides itself on diversity, equity and inclusion. By failing to protect its Jewish students and leaving them to fend for themselves among the riots created by the Campus Terrorists," multiple Encampments, "Jew Exclusion Zone" and illegal occupation of school property USC failed to abide by its own standards. What's worse, USC's internet platform continues to publish flyers and announcements promoting and advocating for antisemitic and Muslim causes and protests to the detriment of Jewish students or other ethnicities who do not support such causes.

124. USC's failure to condemn anti-Semitism and its appeasement policy provides "cover" for hate mongers like Asna and justifies her antisemitic behavior. Accordingly, Jewish student's fear and anxiety is real and justified.

125. Defendant USC is a California private benefit corporation controlled by its Board of Trustees.

125a. Defendant JEWISH VOICES FOR PEACE ("JVP") is an unincorporated association and/or other entity that maintains a presence and operations on the USC campus and is alleged to have aided, abetted, encouraged, and participated in the creation, maintenance, and enforcement of the Jew Exclusion Zone described herein, and the exclusion of Plaintiffs from USC campus areas.

125b. Defendant STUDENTS for JUSTICE in PALESTINE ("JFP") is an unincorporated association and/or other entity that maintains a presence and operations on the USC campus and is alleged to have aided, abetted, encouraged, and participated in the creation, maintenance, and enforcement of the Jew Exclusion Zone described herein, and the exclusion of Plaintiffs from USC campus areas.

125c. Plaintiffs are ignorant of the true names or capacities of the defendants sued herein under the fictitious names of "DOES 1 through 50" who are named herein pursuant to Code of Civil Procedure section 474. Plaintiffs will seek leave to amend this Complaint to include such defendants when their identities are ascertained. These defendants include perpetrators of violence, coercion and intimidation in the Spring of 2024 occupation and siege as well as the organizations and individuals who funded the operation nationwide and at USC. Regrettably, USC permitted most of the perpetrators of the violence to hide and conceal their identities to further terrorize Jewish students and faculty in flagrant violation of USC's own antidiscrimination policies and procedures.

125d. Each of the defendants was the agent, joint venturer, and employee of each of the remaining defendants and in doing the things alleged in this Complaint was acting within the course and scope of said agency, employment and joint venture with the advance knowledge of each and every remaining defendant.

## CLASS ACTION ALLEGATIONS

126. This is a Class Action originally filed pursuant to the provisions of Code of Civil Procedure section 382, which is patterned after Rule 23 of the Federal Rules of Civil Procedure. Section 382 and Rule 23 both say substantially the same thing, namely:

> "[W]hen the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

(California Code of Civil Procedure section 382).

127. Plaintiff DOE USC FACULTY MEMBER 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Professor"), sues in Jewish professor's individual capacity as a Jewish USC professor who suffered damages, harm and was stigmatized as a result of USC's conduct, and as a representative on behalf of all others similarly situated Jewish professors.

128. Plaintiff DOE JEWISH USC STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Student"), is a Jewish USC student who sues in Jewish student's individual capacity as a Jewish USC professor who suffered damages, harm and was stigmatized as a result of USC's conduct, and as a representative on behalf of all others similarly situated Jewish students.

129. Both subclasses are ascertainable and sufficiently numerous. Jewish Professor is informed and believes that there are over 7,000 full-time Jewish USC faculty members and that a substantial number of them are similarly to Jewish Professor. Plaintiff Jewish USC student is informed and believes that there are over 3,000 full-time Jewish USC students and that a substantial number of them are similarly situated to Jewish student.

130. The Jewish professors and faculty members and Jewish students share the same common interests of wanting to be safe and free from Campus Terrorists and antisemitism on campus and safe and free from other harm including stigmatization, status discrimination, religious discrimination, assault, battery and other general damages.

131. Plaintiffs also have the common interest of enjoying their freedom of travel, access and passage, and freedom to practice of their religion without discrimination or discriminatory

practices, or fear of reprisal from USC-sponsored Campus Terrorists. It remains to be seen what the Campus Terrorists would have done or would do in the future if USC again tolerated the creation of encampments or other "Jew Exclusion Zones."

131. Judicial economy and efficiency will be served by treating and certifying this matter as a class action given the numerosity of plaintiffs in each subclass, common issues of fact and law and related common issues.

**RELIEF NEEDED**

132. As set forth above, USC knowingly allowed violent activists to establish a "Jew Exclusion Zone" on USC's campus for more than two weeks during the spring quarter in 2024, and aided, abetted, appeased, enabled, supported, condoned and appeased Co-Defendants JVP, SJP and the Campus Terrorists to construct it as well as the encampments, giving the appearance to Jewish students and faculty that the Campus Terrorists were in a favored position while Jews at USC were second class citizens.

133. Defendants had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist in flagrant violation of Plaintiffs' constitutional rights.

134. USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone. Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests still taking place at Columbia and other East Coast campuses as of the filing of this Complaint and the May 2025 on campus uprising. This time, with the help of LAPD, USC quelled the potential harm after several hours instead of weeks. But what about next time?

135. Since Plaintiffs have been harmed by USC's previous allowance of the Jew Exclusion Zone and its continued failure to combat on-campus antisemitism, as evidenced in part by the DOJ's Antisemitism Task Force identifying USC as one of the 10 worst college campuses in the United States with respect to combating it, Plaintiffs seek an order from this court or injunction to

be able to continue their educational and professional pursuits on campus in peace and freedom. Plaintiffs need to know that they will be safe on campus, be free to exercise their religion, and receive equal protection of the laws. Accordingly, Plaintiffs need an order or injunction requiring USC to ensure that no other "Jew Exclusion Zone" will be allowed on USC's campus, both during the pendency of this case and beyond.

**USC's Sponsorship of JVP and JFP and Tolerance of Antisemitic Hostility Creates a Hostile and Dangerous Educational Environment**

136. The University of Southern California (USC), is an institution that receives substantial public funds and holds itself out as an inclusive and nondiscriminatory educational environment. Thus, USC has a legal and moral obligation to protect all students from harassment, intimidation, and discrimination based on their religion. By allowing groups such as Jewish Voices for Peace (JVP) and Students for Justice for Palestine (SJP) to operate freely on campus while those organizations promote Hamas-aligned rhetoric, engage in exclusionary protest activity, and foster hostility toward Jewish students and faculty, USC has created a dangerous and discriminatory environment in violation of California law and its own stated policies.

136b. These groups are not merely advocacy organizations. They are ideologically aligned with Hamas, a federally designated terrorist organization, and promote antisemitic propaganda. USC has supported them by granting official recognition, office space, and use of university email and web platforms. Jewish students have been spat on, verbally abused, blocked from campus areas, and told to disavow their religion to gain access to public university spaces, which includes members of JVP, SJP and on information and belief, USC faculty members.

136c. By continuing to support and sponsor these groups, USC has created a hostile educational environment in violation of the Unruh Civil Rights Act (Civ. Code § 51), Bane Act (Civ. Code § 52.1), and state constitutional guarantees, not to mention violation of the federal Civil Rights Act of 1964, now codified in 42 U.S.C. § 2000d, as well as 42 U.S.C. §1981. The failure to discipline

those responsible or to enforce existing anti-harassment policies also makes the University complicit.

**USC has a legal and moral duty**
**to protect its students from discrimination and harassment**

136c. USC is not a passive bystander. By housing and supporting groups like Justice for Palestine (JFP) and Jewish Voices for Peace (JVP) — which openly promote antisemitic rhetoric, glorify Hamas, and incite hostility toward Jewish students — the university becomes an active enabler of discrimination. California law (Unruh Act, Bane Act, Ralph Act) and the California Constitution prohibit this.

- These are not neutral political groups. As alleged, JFP and JVP coordinate protests that exclude, intimidate, and target Jewish students for their religious identity or support of Israel.
- When USC provides institutional support—offices, event space, official status, email platforms—it is endorsing and legitimizing groups that foster a hostile and unsafe environment.

**The presence of JFP and JVP creates a hostile educational environment**

136d. In legal terms, Jewish students are deprived of the "full and equal benefits" of their education. In practical terms, they:

- Avoid entire areas of campus for fear of harassment;
- Are told to stay in dorms while JVP/JFP-aligned mobs roam freely;
- Are subject to litmus tests ("Are you a Zionist?") at exclusion checkpoints;
- Suffer emotional trauma, religious marginalization, and social isolation.

This is not academic disagreement—it's religiously motivated hostility, bordering on segregation.

**USC's support of JVP and JFP violates its own policies**

137e. USC publicly claims to uphold:

- Diversity, equity, and inclusion (DEI),
- Zero tolerance for hate or harassment,
- Equal access to campus for all students regardless of religion.

Yet it selectively enforces those values by shielding groups like JVP and JFP from accountability, even when they threaten, intimidate, or assault Jewish students. That is not just hypocritical — it's a breach of USC's contractual and ethical obligations to its students.

**Why USC should care**

137f. USC's continued support for extremist and designated terrorist groups:

- Exposes it to civil liability, as the instant lawsuit attests.
- Puts it under federal investigation, as with DOJ's March 2025 Antisemitism Task Force probe.
- Damages its reputation, alumni support, and accreditation standing.
- Sends a dangerous message to Jewish students: you are not protected here.

In short: Jewish students are harmed because USC tolerates and facilitates hate in the name of activism. And the university's role is not neutral — it has crossed the line from tolerance into complicity.

**CLAIMS FOR RELIEF**

**Count I**

**VIOLATION OF CALIFORNIA'S BANE ACT (Civil Code section 52.1)**

**AGAINST DEFENDANTS USC, JVP, SJP AND DOES 1 THROUGH 10**

138. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 137f as if fully set forth at length herein.

138a. Under the Fourteenth Amendment to the United States Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

139. The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

140. USC's intentional actions of aiding and abetting the Campus Terrorists to violently occupy USC's common areas and create and maintain the "Jew Exclusion Zone," as alleged herein above, as well as segregating Jewish students and faculty members to deal with the siege, occupation and denial of access to the common areas has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish.

140a. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

141. USC also intentionally adopted and promulgated a "separate but equal policy" that harmed Jewish students to their detriment while favoring Hamas-supporting on campus organizations like JVP and SJP as well as the Campus Terrorists who terrorized Jewish Students and Faculty by deliberately concealing their identities to coerce, intimidate and Jewish Students and Faculty without compunction or accountability,

141a. USC furthered no legitimate or compelling state interest by engaging in this conduct.

142. USC's failed to tailor their actions narrowly to serve any such interest.

**Parallels to 1939: When a University Aids in Religious Segregation, History Repeats**

142a. The events at USC in April and May 2024—where Jewish students and faculty were blocked from campus areas unless they disavowed their beliefs—bear disturbing similarities to the segregation and exclusion of Jewish students in Nazi Germany in the late 1930s. There, Jewish students were expelled from classes, physically barred from attending campus, and told they no longer belonged in educational institutions.

142b. In both cases, universities functioned not as safe spaces but as vehicles of religious exclusion. The use of threats, ideological loyalty tests, and mob violence—combined with institutional appeasement—created an environment of fear. USC's telling Jewish students to 'stay in their dorms or offices' instead of intervening mirrors the cowardice of institutions in pre-war Europe.

142c. That a modern American university knowingly repeated this error is alarming. The Holocaust did not begin with gas chambers—it began when institutions allowed mobs to isolate and target Jews. The law must make clear that this kind of religious exclusion is not only unconstitutional, but intolerable in any civilized society.

143. As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms.

143a. As a direct and proximate result of the USC's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and prejudgment and post-judgment

interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be harmed by USC's actions.

144b. All times herein mentioned, USC aided and abetted paid outside agitators and violent student protesters – including Co-defendants JVP and SJP -- to cause plaintiffs to reasonably believe that if they exercised their right to practice their religious faith and failed to denounce Zionist or baby killers and entered the Jew exclusion zone the violence would be committed against them in light of the campus terrorists apparent ability to carry out their threats and intimidation.

144c. Jewish communities have a deep historical memory of being scapegoated, harassed, and physically attacked, particularly when political tensions flare. When expressions of hostility (even if politically motivated) appear unchecked, it can trigger genuine fear for personal safety. The presence of terrorist organizations or their affiliates on USC's campus like JVP and JFP, clear supporters of Hamas and designated terrorist groups by the United States government as of March 2025 and USC's support of them and their violent activities on grounds of "academic freedom" is a sham. More importantly, it was and is serious concern to Jewish students and faculty.

144d. When mass individuals shout aggressively racial epitaphs aggressively and threaten assault and battery and commit actual battery on Jewish students and faculty, it creates fear, intimidation and coercion, all acquiesced to, encouraged and supported by USC. Blocking entry, isolating students, preventing people from accessing buildings or singling out students based on identity (for example, calling for Zionists or Jews to leave or to not enter) resembles mob behavior that can quickly become dangerous. When USC or any university fails to intervene in hostile behavior it can signal to Jewish students that their safety is not a priority. This perceived abandonment is frightening and demoralizing especially when Jews are systematically segregated

by the university as a matter of policy to dormitories and offices while non-Jews or Jews disavowing Zionism are permitted free access. Needless to say, it makes Jews feel like second class citizens while attending and working at a university that they formerly believed was a bastion of higher learning.

145. At all times here in mentioned, the Campus Terrorists acted violently against Plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions, with the acquiescence, aid, and comfort provided by USC, JVP and SJP, interfering with Plaintiffs' civil rights by threats, intimidation and coercion, as more fully described above.

146. Plaintiffs were harmed as a result of USC's and JVP's and SJP's actions and inaction, as more particularly alleged herein in paragraphs 1 though145 of this Complaint as if fully set forth at length herein.

147. Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

**Count II**

**VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT**

**AGAINST DEFENDANTS USC, JVP, SJP, AND DOES 1 THROUGH 10**

**(Civil Code sections 51, 52)**

148. Plaintiffs incorporate by reference the allegations set forth in paragraphs 138 through 147 of this Complaint as if fully set forth at length herein.

149. Under the Fourteenth Amendment to the United States Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

150. The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

151. USC has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political

organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the Jew Exclusion Zone and encampment, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

151. As a result of the actions of USC, its Co-Defendants, JVP and SJP in conjunction and complicity with the Campus Terrorists, Plaintiffs were deprived and denied access to benefits other similarly situated non-Jewish students and faculty received.

152. USC furthered no legitimate or compelling state interest by engaging in this conduct.

153. USC failed to tailor their actions narrowly to serve any such interest.

154. As a direct and proximate result of Defendants' actions and inaction, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in- person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms.

150a. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and pre-judgment and post-judgment interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be harmed by Defendants' conduct.

151. All times herein mentioned USC aided and abetted paid outside agitators and student violent student protesters to cause plaintiffs to reasonably believe that if they exercised their right to practice their religious faith and failed to denounce Zionism and entered the "Jew Exclusion Zone that violence would be committed against them in light of the Campus Terrorists apparent ability to carry out their threats and intimidation.

152. At all times here in mentioned, the campus terrorists acted violently against Plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions.

153. Plaintiffs were harmed as a result of USC's actions and inaction, as more particularly alleged herein and herein above.

154. USC's conduct was a substantial factor in causing Plaintiffs' harm.

155. As a result of USC's actions and inactions described above, USC denied, aided and incited a denial of discrimination and made a distinction that denied full and equal accommodations, advantages, facilities, privileges and services to Plaintiff Students in violation of the Unruh Act.

156. Plaintiffs' religion or religious beliefs were a substantial motivating reason for USC's conduct. Plaintiffs were harmed. USC's conduct was a substantial factor in causing Plaintiffs' harm.

**Count III**

**VIOLATION OF CALIFORNIA'S RALPH CIVIL RIGHTS ACT AGAINST DEFENDANTS USC, JVP, SJP AND DOES 1 THROUGH 10**

**(Civil Code section 51.7)**

156a. Plaintiffs incorporate by reference the allegations set forth in paragraphs 148 through 156 of this Complaint as if fully set forth at length herein.

157. At all times herein mentioned, USC, JVP, SJP and other currently unknown USC sanctioned bad actors aided, abetted, assisted, encouraged, and participated with the Campus Terrorists in the Spring 2024 siege, not to mention the Campus Terrorists' occupation of USC's property and creation and maintenance of the Encampments and "Jew Exclusion Zone." USC and the other defendants continued to appease the Campus Terrorists during their occupation and siege of USC's Town Square.

158. The Campus Terrorists threatened to commit violent acts and destroy property and in fact did commit violent acts against Plaintiffs or their property and harmed them, as alleged herein above.

159. As alleged herein above, a substantial motivating reason for USC's conduct and inaction was because of Plaintiffs' religious beliefs.

**Count IV**

**NEGLIGENCE**
**AGAINST USC ONLY AND DOES 15 THROUGH 20**

160. Plaintiffs incorporate by reference the allegations set forth in paragraphs 156 through 159 as though fully set forth at length herein.

161. At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws. USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

162. Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024 in flagrant violation of Plaintiffs' constitutional rights.

163. USC had the ability to disband the encampment, which violated stated USC's stated antidiscrimination and safety policies, but instead chose to allow it to persist.

164. USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but instead reinforced the Jew Exclusion Zone and gave the violent protestors aid and comfort, as more particularly alleged in paragraphs 1 through 163 of this Complaint, including the segregation of Jewish students and faculty.

165. Intimidating and violent "protest" groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this Complaint, as well as the uprising at USC itself in March 2025. While USC admittedly quelled the mob in March 2025 after several hours, a far cry from what happened in the Spring of 2024, USC has done nothing of substance or changed policies to stop these violent protests against Jewish students and faculty from returning

166. As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed.

**Count V**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST USC ONLY)**

167. Plaintiffs incorporate by reference the allegations set forth in paragraphs 160 through 166 as though fully set forth at length herein.

168. At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws. USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

169. Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024.

170. USC had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist.

171. USC had the ability to order USC police and private security officers to help Jewish students and faculty obtain equal access to campus, but did not and instead reinforced the Jew Exclusion Zone.

172. Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this Complaint, as well as the return of the Campus Terrorists in May 2025 that was quelled in less than four hours after USC called in the LAPD.

173. As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed and suffered serious emotional distress, including suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, stress, humiliation, loss of self esteem, stigmatization and shame.

**Count VI**

**BREACH OF CONTRACT (AGAINST USC ONLY)**

174. Plaintiffs incorporate by reference the allegations set forth in paragraphs 167 through 173 as though fully set forth at length herein.

175. This cause of action arises from the University of Southern California's express and implied contractual obligations owed to the student Plaintiffs under its 2022 anti-discrimination policies, including those promulgated by its Office for Equity, Equal Opportunity, and Title IX ("EEO-TIX"). These policies form part of the binding agreement between USC and its students and faculty. Under California law, university policies may give rise to contractual obligations (see *Zumbrun v. University of Southern California*, 25 Cal.App.3d 1 (1972)).

176. USC materially breached these promises when it permitted the establishment of a religiously discriminatory "Jew Exclusion Zone," restricted Jewish students and faculty from campus facilities based on their religious identity, and failed to enforce protections guaranteed in its own nondiscrimination rules. Plaintiffs were denied full access to academic and campus facilities unless they disavowed their sincerely held beliefs, including support for the Jewish state.

176a. Plaintiffs suffered harm, including loss of educational opportunities, emotional distress, and unequal treatment, as a result of USC's breach of its contract with Plaintiffs. Plaintiffs seek damages and an injunction requiring USC to enforce its stated antidiscrimination policies.

176b. At all times herein mentioned, USC had a contractual duty to all plaintiffs to provide a campus and educational and work experience free from having to experience daily, violent pro-Hamas activists perpetrating a siege, taking over and occupying USC property, creating encampments to bar Jews and denying access to USC property by Plaintiffs unless they disavowed Zionism and other facets of their Jewish faith.

176c. Plaintiffs performed all of the contractual duties they were required to perform except for those excused by virtue of USC's non performance.

177. USC breached its contract by failing to provide a safe campus that did not discriminate against Jews. USC also violated its own policies on prohibited discrimination, harassment and retaliation effective as of January 1, 2022. Among other things, USC admits that intentional

discrimination under USC's policy includes but is not limited to actions that result in the interference with, limitation of, or denial of access to a student's (or employee's) ability to participate in, access, or benefit from educational programs, services, or activities (or benefits of employment with respect to faculty members). USC's purposeful and intentional policy of segregating Jewish students and faculty to their dorms or offices, respectively, while allowing unfettered and free access to university accommodations and campus benefits by the Campus Terrorists, including JFP and JVP (and non-Jews or Jews who disavowed Zionism) constituted a flagrant violation of USC's own anti-discrimination policies and disparate treatment of Jews, who were relegated to second-class citizens by USC's policy.

177a. USC's policies also state that "hostile environment harassment" exists whenever verbal, physical, written, electronic or other conduct based on an individual's protector's protected characteristics is sufficiently severe, persistent, or pervasive such that it unreasonably interferes with, limits or denies that individual's ability to participate or benefit from the university's educational programs or activity, employment access, benefits, or opportunities or other university programs and activities (such as campus housing, official university listservs, university sponsored platforms when viewed both from a subjective and objective perspective). Plaintiffs were denied access to USC's town square by USC's tolerance of and acquiescence in the "Jew Exclusion Zone"

178. As a direct and proximate result USC's breach of its contract and its own policies, plaintiffs have been damaged in an amount to be shown at the time of trial in accordance with proof.

**Count VII**

**ASSAULT**
**AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 10**

179. Plaintiffs incorporate by reference the allegations set forth in paragraphs 174 Through 178 as though fully set forth at length herein.

180. At all time here and mentioned, for the reasons herein above, USC, JVP and SJP aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish students and faculty by excluding any Jewish students and faculty from entering the Jew Exclusion Zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

190. At all times herein mentioned, Plaintiffs reasonably believed that they were about to be touched in a harmful or offensive manner. Towards that end, Plaintiff Jewish Professor 2004 was actually spat on by one or more of the Campus Terrorists. At all times herein mentioned, the Campus Terrorists that Defendants aided or abetted threatened to touch Plaintiffs in a harmful or offensive manner.

192. At all times herein mentioned, it reasonably appeared to Plaintiffs that the Campus Terrorists were about to carry out the threat.

193. Plaintiffs did not consent to the Campus Terrorists' offensive and threatening conduct.

194. Plaintiffs were harmed as a result of Defendants' conduct and in particular, USC's inaction and favoring continued violent protests over protecting Jewish students and faculty from further harm.

195. Defendants' conduct and USC's inaction was a substantial factor in bringing about such harm.

**Count VIII**

**BATTERY AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 10**

196. Plaintiffs incorporate by reference the allegations set forth in paragraphs 179 Through 195 as though fully set forth at length herein.

197. At all time here and mentioned, for the reasons herein above, USC aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish Students and Faculty by excluding any Jewish

students and faculty from entering the Jew exclusion zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

198. Plaintiffs are informed and believe and thereon allege that Campus Terrorists touched certain Jewish Student Plaintiffs or caused them to be touched with the intent to harm or offend them.

199. USC knew that this would happen by virtue of its conduct, inaction and appeasement policy, and allowed it to happen by its inaction and stonewalling.

200. Plaintiffs did not consent to the touching.

201. Plaintiffs were harmed or offended by USC's conduct.

202. A reasonable person in Plaintiffs' position would have been offended by the touching.

**Count IX**

**DECLARATORY RELIEF**

203. Plaintiffs incorporate by reference the allegations set forth in paragraphs 196 through 202 as though fully set forth at length herein.

203. An actual controversy has arisen and now exists with respect to the dispute herein in that plaintiffs contend that USC has violated the First and Fourteenth amendments to the United states Constitution, the Ralph Civil Rights Act of 1976, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, and federal civil rights laws including 42 USC sections 1981 and 2000d - whereas USC disputes these contentions.

204. Plaintiffs request and require this court to declare an adjudicate that the constitutional violations occurred and to issue a preliminary and permanent injunction prohibiting USC's unequal treatment of plainness in violation of Plaintiffs constitutional and statutory rights.

**Count X**

**42 USC SECTION 2000d et. seq.**

**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**

**AGAINST USC AND DOES 1 THROUGH 5**

205. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 203 through 204.

206. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

207. USC receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964. Irrespective of whether USC is a private university, it received substantial federal grants and funding and was subject to the provisions of Title 6 of the Civil Rights Act of 1964, including its ban on unconstitutional actions taken by educational institutions and universities serving the interests of the public and ban against antisemitism and discrimination against Jews in particular.

208. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

209. Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

210. A policy is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

211. USC treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities. USC furthered no legitimate or compelling state interest by engaging in this conduct.

211a. Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. Cf. *Shaare Tefila*, 481 U.S. at

616 (discrimination against Jews is discrimination based on race); see also 34 C.F.R. § 100.3(b)(1)(iv), (vi).

212. USC also excluded Plaintiffs from participation in USC programs, denied Plaintiffs the full benefits of USC programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

213. As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

213a. Plaintiffs also suffered intentional religious and racial discrimination, including disparate and unequal treatment 1and impact, as a result of the actions and inaction of Defendants USC, JFP and JVP and the Campus Terrorists.

214. Under the 14th Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

215. The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

216. Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. Cf. *Shaare Tefila*, 481 U.S. at 616 (discrimination against Jews is discrimination based on race); see also 34 C.F.R. § 100.3(b)(1)(iv), (vi).

217. Defendant excluded Plaintiffs from participation in USC programs, denied Plaintiffs the full benefits of USC programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

218. As a result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

219. Plaintiffs also suffered intentional religious and racial discrimination, including disparate and unequal treatment and impact, as a result of the actions and inaction of USC and the actions of the Campus Terrorists - including Defendants JFP and JVP.

220. Defendant USC has deprived Plaintiffs of equal protection of the laws, as secured by the 14th Amendment, through a policy and practice that treats plaintiffs differently than similarly situated individuals because plaintiffs are ethnically and religiously Jewish.

221. Defendant has knowingly allowed private individuals to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, defendants affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers not to intervene.

222. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

223. Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

224. A law or policy "targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533. 363. Defendant targeted Plaintiffs' Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

225. A policy is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

226. USC treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities. Defendant furthered no legitimate or compelling state interest by engaging in this conduct.

227. Defendant failed to tailor its actions narrowly to serve any such interest.

228. As a direct and proximate result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal

participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

229. As a direct and proximate result of Defendant's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post judgment interest.

230. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

**Count XI**

**42 USC SECTION 1981**

**VIOLATION OF 42 USC SECTION 1981**

**AGAINST USC AND DOES 1 THROUGH 5**

231. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 205 through 230

232. 42 U.S.C. § 1981 guarantees that all persons within the jurisdiction of the United States have the same right to make and enforce contracts as enjoyed by white citizens. This includes the making, performance, modification, and termination of contracts, as well as the enjoyment of all benefits and privileges of the contractual relationship. The statute specifically focuses on ensuring equal rights to make and enforce contracts without regard to race. The statute applies equally to Plaintiffs as a result of their Jewish ancestry and racial identity.

233. USC violated the guarantee afforded to Plaintiffs under section 1981 by excluding Plaintiffs from accessing university benefits – as alleged hereinabove – under the guise of Plaintiffs' "protection," as further alleged in Plaintiffs' claim for breach of contract.

234 Plaintiffs have suffered harm as a result of USC's violation of 42 section 1981 and require injunctive relief to prevent USC's continuing breach of its contractual duties.

**Count XII**

**VIOLATION OF CALIFORNIA EDUCATION CODE 220**

**AGAINST USC AND DOES 1 THROUGH 5**

235. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 231 through 234.

236. California Education Code section 220 prohibits discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid

237. At all times herein mentioned, USC received benefits from California and financial assistance, and enrolls pupils at USC who receive state student financial aid.

238. Beginning in or about the Spring of 2024 and continuing to the present time, USC discriminated against Jewish students and faculty for the reasons alleged herein above.

239. Plaintiffs have suffered harm as a result of USC's violation of California Education Code section 220 and require injunctive relief to prevent USC's continuing discrimination.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Declare that USC has violated the First and Fourteenth amendments to the United States Constitution, the California Constitution, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, the Ralph Civil Rights Act, Title 6 of the Civil Rights Act of 1964, 42 USC sections 1981 and 2000d and California Education Code section 220;

2. Issue preliminary and permanent injunctive relief prohibiting USC's unequal treatment of Plaintiffs in violation of Plaintiffs' constitutional and statutory rights, banning face

masks or other disguises intended to terrorize, intimidate, coerce, and threaten Jewish students and faculty, and enact other measures to prevent further coercion, intimidation and violence perpetrated by bad actors from erupting on USC's campus;

3. Award Plaintiffs compensatory, punitive, and nominal damages for the loss of their rights under California state law (and under federal law to conform to proof);
4. Award plaintiffs the cost of this action, including statutory attorney's fees; and
5. Awards such other and further relief as the court deems equitable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable

DATED: July 7, 2025

LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation

By:/s/*Michael E. Reznick*
Michael E. Reznick

By:/s/*E. Jay Gotfredson*

Attorneys for Plaintiffs DOE JEWISH USC FACULTY MEMBER 2004 and DOE JEWISH USC STUDENT 1987, individually and on behalf of all others similarly situated

# EXHIBIT A

7:38 94

You
5/3/24, 10:27 AM

All media

0:08 -0:00




Refaat Alareer



# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br>Plaintiffs,<br>v.<br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br>Defendants. | Case No. 2:24-cv-04702-MCS-PD<br>**ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 48)** |

In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*. UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protesters. But under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion.

In response to the exclusion of Jewish students from portions of UCLA's campus, Plaintiffs Yitzchok Frankel, Joshua Ghayoum, and Eden Shemuelian moved for a preliminary injunction against Defendants Regents of the University of California, Michael V. Drake, Gene D. Block, Darnell Hunt, Michael Beck, Monroe Gorden, Jr., and Rick Braziel (hereinafter, "UCLA"). (Mot., ECF No. 48-1.) UCLA opposed, (Opp'n, ECF No. 62), and Plaintiffs filed a reply, (Reply, ECF No. 64). Amici Agudath Israel of America, Union of Orthodox Jewish Congregations of America, and Faculty for Justice in Palestine at UCLA filed amicus briefs. (First Amicus Br., ECF No. 76; Second Amicus Br., ECF No. 88.) The Court heard oral argument on July 29, 2024. (Mins., ECF No. 77.) At the hearing, the Court ordered the parties to meet and confer on the terms of a proposed preliminary injunction that would protect Plaintiffs' rights while allowing UCLA the flexibility needed to administer the UCLA campus. (*Id.*) Plaintiffs and UCLA filed separate responses to the order, but were unable to make meaningful ground on a compromise position. (*See* Pls.' Resp., ECF No. 82; Defs.' Resp., ECF No. 83.) The Court deems this matter appropriate for decision without further oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

///

## I. BACKGROUND[1]

At the outset, the Court notes that this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counterprotest movements responding thereto.[2] This case is narrowly focused on the materially undisputed factual allegations presented to the Court in the complaint and motion papers.[3]

On April 25, 2024, a group of pro-Palestinian protesters occupied a portion of the UCLA campus known as Royce Quad and established an encampment. (Beck Decl. ¶ 5,

---

[1] Evidence in support of and in opposition to this motion includes the sworn declarations of Plaintiffs Frankel, Ghayoum, and Rassbach; Defendants Beck, Braziel, and Gorden; Plaintiffs' counsel Eric Rassbach; defense counsel Matthew Cowan; and third party Kamran Shamsa, as well as exhibits including various news articles, social media posts, emails, and documents. At later stages of this case, some of this evidence may be inadmissible for many reasons, including as hearsay. "A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1984)); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). The Court exercises its discretion to consider evidence that might otherwise be inadmissible in connection with the motion because Defendants do not place the key facts upon which this Order relies in material dispute.

[2] Nor is this case about the content or viewpoints contained in any protest or counterprotest slogans or other expressive conduct, which are generally protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[3] Amicus Faculty for Justice in Palestine at UCLA asserts several allegations in its brief that, if true, could support claims for violations of the constitutional or civil rights of pro-Palestinian activists. (Second Amicus Br. 7–12.) Those possible claims would be better addressed in a separately filed action.

ECF No. 62-3; Shemuelian Decl. Ex. 15, ECF No. 48-23.) Royce Quad is a major thoroughfare and gathering place and borders several campus buildings, including Powell Library and Royce Hall. (Shemuelian Decl. ¶¶ 49–52, ECF No. 48-8; Ghayoum Decl. ¶¶ 16–18, ECF No. 48-4.) The encampment was rimmed with plywood and metal barriers. (Frankel Decl. ¶¶ 29, 34, ECF No. 48-2; Ghayoum Decl. ¶ 37.) Protesters established checkpoints and required passersby to wear a specific wristband to cross them. (*See* Ghayoum Decl. ¶¶ 39–41.) News reporting indicates that the encampment's entrances were guarded by protesters, and people who supported the existence of the state of Israel were kept out of the encampment. (Rassbach Decl. Ex. 22, ECF No. 48-59.)[4] Protesters associated with the encampment "directly interfered with instruction by blocking students' pathways to classrooms." (Shemuelian Decl. Ex. 19, ECF No. 48-27.)

Plaintiffs are three Jewish students who assert they have a religious obligation to support the Jewish state of Israel. (Frankel Decl. ¶¶ 11–13; Ghayoum Decl. ¶ 11; Shemuelian Decl. ¶¶ 11, 128.) Prior to the protests, Plaintiff Frankel often made use of Royce Quad. (Frankel Decl. ¶¶ 23–25.) After protesters erected the encampment, Plaintiff Frankel stopped using the Royce Quad because he believed that he could not traverse the encampment without disavowing Israel. (*Id.* ¶¶ 26, 38, 41.) He also saw protesters attempt to erect an encampment at the UCLA School of Law's Shapiro courtyard on June 10, 2024. (*Id.* ¶ 45.) Similarly, Plaintiff Ghayoum was unable to access Powell Library because he understood that traversing the encampment, which

---

[4] In its brief, Amicus Faculty for Justice in Palestine at UCLA disputes the facts presented in the complaint and motion papers and asserts, inter alia, that no one "was denied entrance to the Palestinian solidarity encampment based on their identity." (Second Amicus Br. 5.) This conclusory assertion is in tension with Plaintiffs' record evidence, which UCLA declined to refute. Further, Amicus' assertion that no one was excluded from the encampment based on identity does not grapple with an important nuance—that Plaintiffs here assert that supporting the Jewish state of Israel is their sincerely held religious belief.

blocked entrance to the library, carried a risk of violence. (Ghayoum Decl. ¶¶ 34–38.) He also canceled plans to meet a friend at Ackerman Union after four protesters stopped him while he walked toward Janss Steps and repeatedly asked him if he had a wristband. (*Id.* ¶¶ 39–45.) Plaintiff Ghayoum also could not study at Powell Library because protesters from the encampment blocked his access to the library. (*Id.* ¶ 48.) And Plaintiff Shemuelian also decided not to traverse Royce Quad because of her knowledge that she would have to disavow her religious beliefs to do so. (Shemuelian Decl. ¶¶ 111, 118–20, 128.) The encampment led UCLA to effectively make certain of its programs, activities, and campus areas available to other students when UCLA knew that some Jewish students, including Plaintiffs, were excluded based of their genuinely held religious beliefs.

The encampment persisted for a week, until the early morning of May 2, when UCLA directed the UCLA Police Department and outside law enforcement agencies to enter and clear the encampment. (Shemuelian Decl. Ex. 19.)

Since UCLA dismantled the encampment, protesters have continued to attempt to disrupt campus. For example, on May 6, protesters briefly occupied areas of the campus. (Braziel Decl. ¶ 28, ECF No. 62-5.) And on May 23, protesters established a new encampment, "erecting barricades, establishing fortifications and blocking access to parts of the campus and buildings," and "disrupting campus operations." (Shemuelian Decl. Ex. 25, ECF No. 48-33; Rassbach Decl. Ex. 20, ECF No. 48-57; *see* Braziel Decl. ¶ 29.)

Most recently, on June 10, protesters "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" on campus. (Rassbach Decl. Ex. 21, ECF No. 48-58 (emphasis removed); *see* Braziel Decl. ¶ 30.) These protesters "restricted access to the general public" and "disrupted nearby final exams." (Rassbach Decl. Ex. 21. (emphasis removed).) Some students "miss[ed] finals because they were blocked from entering classrooms," and others were "evacuated in the middle" of finals. (Shemuelian Decl. Ex. 27, ECF No. 48-35.)

Based on these facts and other allegations, Plaintiffs assert claims for violations of their federal constitutional rights, including violation of the Equal Protection Clause, the Free Speech Clause, and the Free Exercise Clause; claims for violations of their federal civil rights, including violations of Title VI of the Civil Rights Act of 1964, conspiracy to interfere with civil rights, and failure to prevent conspiracy; claims for violations of their state constitutional rights, including violation of the California Equal Protection Clause and the California Free Exercise Clause; and claims for violations of their state civil rights, including violations of section 220 of the California Education Code, the Ralph Civil Rights Act of 1976, and the Bane Civil Rights Act. (Compl. ¶¶ 320–430, ECF No. 1.)

## II. STANDING

UCLA raises a challenge to Plaintiffs' constitutional standing to sue. (Opp'n 8–12.) Since the challenge pertains to the Court's jurisdiction, the Court addresses it first. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("A district court may not grant a preliminary injunction if it lacks subject matter jurisdiction over the claim before it."), *aff'd*, 709 F.3d 1281 (9th Cir. 2013).

### A. Legal Standard

At the preliminary injunction stage, a plaintiff "'must make a clear showing of each element of standing,' proving (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) 'a causal connection between the injury and the conduct complained of'; and that (3) 'the injury will likely be redressed by a favorable decision.'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)). To have standing "for injunctive relief . . . the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). In determining

standing to pursue injunctive relief, courts "presume the truth of [plaintiffs'] allegations" and "construe all of the allegations in [plaintiffs'] favor." *Id.* at 971.

UCLA's challenge to Plaintiffs' standing focuses on the first two elements. The Court considers each in turn.

**B. Imminent Likelihood of Future Injury**

UCLA argues that Plaintiffs lack standing because they fail to allege an imminent likelihood of future injury. (Opp'n 8–11.) But, "[i]t is well settled that evidence of past instances of enforcement is important in a standing inquiry." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (citing *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1128 (9th Cir. 1996)); *accord American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 507 (9th Cir. 1991)). While, "[p]ast wrongs are 'insufficient by themselves to grant standing,' [they] are 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (quoting *Davidson*, 889 F.3d at 967). "When a plaintiff's standing is grounded entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at 1119 (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (ellipsis in original) (quoting *Lyons*, 461 U.S. at 102). "Courts have also considered the Government's failure to disavow" unconstitutional acts "as a factor in favor of a finding of standing." *LSO, Ltd.*, 205 F.3d at 1155 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996), and *American-Arab*, 970 F.2d at 508). When government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Id.*

UCLA contends that its remedial actions following the Royce Quad encampment make any "future injury speculative at best." (Opp'n 8–9.) These actions include the creation of a new Office of Campus Safety and the transfer of day-to-day responsibility for campus safety to an Emergency Operations Center. (Braziel Decl. ¶¶ 12–16, 21, ECF No. 62-5.) The changes, while commendable, do not minimize the risk that Plaintiffs "will again be wronged" by their exclusion from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs below "a sufficient likelihood." *Wright*, 48 F.4th at 1119 (internal quotation marks omitted). First, since UCLA's changes, protesters have violated UCLA's protest rules at least three times: on May 6, May 23, and June 10. (Braziel Decl. ¶¶ 28–30.) While these events may not have been as disruptive as the Royce Quad encampment, according to a UCLA email, the June 10 events "disrupted final exams," temporarily blocked off multiple areas of campus, and persisted from 3:15 p.m. to the evening. (Shemuelian Decl. ¶ 151 & Ex. 27.) Similarly, also according to UCLA emails, the May 6 and 23 events disrupted access to several campus areas. (*Id.* ¶¶ 145, 148 & Exs. 25–26, ECF No. 48-33 to 34.) Further, any relative quiet on UCLA's campus the past few months, (Braziel Decl. ¶ 26), is belied by the facts that fewer people are on a university campus during the summer and that the armed conflict in Gaza continues, Fed R. Evid. 201(b)(1). Finally, while UCLA's focus on safety is compelling, UCLA has failed to assuage the Plaintiffs' concerns that some Jewish students may be excluded from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should exclusionary encampments return. In response to these concerns raised at the hearing, UCLA did "not state[] affirmatively that" they "will not" provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students. *Bland*, 88 F.3d at 737.

It remains to be seen how effective UCLA's policy changes will be with a full campus. While the May and June protests do not appear to have resulted in the same religious-belief-based exclusion as the prior encampment that gives rise to the

Plaintiffs' free exercise concerns, the Court perceives an imminent risk that such exclusion will return in the fall with students, staff, faculty, and non-UCLA community members. As such, given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown an imminent likelihood of future injury for standing purposes.

**C. Causation**

UCLA also argues that Plaintiffs lack standing because "they have not pleaded facts demonstrating that *UCLA* would be the *cause* of any future injury that they might suffer, such that an injunction directed *at UCLA* would redress those alleged injuries." (Opp'n 11–12.) "To show causation, the plaintiff must demonstrate a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

UCLA, however, misconstrues the Plaintiffs' injuries. The injuries are not simply the exclusion of Plaintiffs from certain of UCLA's ordinarily available programs, activities, and campus areas. The injuries result when Plaintiffs are excluded from certain of UCLA's ordinarily available programs, activities, and campus areas *and* UCLA *still provides* those programs, activities, and campus areas to other students knowing that Plaintiffs and students like them are excluded based on their religious exercise. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" (alteration in original) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)); *Carson*

*v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). The complaint is replete with allegations that Plaintiffs and other students were denied access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs. (*See, e.g.*, Compl. ¶¶ 16, 113, 115, 118, 121–22, 124, 134, 203, 249, 255, 278, 287, 348.) Taking these allegations as true, as the Court must at this stage, and given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown causation for standing purposes.

The Court rejects UCLA's standing challenge and proceeds to the merits of Plaintiffs' motion.

## III. PRELIMINARY INJUNCTION

### A. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Ninth Circuit also employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, an injunction may issue if the plaintiff shows that serious questions go to the merits, the balance of hardships tips sharply toward the plaintiff, the plaintiff is likely to suffer irreparable injury, and an injunction is in the public interest. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line,*

*Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**B. *Winter* Factors**

1. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of their federal equal protection, free speech, free exercise, and Title VI claims. (Mot. 15–24.) Because analysis of Plaintiffs' free exercise claim resolves this motion, the Court addresses only that claim in the interest of judicial economy.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free Exercise Clause extends to the states under the Fourteenth Amendment). The clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran*, 582 U.S. at 458 (alteration in original) (quoting *City of Hialeah*, 508 U.S. at 533, 542). "[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S.at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533). In other free exercise cases, challenged laws "must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 478 (2020)). "To satisfy strict scrutiny, government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* (internal quotation marks omitted).

Here, UCLA made available certain of its programs, activities, and campus areas when certain students, including Plaintiffs, were excluded because of their genuinely

held religious beliefs. For example, Plaintiff Frankel could not walk through Royce Quad because entering the encampment required disavowing the state of Israel. (Frankel Decl. ¶¶ 11, 26, 38; *see* Rassbach Decl. Ex. 22.) Similarly, Plaintiff Ghayoum was prevented from entering a campus area at a protester checkpoint, (Ghayoum Decl. ¶¶ 11, 39–45), and Plaintiff Shemuelian could not traverse Royce Quad, unlike other students, (Shemuelian Decl. ¶ 111, 118–120, 128).

In other contexts, the Supreme Court has invalidated state acts that had the effect of excluding individuals from public benefits based on their religious status. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (holding a state cannot withhold unemployment benefits from Seventh-day Adventist who refused to work on the Sabbath); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709, 720 (1981) (similar holding as to Jehovah's Witness who refused to participate in the production of weapons). As such, Plaintiffs' exclusion from campus resources while other students retained access raises serious questions going to the merits of their free exercise claim. *See All. for Wild Rockies*, 632 F.3d at 1131.

UCLA argues that their acts focused on deescalating and preventing violence satisfy strict scrutiny. (Opp'n 15–18.) This might be true, but the acts related to deescalating and preventing violence are not the acts which led to the likely Free Exercise Clause violation. As such, UCLA's strict scrutiny argument is not relevant to the free exercise issue.

2. Likelihood of Irreparable Injury

"It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) (cleaned up). "Irreparable harm is relatively easy to establish in a First Amendment case" because the plaintiff "need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch.*

*on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (internal quotation marks omitted). For all the reasons stated above, Plaintiffs have put forward a colorable claim that UCLA's acts violated their Free Exercise Clause rights. Further, given the risk that protests will return in the fall that will again restrict certain Jewish students' access to ordinarily available programs, activities, and campus areas, the Court finds that Plaintiffs are likely to suffer an irreparable injury absent a preliminary injunction.

### 3. Balancing the Equities and Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). As discussed above, Plaintiffs have demonstrated serious questions as to the merits. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). And the state "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). As such, the Court finds that the balance of the equities tips sharply toward Plaintiffs, and the public interest favors the issuance of an injunction.

### 4. Summary

For the reasons stated above, the Court finds that all the *Winter* factors favor granting a preliminary injunction. Because the Court analyzes only the facts pertinent to the federal free exercise claim, the Court issues a preliminary injunction addressing only those risks. The Court's injunction is thus narrower than Plaintiffs' proposed preliminary injunction.[5]

---

[5] The Court does not issue the injunction against Defendant Regents of The University of California. "The Eleventh Amendment bars suits which seek either damages or

Under the Court's injunction, UCLA retains flexibility to administer the university. Specifically, the injunction does not mandate any specific policies and procedures UCLA must put in place, nor does it dictate any specific acts UCLA must take in response to campus protests. Rather, the injunction requires only that, if any part of UCLA's ordinarily available programs, activities, and campus areas become unavailable to certain Jewish students, UCLA must stop providing those ordinarily available programs, activities, and campus areas to any students. How best to make any unavailable programs, activities, and campus areas available again is left to UCLA's discretion.

**C. Security**

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks omitted).

UCLA does not request a bond. (Defs.' Resp. 9.) Courts have issued preliminary injunctions "without requiring security based on" likelihood of success of prevailing on a First Amendment claim. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 966 (N.D.

---

injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995) (citation omitted). "The Regents, a corporation created by the California constitution, is an arm of the state for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning of section 1983." *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir. 1992). That said, the injunction may issue as against the other defendants; immunity under the Eleventh Amendment is not absolute, and under the *Ex parte Young* doctrine, immunity does not apply when plaintiffs sue state officials in their official capacities for prospective injunctive relief. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996).

Cal. 2023); *see also Weaver v. City of Montebello*, 370 F. Supp. 3d 1130, 1139 (C.D. Cal. 2019). As such, the Court does not require security.

**D. Stay**

UCLA requests a stay of any preliminary injunction pending appeal. (Defs.' Resp. 8–9.) The request is denied for failure to comply with rules governing motion and ex parte practice. *E.g.*, C.D. Cal. Rs. 6-1, 7-3, 7-4, 7-19; *Smith v. Premiere Valet Servs., Inc.*, No. 2:19-cv-09888-CJC-MAA, 2020 U.S. Dist. LEXIS 228465, at *42 (C.D. Cal. Aug. 4, 2020) (collecting cases for the proposition that "a request for affirmative relief is not proper when raised for the first time in an opposition"). Denial is without prejudice to reraising the request in a properly noticed motion or ex parte application after an appeal is taken, if any.

## IV. CONCLUSION

"If a movant makes a sufficient demonstration on all four *Winter* factors (three when as here the third and fourth factors are merged), a court must not shrink from its obligation to enforce [movant's] constitutional rights, regardless of the constitutional right as issue." *Baird*, 81 F.4th at 1041 (cleaned up). Thus, the Court orders:

1. Defendants Drake, Block, Hunt, Beck, Gordon, and Braziel ("Defendants") are prohibited from offering any ordinarily available programs, activities, or campus areas to students if Defendants know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students.

2. Defendants are prohibited from knowingly allowing or facilitating the exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas, whether as a result of a de-escalation strategy or otherwise.

3. On or before August 15, 2024, Defendants shall instruct Student Affairs Mitigator/Monitor ("SAM") and any and all campus security teams (including without

limitation UCPD and UCLA Security) that they are not to aid or participate in any obstruction of access for Jewish students to ordinarily available programs, activities, and campus areas.

4. For purposes of this order, all references to the exclusion of Jewish students shall include exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel.

5. Nothing in this order prevents Defendants from excluding Jewish students from ordinarily available programs, activities, and campus areas pursuant to UCLA code of conduct standards applicable to all UCLA students.

5. Absent a stay of this injunction by the United States Court of Appeals for the Ninth Circuit, this preliminary injunction shall take effect on August 15, 2024, and remain in effect pending trial in this action or further order of this Court or the United States Court of Appeals for the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: August 13, 2024

Mark C. Scarsi

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.

EXECUTIVE ORDERS

# Executive Order on Combating Anti-Semitism

LAW & JUSTICE Issued on: December 11, 2019

★ ★ ★

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Policy. My Administration is committed to combating the rise of anti-Semitism and anti-Semitic incidents in the United States and around the world. Anti-Semitic incidents have increased since 2013, and students, in particular, continue to face anti Semitic harassment in schools and on university and college campuses.

Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d et seq., prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving Federal financial assistance. While Title VI does not cover discrimination based on religion, individuals who face discrimination on the basis of race, color, or national origin do not lose protection under Title VI for also being a member of a group that shares common religious practices. Discrimination against Jews may give rise to a Title VI violation when the discrimination is based on an individual's race, color, or national origin.

It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI.

Sec. 2. Ensuring Robust Enforcement of Title VI. (a) In enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies (agencies) charged with enforcing Title VI shall consider the following:

(i) the non-legally binding working definition of anti Semitism adopted on May 26, 2016, by the International Holocaust Remembrance Alliance (IHRA), which states, "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities"; and

(ii) the "Contemporary Examples of Anti-Semitism" identified by the IHRA, to the extent that any examples might be useful as evidence of discriminatory intent.

(b) In considering the materials described in subsections (a)(i) and (a)(ii) of this section, agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment. As with all other Title VI complaints, the inquiry into whether a particular act constitutes discrimination prohibited by Title VI will require a detailed analysis of the allegations.

Sec. 3. Additional Authorities Prohibiting Anti-Semitic Discrimination. Within 120 days of the date of this order, the head of each agency charged with enforcing Title VI shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying additional nondiscrimination authorities within its enforcement authority with respect to which the IHRA definition of anti-Semitism could be considered.

Sec. 4. Rule of Construction. Nothing in this order shall be construed to alter the evidentiary requirements pursuant to which an agency makes a determination that conduct, including harassment, amounts to actionable discrimination, or to diminish or infringe upon the rights protected under any other provision of law.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
December 11, 2019.

The White House

President Donald J. Trump

Vice President Mike Pence

News

Remarks

# EXHIBIT D


8:36
July 3, 2024
uscdivestfromdeath and 3 others
NEW ACCOUNT!
الحرية لفلسطين
FREEDOM FOR PALESTINE
الحرية لفلسطين
FREEDOM FOR PALESTINE
الحرية لفلسطين
FREEDOM FOR PALESTINE
الحرية لفلسطين
FOLLOW @USCDIVEST FROMDEATH FOR COALITION UPDATES
WE WILL NOT REST UNTIL OUR DEMANDS ARE MET
219 likes
uscscale


USC FACULTY RALLY
JOIN US TODAY!
BOVARD AT 11:00 AM
CALLING ALL STUDENTS FACULTY AND STAFF

# EXHIBIT E

# USC photos

From: Lisa Deborah Schneider (lansell@usc.edu)

To: reznagoura@aol.com

Date: Sunday, March 16, 2025 at 12:18 PM PDT



# EXHIBIT 2

Rasha Gerges Shields (Cal. Bar No. 218248)
rgergesshields@jonesday.com
Tyler J. Scott (Cal. Bar No. 341039)
tscott@jonesday.com
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone: +1.213.243.2719
Facsimile: +1.213.243.2539

Jeffrey D. Baltruzak (*pro hac vice* forthcoming)
jbaltruzak@jonesday.com
Daniel Paul Johnson (*pro hac vice* forthcoming)
dpjohnson@jonesday.com
JONES DAY
500 Grant Street Suite 4500
Pittsburgh, PA 15219
Telephone: +1.412.391.3939
Facsimile: +1.412.394.7959

Attorneys for Defendant
UNIVERSITY OF SOUTHERN CALIFORNIA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE JEWISH USC FACULTY MEMBER 2004 and DOE JEWISH USC STUDENT 1987, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, a private public-benefit nonprofit corporation; JEWISH VOICES FOR PEACE ("JVP"), a business organization, form unknown; STUDENTS FOR JUSTICE IN PALESTINE ("SJP"), a business organization, form unknown; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:25-CV-6375<br><br>[Removed from Los Angeles Superior Court, Case No. 25STCV20404]<br><br>**DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1331, 1332, 1441, 1446, AND 1453**<br><br>**[FEDERAL QUESTION AND CAFA JURISDICTION]**<br><br>Complaint Filed: July 8, 2025 |

**TO THE CLERK OF THE COURT:**

**PLEASE TAKE NOTICE** that Defendant UNIVERSITY OF SOUTHERN CALIFORNIA ("USC"), hereby removes the above-captioned action from the Superior Court of California, County of Los Angeles to the United States District Court for the Central District of California, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446 and 1453. For the reasons set forth below, this Court has original subject matter jurisdiction over this action for two independent reasons.

*First*, because Plaintiffs bring federal causes of action, this Court has federal question jurisdiction over those claims under 28 U.S.C. § 1331. And since state-law claims arise from the same operative facts as the federal claims, the Court has supplemental jurisdiction over the state-law claims as well. 28 U.S.C. § 1367.

*Second*, the Court independently has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified in part at 28 U.S.C. §§ 1332(d) and 1453, because minimum diversity exists, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 putative class members.

In support of this removal, USC states the following:

**PLAINTIFFS' PRIOR ACTION WAS REMOVED AND THEN DISMISSED**

1. This is the second time that these Plaintiffs, represented by the same counsel, have filed putative class claims against USC predicated on alleged campus protests.

2. On May 15, 2024, Plaintiff "DOE Jewish Faculty Member 2004" filed a putative class action complaint stemming from campus protests in the Spring of 2024 entitled *DOE Jewish USC Faculty Member 2004 v. Trustees of the University of Southern California*, Case No. 24STCP01592, in the Superior Court of the State of California for the County of Los Angeles ("Prior Action").

3. On June 5, 2024, Plaintiff "DOE Jewish Faculty Member 2004," along with plaintiff "DOE Jewish USC Student 1987," filed an amended putative class action complaint in the Prior Action, bringing the same set of claims against USC in

connection with last year's campus protests (the "First Amended Complaint"). In particular, in the First Amended Complaint, Plaintiffs asserted claims for violations of the Bane, Unruh and Ralph civil rights acts, as well as claims for negligence, breach of contract, assault, battery, declaratory relief, and injunctive relief. The two Plaintiffs, who assert they are a USC professor and USC student, brought the First Amended Complaint on behalf of themselves and a putative class.

4. On July 8, 2024, USC removed the Prior Action to federal court under the Class Action Fairness Act. USC's notice of removal demonstrated minimal diversity, an amount in controversy in excess of $5,000,000, and more than 100 putative class members. *See Doe Jewish USC Faculty Member 2004 et al v. University of Southern California et al.*, No. 2:24-cv-05712 (C.D. Cal. Jul. 8, 2024), ECF No. 1.

5. Though Plaintiffs contested removal, Judge Fernando Aenlle-Rocha agreed that all the CAFA requirements were satisfied, that no exceptions applied, and that the Prior Action belonged in federal court. *Id.* at ECF 69 (Jan. 3, 2025) (Order Discharging Order to Show Cause and Denying Plaintiffs' Motion to Remand).

6. The Prior Action continued, and Judge Aenlle-Rocha granted USC's motion to dismiss Plaintiffs' First Amended Complaint and to strike their class allegations in full. *Id.* at ECF 72 (Mar. 4, 2025). Judge Aenlle-Rocha dismissed some claims with prejudice, and granted Plaintiffs leave to amend certain claims. *Id.* On March 18, 2025, Plaintiffs filed their Second Amended Complaint on March 18, 2025. *Id.* at ECF 77. USC then moved to dismiss that complaint as well. *Id.* at ECF 78. That motion was fully briefed, and the Court took it under submission on April 28, 2025. *Id.* at ECF 83.

7. Notwithstanding the fully briefed motion to dismiss, Plaintiffs filed a Notice of Voluntary dismissal on June 23, 2025. *Id.* at ECF 84. The Court entered an order dismissing the Prior Action on June 24, 2025.

## THE CURRENT ACTION

8. Plaintiffs electronically filed the current action on July 9, 2025 in the Los Angeles County Superior Court. *Doe Jewish USC Fac. Member 2004 v. Univ. of S. Cal.,* No. 25STCV20404 (Cal. Super. Ct. Jul 9, 2025) ("Current Action"). Again, Plaintiffs' complaint seeks injunctive relief, declaratory relief, compensatory damages, and attorneys' fees and costs in connection with campus protests in the Spring of 2024 ("Current Complaint").

9. As a preliminary matter, USC denies the factual allegations in all of Plaintiffs' complaints and denies that: (i) it has any liability to Plaintiffs or any members of the putative class they seek to represent; (ii) any class can be or should be certified in this action; and (iii) Plaintiffs or any putative class members are entitled to any damages or relief in this matter. USC will answer the Current Complaint in full at the appropriate time. That said, for the reasons set forth below, all requirements of both federal question jurisdiction and CAFA jurisdiction are satisfied. Removal of the Current Action to the United States District Court for the Central District of California is proper.

10. By filing this Notice of Removal, USC does not waive any defense.

## COMPLIANCE WITH STATUTORY REQUIREMENTS

11. This notice of removal is timely. USC has not been served with a copy of the summons and complaint, and so the time limit to remove has not yet run. *See* 28 U.S.C. § 1446(b)(1); *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48, 354 (1999).[1] USC "d[oes] not have to wait until Plaintiffs served it with the Complaint and Summons before removing the case. A complaint need only be filed to be removable." *Watanabe v. Lankford*, 684 F. Supp. 2d 1210, 1214 (D. Haw. 2010).

[1] USC states that it first obtained a copy of the filed Current Complaint through its counsel, who accessed it using Bloomberg Law on July 11, 2025.

12. USC has not yet answered or otherwise responded to the Current Complaint, nor has its time to respond expired.

13. No "process, pleadings, [or] orders" have yet been "served upon [USC]." 28 U.S.C. § 1446(a). Nevertheless, a copy of the Current Complaint filed with the Los Angeles Superior Court is attached hereto as **Exhibit A.**

14. Pursuant to 28 U.S.C. § 1446(d), USC will file a copy of this Notice of Removal with the clerk of the Los Angeles Superior Court, and will serve Plaintiffs through their attorney of record with this Notice promptly after its filing.

## VENUE

15. Removal to this federal judicial district and division is proper under 28 U.S.C. §§ 1441(a) and 1446(a) because the Current Action was originally pending in this judicial district, namely Los Angeles Superior Court.

## SUBJECT MATTER JURISDICTION – FEDERAL QUESTION AND SUPPLEMENTAL JURISDICTION

16. The action is removable under 28 U.S.C. § 1441(a). The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. That section provides the court with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* Counts 10 and 11 of the present complaint arise under the laws of the United States. Count 10 purports to state a violation of the Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d). And Count 11 purports to state a violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981). The remaining counts are state-law claims arising from the same operative allegations that underpin the federal claims. *See* 28 U.S.C. § 1367.

17. Plaintiffs sued other Defendants in addition to USC in the Current Action, but the consent of any other defendant is unnecessary for removal because, on information and belief, no other Defendant has been served. *See, e.g.*, *Watanabe v. Lankford*, 684 F. Supp. 2d 1210, 1214 (D. Haw. 2010) ("Defendants who have not been served … are not required to join in the removal"); *accord Doe v. CRST*

*Expedited, Inc.*, 2023 WL 3564781, at *3 n.3 (C.D. Cal. Mar. 30, 2023) (citing *id.*). Nothing on the state court docket or elsewhere indicates that any other Defendant has been served with a copy of the summons and complaint.

18. Accordingly, removal is proper on this basis alone.

**SUBJECT MATTER JURISDICTION - CAFA**

19. Additionally and independently, the Court has original subject matter jurisdiction over the Current Action pursuant to CAFA. *See* 28 U.S.C. § 1332(d)(2).

20. Under CAFA, a district court has original jurisdiction over any civil action styled as a class action in which: (i) the number of members of the proposed plaintiff class is not less than 100, in the aggregate; (ii) the matter in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) any member of a class of plaintiffs is a citizen of a State or country different from any defendant. *See* 28 U.S.C. §§ 1332(d)(2) and (d)(5); *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 771 (9th Cir. 2020). If a state court putative class action meets all three requirements, it may be removed to federal court. *See* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . ."); *see also Benko v. Quality Loan Service Corp.*, 789 F.3d. 1111, 1116 (9th Cir. 2015) ("CAFA's language favors federal jurisdiction over class actions") (internal citation and quotation omitted). As set forth below, all requirements to establish jurisdiction pursuant to CAFA are satisfied in this case.

21. Moreover, "a removing defendant's notice of removal need not contain evidentiary submissions but only plausible allegations of the jurisdictional elements." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2015) (internal quotation and citation omitted). "[C]ourts should apply the same liberal rules to removal allegations that are applied to other matters of pleading," and "no antiremoval presumption attends cases invoking CAFA." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (quotation marks and citations omitted). Any

defendant may remove under CAFA, and the consent of one's co-defendants is unnecessary. *Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 445 (2019).

22. In the Prior Action, considering a nearly identical complaint and identical proposed classes, Judge Annelle-Rocha found USC satisfied all three CAFA requirements and denied Plaintiffs' motion to remand. *See* Prior Action, No. 2:24-cv-05712, ECF 69 (Jan. 3, 2025).

**The Proposed Class Has More Than 100 Members.**

23. The number of putative class members exceeds 100. 28 U.S.C. § 1332(d)(5)(B). Plaintiffs' allegations center around campus protests at USC in the Spring of 2024. They seek to certify a class of Jewish USC faculty members and Jewish students. And they expressly allege that "there are over 7,000 full-time Jewish USC faculty members" and "over 3,000 full-time Jewish USC students." Current Complaint ¶ 129. As discussed in the accompanying Declaration of Frank Chang, attached hereto as **Exhibit B**, USC does not require its students to disclose their religious affiliation to USC, and, as a result, it does not know the religious affiliation of the vast majority of its students. *See* Ex. B, Chang Decl., ¶ 3.[2] However, over 100 students enrolled in USC in the Spring of 2024 have self-reported their religious affiliation as Jewish to USC's Registrar's Office. *Id.*, ¶ 4. Accordingly, the proposed class has more than 100 members. Indeed, the class here is indistinguishable from the class that these Plaintiffs previously attempted to allege, and for which Judge Annelle-Rocha previously concluded it was "more likely than not" that the number of putative class members exceeds 100. *See* Prior Action, No. 2:24-cv-05712, ECF 69 (Jan. 3, 2025) (Order denying Plaintiffs' motion for remand).

---

[2] The Chang Declaration was also filed when USC removed the Prior Action. *See* Prior Action, No. 2:24-cv-05712 at ECF No. 1, Ex. B. Because Plaintiffs bring the same class and continue to focus on the alleged campus protests in the Spring of 2024, the facts stated in the Chang Declaration continue to apply.

**The Amount In Controversy Exceeds $5 Million.**

24. Plaintiffs do not plead a specific amount of damages, though the amount in controversy ("AIC") is ascertainable from the allegations set forth in the complaint about the "amount at stake." *See Greene*, 965 F.3d at 771 (courts "first look to the complaint" to determine the amount in controversy). "'Amount at stake' does not mean likely or probable liability; rather, it refers to *possible* liability." *Id.* (emphasis added); *see also Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008) ("In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint."). In short, to meet CAFA's AIC requirement, a defendant needs only to "plausibly show that it is reasonably possible that the potential liability exceeds $5 million." *Greene*, 965 F.3d at 772; *see also Dart Cherokee*, 574 U.S. at 89 ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *Korn*, 536 F. Supp. 2d at 1204-05 ("a removing defendant is not obligated to research, state, and prove the plaintiff's claims for damages").

25. "Among other items, the amount in controversy includes damages . . . the costs of complying with an injunction, and attorneys' fees awarded under fee-shifting statutes . . . ." *Fritsch v. Swift Trans. Co. of Arizona, LLC*, 899 F.3d 785, 793 (9th Cir. 2018) ("a court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met"); *see also Greene*, 965 F.3d at 774 n.4 ("A defendant does not need to prove to a legal certainty that a plaintiff will be awarded the proffered attorneys' fees in the removal notice") (internal quotation and citation omitted).

26. Here, Plaintiffs seek damages for an alleged "reign of terror" by "Campus Terrorists" that lasted "for weeks on end" intended to "terrorize, intimidate, assault, and shame Jewish Students and Faculty members" and placed them "at severe emotional and physical risk." Current Complaint ¶¶ 4, 8, 32, 6, and 17. According

to Plaintiffs, USC has allowed "severe and pervasive" antisemitism to "fester," and its conduct is an "egregious violation" of the civil rights laws. *Id.* at ¶¶ 77, 80, 88. Plaintiffs claim that as a result, Plaintiffs "have been robbed of a healthy and safe college and graduate school experience." *Id.* at ¶ 89. In other antisemitism cases, as Judge Aenlle-Rocha pointed out in denying remand of the Prior Action, damages under the civil rights laws have reached figures up to $180,000 to individual Plaintiffs. *See* Prior Action, No. 2:24-cv-05712, ECF 69, at *7-8 (Jan. 3, 2025). The caselaw in California supports an AIC in excess of $5.5 million based on civil rights damages alone. *Id.* at *9 ("Assuming conservatively a minimum class size of 100 and an award of $55,000 to each class member pursuant to the Unruh Act, the total damages are $5.5 million, satisfying the AIC requirement.").[3]

27. Plaintiffs also assert that USC "must now be compelled to implement institutional, *far-reaching*, and concrete remedial measures." Current Complaint at ¶ 89 (emphasis added). Plaintiffs ask for preliminary and permanent injunctive relief that would seemingly apply to all "available USC programs, activities, [and] campus areas." *Id.* ¶ 39. The costs of the wide ranging relief that Plaintiffs purport to seek would further increase the AIC.

28. In addition, Plaintiffs seek recovery of attorneys' fees, which amounts are also included in the amount in controversy for purposes of CAFA jurisdiction. *See id.* at p. 58.

---

[3] To be clear, USC denies that it has any liability in this matter whatsoever and will answer the Current Complaint fully in due course. That said, the Court must assume the merits of Plaintiffs' claims when evaluating its jurisdiction under CAFA, including when calculating the AIC. *Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 648 (9th Cir. 2012).1 The AIC "does not mean likely or probable liability; rather, it refers to possible liability." *Jauregui v. Roadrunner Trans. Servs., Inc.*, 28 F.4th 989, 994 (9th Cir. 2022) (quotation marks omitted). Once these required assumptions are applied, the AIC easily exceeds $5 million.

29. Without conceding liability, the appropriateness of class treatment and injunctive relief, the validity of Plaintiffs' allegations or claims for relief, or that awarding attorneys' fees is appropriate, it is clear that here, "the potential liability exceeds $5 million" and the AIC requirement under CAFA is satisfied. *Greene*, 965 F.3d at 772.

**There Is Minimal Diversity Between the Parties.**

30. In this matter, minimal diversity exists because USC and members of the alleged putative class are citizens of different states and countries. 28 U.S.C. § 1332(d)(2).

31. USC is a private, not-for-profit, public benefit corporation organized and existing under the laws of the State of California. Thus, USC is a citizen of California. Further, USC is not a state, state official, or other governmental entity.

32. The Current Complaint is silent as to Plaintiffs' citizenship. Their citizenship, however, is not essential for establishing CAFA jurisdiction because even if they are citizens of California: (i) at least one member of the putative class is a citizen of a state other than California, and (ii) at least one member of the putative class is a foreign citizen. *See* 28 U.S.C. § 1332(d)(2) (only requiring that "any member of a class of plaintiffs is a citizen of a State different from any defendant" or "any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State" for minimal diversity). Specifically, more than one of the USC students who have self-reported their religious affiliation as Jewish to USC's Registrar's Office are from states outside of California (including at least one from New York), and at least one is a citizen of a country outside of the United States (including one from Guatemala). *See* Ex. B, Chang Decl., ¶ 4. Judge Anelle-Rocha previously agreed that such evidence satisfies CAFA's minimal diversity requirement. *See* Prior Action, No. 2:24-cv-05712, at ECF 69, at *5-6 (Jan. 3, 2025).

33. Further, Plaintiffs' proposed classes include Jewish USC faculty members and USC students regardless of their citizenship. Given that a substantial part of USC's student body consists of students from outside California, the idea that *every* Jewish student at USC is a citizen of California "is simply beyond belief." *Hicks v. Grimmway Enterprises, Inc.*, No. 22-CV-2038, 2023 WL 3319362, at *8 (S.D. Cal. May 9, 2023) (where class of purchasers was not limited to California citizens, the "contention that not one of those products was purchased by a non-California, non-Delaware citizen is simply beyond belief."); *see also King v. Safeway, Inc.*, No. C-08-0999, 2008 WL 1808545, at *1 (N.D. Cal. Apr. 2008) (defendant showed minimal diversity where class consisted of "persons in the State of California" who purchased a product and the defendant had stores near other states); *McMorris v. TJX Companies, Inc.*, 493 F. Supp. 2d 158, 163 (D. Mass 2007) ("[T]his putative class that is composed entirely of residents of Massachusetts, does not, by definition, foreclose the inclusion of non-citizens as well. This suffices to support the assertion of federal jurisdiction in this [CAFA] case."). Accordingly, the minimal diversity requirement is therefore satisfied.

**Plaintiffs May Not Circumvent the Previous CAFA Removal.**

34. Finally, and alternatively, even if the present complaint were not removable under CAFA (and it is), Plaintiffs may not circumvent the previous CAFA removal merely by dismissing the removed case and refiling it in state court.

WHEREFORE, USC notices the removal of this action from the Superior Court of California, County of Los Angeles to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446 and 1453.

Dated: July 11, 2025

Respectfully submitted,

JONES DAY

By: */s/ Rasha Gerges Shields*
Rasha Gerges Shields

Attorneys for Defendant
UNIVERSITY OF SOUTHERN CALIFORNIA

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE JEWISH USC FACULTY MEMBER 2004, et al.<br>Plaintiff(s),<br>v.<br>UNIVERSITY OF SOUTHERN CALIFORNIA , et al.<br>Defendant(s). | CASE NUMBER:<br>2:25–cv–06375–FLA–SSC<br>**ORDER/REFERRAL TO ADR** |

The Court, having reviewed the parties' Request: ADR Procedure Selection (Form ADR-01), the Notice to Parties of Court-Directed ADR Program, or the report submitted by the parties pursuant to Fed. R. Civ. P. 26(f) and L.R. 26-1, hereby:

**ORDERS** this case referred to:

☑ **ADR PROCEDURE NO. 1**: This case is referred to ☑ the magistrate judge assigned to the case ***or*** ☐ the magistrate judge in Santa Barbara for such settlement proceedings as the judge may conduct or direct. Counsel are directed to contact the magistrate judge's courtroom deputy to arrange a date and time for the ADR proceeding.

☐ **ADR PROCEDURE NO. 2**: This case is referred to the Court Mediation Panel. Within twenty-one (21) days, plaintiff shall obtain the consent of a neutral on the Court Mediation Panel who will conduct the mediation and shall file Form ADR-2, Stipulation Regarding Selection of Panel Mediator. If the parties have not selected and obtained the consent of a Panel Mediator within twenty-one (21) days, the ADR Program (213-894-2993) will assign one. Forms and a list of the Panel Mediators are available on the Court website, www.cacd.uscourts.gov. Absent extraordinary circumstances, parties cannot request a continuance within three (3) business days of a scheduled mediation.

☐ **ADR PROCEDURE NO. 3**: This case is referred to private mediation. Counsel are directed to contact the private mediator of their choice to arrange a date and time for the mediation.

**IT IS FURTHER ORDERED:**

The ADR proceeding is to be completed by: 2/25/2027.

The parties shall file a joint report no later than seven (7) days after the ADR proceeding regarding the progress of the settlement discussions.

The Court sets a further status conference for: _______.

Dated: September 24, 2025

FERNANDO L. AENLLE-ROCHA
United States District Judge

**EXHIBIT 4**

Electronically Received 03/06/2026 09:55 AM

Michael E. Reznick, Esq. State Bar No. 116126
E. Jay Gotfredson, Esq. State Bar No. 52428
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel: (818) 437-5630
Email: reznagoura@aol.com

FILED
Superior Court of California
County of Los Angeles
03/06/2026
David W. Slayton, Executive Officer / Clerk of Court
By: T. Bivins Deputy

Attorney for Plaintiffs DOE JEWISH UCLA STUDENT 1958, DOE JEWISH UCLA STUDENT 1972, DOE JEWISH UCSC STUDENT 1987, DOE JEWISH USD STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

DOE JEWISH UCLA STUDENT 1958, DOE JEWISH UCLA STUDENT 1972, DOE JEWISH UCSC STUDENT 1987, DOE JEWISH UCD STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated

Plaintiffs,

v.

Regents of THE UNIVERSITY OF CALIFORNIA, LOS ANGELES ("UCLA"), a public nonprofit corporation; Regents of THE UNIVERSITY OF CALIFORNIA, SANTA CRUZ ("UCSC"), a public nonprofit corporation; Regents of THE UNIVERSITY OF CALIFORNIA, DAVIS ("UCD"), a public nonprofit corporation; and DOES 1 through 100, inclusive,

Defendants.

**CASE NO.: 24STCV11971**

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE AND OTHER RELIEF FOR:**

**1) VIOLATION OF 42 U.S.C. 1983 [EQUAL PROTECTION CLAUSE]**
**2) VIOLATION OF 42 U.S.C. 1983 [FREE EXERCISE CLAUSE]**
**3) VIOLATION OF 42 U.S.C. 1983 [FREE SPEECH CLAUSE**
**4) TITLE VI CIVIL RIGHTS ACT OF 1964 [42 U.S.C. 2000d]**
**5) VIOLATION OF THE BANE ACT [Cal. Civil Code 52.1]**
**6) VIOLATION OF THE RALPH ACT [Cal. Civil Code section 51.7]**
**7) VIOLATION OF THE UNRUH ACT [Cal. Civil Code 51 et seq.]**
**8) NEGLIGENCE**
**9) ASSAULT AND BATTERY**
**10) BREACH OF CONTRACT**
**11) DECLARATORY RELIEF**
**12) INJUNCTIVE RELIEF**

Plaintiffs DOE JEWISH UCLA STUDENT 1958, DOE JEWISH UCLA STUDENT 1972, DOE JEWISH UCSC STUDENT 1987, DOE JEWISH UCD

STUDENT 2004, individually and on behalf of all others similarly situated, for their complaint against defendants Regents of THE UNIVERSITY OF CALIFORNIA, LOS ANGELES ("UCLA"), a public nonprofit corporation; Regents of THE UNIVERSITY OF CALIFORNIA, SANTA CRUZ ("UCSC"), a public nonprofit corporation; Regents of THE UNIVERSITY OF CALIFORNIA, DAVIS ("UCD"), a public nonprofit corporation; and DOES 1 through 100, inclusive, allege as follows:

## I. INTRODUCTION

1. This action arises from the Regents of the University of California's decision to tolerate, enable, and ratify the forced exclusion and segregation of Jewish students from portions of its public university campuses during the antisemitic unrest of 2023–2024.

2. Following the October 7, 2023 Hamas terrorist attacks in Israel—perpetrated by an organization long designated by the United States Department of State as a Foreign Terrorist Organization—antisemitic agitation intensified across university campuses nationwide, including campuses governed by the Regents of the University of California.

3. Rather than enforce its own published rules prohibiting obstruction, intimidation, encampments, and discriminatory exclusion, the Regents adopted and permitted a policy and practice of selective non-enforcement.

4. In Spring 2024, organized encampments at UCLA erected barricades in central campus locations, restricted access to public university facilities, imposed ideological screening at access points, and conditioned passage on political compliance regarding Israel and Zionism.

5. Jewish students were physically blocked, verbally harassed, and in some instances instructed by university officials to avoid certain areas of campus for their "own safety."

6. Protective segregation is still segregation. Directing Jewish students to avoid public university spaces while allowing exclusionary encampments to remain resulted in de facto exclusion zones on public property.

7. These exclusionary access regimes were not spontaneous. They persisted in plain view of administrators and campus police.

8. For Jewish students, these events were not abstract political demonstrations. They were personal, immediate, and destabilizing. Students report being asked whether they were "Zionists" before being permitted to walk through areas of their own public campus. Some concealed their Jewish identity to avoid confrontation. Others altered daily routines, avoided campus quads, and refrained from participating in student life out of fear.

9. Several Jewish students describe feeling that the University had "thrown them to the wolves" – left to navigate barricades, masked

demonstrators, and ideological hostility without meaningful administrative protection.

10. When a public university tolerates conditions in which Jewish students must hide their identity to move freely on campus, equal protection has already broken down.

11. The Regents possessed full constitutional and statutory authority to prevent this conduct and chose not to exercise that authority.

12. In May 2024, in *Frankel v. Regents of the University of California* (C.D. Cal. Case No. 2:24-cv-04702) ("Frankel"), a federal district court issued a preliminary injunction finding that UCLA's tolerance of physical encampment barriers and restricted access zones likely violated federal civil rights protections (the "PI Order").

13. The PI Order placed the Regents on actual notice that permitting exclusionary access regimes targeting Jewish students was unlawful.

14. On February 24, 2026, the United States Department of Justice publicly announced that it filed suit against the University of California alleging that UCLA engaged in a hostile work environment affecting Jewish and Israeli faculty and staff, including exclusion from portions of the campus quad and tolerance of antisemitic harassment.

15. Although the DOJ action arises under Title VII, it further placed the Regents on actual notice that antisemitic discrimination at UCLA was the subject of active federal enforcement scrutiny.

16. Despite judicial intervention and federal investigation, materially similar exclusionary practices continued across Regents campuses, including UCLA, UC Davis, and UC Santa Cruz.

17. Public universities may not create, tolerate, or ratify separate access regimes that burden students on the basis of Jewish identity, ancestry, ethnicity, or perceived affiliation with Israel.

18. The Equal Protection Clause does not permit state-sponsored segregation—whether framed as protest accommodation, political expression, or temporary "safety" measures.

19. Nor does Title VI permit a federally funded university system to remain deliberately indifferent to known discrimination that denies Jewish students equal access to educational facilities and programs.

20. Plaintiffs seek declaratory, injunctive, and compensatory relief to prevent recurrence of exclusionary encampments, ideological access checkpoints, and state-tolerated segregation on Regents campuses.

## II. THE FRANKEL PRELIMINARY INJUNCTION

21. In Frankel, the Regents were defendants and fully litigated the propriety of encampment barriers, restricted access zones, and exclusion of

Jewish students from portions of the UCLA campus (sometimes referred to as the "Jew Exclusion Zone").

22. The federal district court in Frankel issued an "Order Re Motion for Preliminary Injunction" ("PI Order") that found that plaintiffs were likely to succeed on federal civil rights claims, including claims under Title VI and the Free Exercise Clause. Among other things, the district court found that:

> "In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, ***Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith***. UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protesters. But under constitutional principles, UCLA may not allow services to some students when

UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion."

(PI Order at 2:1-10) (emphasis in original). (A true and correct copy of PI Order is attached hereto as Exhibit A and incorporated herein by this reference). (Pursuant to Evidence Code section 452, Plaintiffs request judicial notice of its existence and contents).

23. Frankel and the PI Order placed the Regents on actual notice that permitting encampment structures restricting Jewish students' access presents serious constitutional and statutory violations.

24. Despite that judicial finding, materially similar exclusionary practices continued across Regents campuses.

25. The Regents' failure to implement uniform corrective policies following Frankel constitutes deliberate indifference to known constitutional violations.

26. The Regents settled the Frankel case pursuant to terms that are public. Plaintiffs contend that the parties, claims and defenses in Frankel, were and are identical to the parties, claims and defenses asserted herein and that Plaintiffs are entitled to the same injunctive relief in this case as a result thereof under the doctrines of collateral estoppel and res judicata. The factual predicate underlying the Frankel PI Order – namely, that Jewish students were excluded from campus areas unless they disavowed their faith

– is material indistinguishable from the facts alleged herein. T permit the Regents to relitigate that issue in this Court would undermine principles of issue preclusion and judicial economy.

## III. REGENTS' CONSTITUTIONAL AUTHORITY AND SYSTEMWIDE GOVERNANCE

27. Defendant Regents of the University of California is a constitutional entity established under Article IX, Section 9 of the California Constitution.

28. The Regents possess broad constitutional authority to organize, govern, and regulate the University of California system, including UCLA, UC Davis, and UC Santa Cruz.

29. The Regents exercise final policymaking authority over systemwide student conduct rules, campus access regulations, security policies, anti-discrimination enforcement, and institutional response protocols.

30. The Regents establish and ratify policies governing encampments, time, place, and manner restrictions, security deployment, enforcement priorities, and responses to campus demonstrations.

31. The Regents maintain ultimate authority to direct campus chancellors, administrators, and university police regarding enforcement of campus rules.

32. To the extent Regents contend that individual campuses possess materially distinct policymaking authority, such contention presents factual

issues inappropriate for resolution at the pleading stage and does not negate the Regents' constitutional governance authority.

33. The policies, customs, practices, and ratifications described herein were adopted, implemented, or permitted pursuant to the Regents' final policymaking authority.

34. The Regents' selective non-enforcement of campus access rules and obstruction prohibitions constituted official policy, custom, or ratified practice for purposes of liability under 42 U.S.C. § 1983.

35. The Regents possessed authority, capacity, and institutional mechanisms to dismantle encampment barriers and enforce neutral access rules at all relevant times.

36. Their failure to enforce those rules, despite knowledge that Jewish students were being denied equal access, constitutes deliberate indifference.

## IV. JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction pursuant to Article VI, section 10 of the California Constitution.

38. California courts possess concurrent jurisdiction over claims arising under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964.

39. A substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in Los Angeles County.

40. Venue is proper pursuant to Code of Civil Procedure section 395.

## V. PARTIES

41. Plaintiff DOE JEWISH UCLA STUDENT 1958 is a Jewish student enrolled at UCLA during the events described herein and brings this action individually and on behalf of similarly situated Jewish students.

42. Plaintiff DOE JEWISH UCLA STUDENT 1972 is a Jewish student enrolled at UCLA during the relevant period and brings this action individually and on behalf of similarly situated Jewish students.

43. Plaintiff DOE JEWISH UCSC STUDENT 1987 is a Jewish student enrolled at UC Santa Cruz during the relevant period.

44. Plaintiff DOE JEWISH UCD STUDENT 2004 is a Jewish student enrolled at UC Davis during the relevant period.

45. Plaintiffs proceed anonymously due to credible fear of reprisal, harassment, and further discrimination.

46. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA is sued in its official capacity as the governing body of the University of California system.

47. DOES 1 through 100 are individuals or entities whose identities are presently unknown but who participated in, authorized, ratified, or failed to prevent the unlawful conduct described herein.

## VI. FACTUAL ALLEGATIONS

### A. Pre–October 7 Antisemitic Incidents at UCLA

48. Antisemitic hostility at UCLA did not begin on October 7, 2023.

49. In October or November 2022, in an Anthropology course titled "Anthro 4 – Culture & Communication," a teaching assistant stated in class that "Zionists are white supremacists" while discussing Israeli and Mizrahi music origins.

50. In February 2023, a teaching assistant in a course titled "America in the 60s" wore a "Free Palestine" shirt while teaching section.

51. In June 2023, a depiction of Adolf Hitler accompanied by a swastika was drawn on a student lounge board within university housing.

52. The incident was reported to housing authorities. Plaintiffs were informed that the matter would be investigated.

53. Plaintiffs are unaware of any meaningful disciplinary response.

### B. Escalation After October 7, 2023

54. On October 7, 2023, Hamas carried out coordinated terrorist attacks in Israel.

55. Within days, demonstrations and encampment planning began on UCLA's campus.

56. Large groups of individuals gathered wearing face coverings and coordinated attire.

57. Slogans referencing "Intifada" and related rhetoric were chanted.

58. Jewish students began reporting fear, harassment, and hostility.

59. Some Jewish students temporarily left campus housing due to safety concerns.

60. Others remained but altered daily routines to avoid confrontation.

**C. Encampment Establishment at UCLA**

61. In April 2024, organized encampments were erected in central campus areas including near Royce Hall.

62. The encampments included tents, barricades, fencing, and individuals monitoring entry points.

63. Access to certain areas of campus was restricted.

64. Individuals attempting to pass were questioned regarding their political views on Israel and Zionism.

65. Jewish students were denied passage if they refused to disavow Zionism.

66. Regents administrators and campus police observed these restrictions.

67. The encampments remained in place for days.

68. Jewish students reported being physically blocked from walking through public areas.

69. Some were told they could pass only if they expressed agreement with anti-Israel positions.

70. Jewish students were advised by university personnel to avoid certain areas for their safety.

71. The practical result was that Jewish students could not access portions of their own public university.

**D. Representative Student Accounts (Illustrative, Not Exhaustive)**

**DOE JEWISH UCLA STUDENT 1958**

72. From the earliest days of the encampment, Jewish students experienced daily hostility. DOE JEWISH UCLA STUDENT 1958 gives the following account in her own words.

73. DOE JEWISH UCLA STUDENT 1958 gives the following account in her own words: "My Jewish classmates and I held a great feeling of uneasiness from the start of this anti-Semitic mob to this very day."

74. "We saw that the University had basically thrown us to the wolves."

75. We were confronted with anti-Israel and anti-Jewish rhetoric and felt compelled to conceal our Jewish identity to avoid escalation. "We've faced harassment on almost a daily basis since the start of the conflict and surrounding the University's encampment—from other students, sometimes from faculty, from patients, and from strangers who came onto campus."

76. "I personally felt like I needed to hide my own identity when confronted with anti-Israel rhetoric and often anti-Jewish rhetoric," which from my point of view are indistinguishable."

77. Flyers referencing "From the River to the Sea" and similar slogans were posted throughout campus.

78. "The University decided to take a hands-off approach and pretended like nothing was happening."

79. Tension mounted for months without meaningful administrative intervention.

80. I experienced difficulty focusing on schoolwork due to constant anxiety and other harm.

81. "There were points where I feared for my life when going to school."

82. My academic performance suffered as a result of the encampment and exclusion zone.

83. I personally observed fellow Jewish students experiencing identical or similar harassment and intimidation.

84. I suffered mental and emotional distress as a result of the encampment, Jew Exclusion Zone and harassment.

**DOE JEWISH UCLA STUDENT 1972**

85. Plaintiff DOE JEWISH UCLA STUDENT 1972 provides the following account in her own words. "Within days of October 7, 2023, large

demonstrations formed on campus, including chants referencing "Intifada." I temporarily remained off campus due to fear.

86. I avoided dining facilities to reduce the risk of confrontation.

87. Individuals enforcing the encampments asked students whether they were Jewish. As a result, I concealed my identity on multiple occasions to avoid harassment.

88. Within less than a week, hundreds of students dressed in coordinated attire were marching around campus calling for "Intifada."

89. A family member was kidnapped by Hamas during the October 7 attacks. Needless to say, this compounded my emotional distress resulting from the harassment at UCLA.

90. Each time I tried to eat in peace, something would happen where individuals asked students if they "were Jewish."

91. I was assigned a dorm roommate affiliated with a student organization publicly hostile to Zionism.

92. With assistance from family, I requested reassignment and ultimately avoided the placement.

93. Other Jewish students experienced similar housing concerns.

94. Campus during encampment was hostile and unrecognizable compared to prior semesters.

95. Some classes were canceled or moved online during unrest.

96. I suffered mental and emotional distress as a result of the encampment, Jew Exclusion Zone and harassment.

**F. Individual Experiences – Additional Named Plaintiffs**

97. Plaintiff DOE JEWISH UCSC STUDENT 1987 reports similar encampment activity and antisemitic rhetoric at UC Santa Cruz.

98. Plaintiff DOE JEWISH UCD STUDENT 2004 reports materially similar exclusionary practices at UC Davis.

99. At both campuses, encampments included barricades and restricted access.

100. Jewish students reported harassment and intimidation.

101. Regents did not implement immediate systemwide corrective directives prohibiting such exclusionary practices.

**G. Systemwide Similarities**

100. The encampments at UCLA, UC Davis, and UC Santa Cruz shared structural similarities including barricades, tents, organized personnel, and ideological screening practices.

101. The recurrence of materially similar exclusionary models across Regents campuses supports an inference of tolerance or ratification at the system level.

102. Regents did not issue systemwide directives prohibiting ideological checkpoints.

103. Regents did not immediately enforce neutral access policies across campuses.

104. Jewish students at multiple campuses experienced substantially similar denial of access.

**H. Notice Through Litigation and Federal Action**

105. The Frankel PI Order was publicly issued and widely reported.

106. Regents were defendants in Frankel.

107. The injunction addressed exclusionary encampment practices materially similar to those alleged herein.

108. Frankel removed any plausible ambiguity regarding the legality of the exclusionary encampments. Once a federal court determined that restricting Jewish students' access likely violated federal law, the Regents' continued tolerance of materially similar conditions cannot be characterized as oversight or discretion. It constitutes deliberate indifference to known constitutional violations.

109. Regents were therefore on actual notice of not only likely constitutional violations, but also known constitutional violations.

110. On February 24, 2026, the Department of Justice announced that it filed suit against the University of California alleging hostile environment conditions affecting Jewish and Israeli faculty and staff at UCLA.

111. The DOJ complaint referenced exclusion from campus areas and antisemitic harassment.

112. Although the DOJ action arises under Title VII, it further placed Regents on notice that antisemitic discrimination at UCLA was subject to federal enforcement scrutiny.

113. Despite notice from both Frankel and DOJ enforcement action, Regents failed to implement comprehensive systemwide corrective measures.

114. Regents' continued tolerance constitutes deliberate indifference.

## VII. FIRST CAUSE OF ACTION

(42 U.S.C. § 1983 – Equal Protection Clause)

114.a Plaintiffs reallege and incorporate all preceding paragraphs as though fully set forth herein.

115. The Fourteenth Amendment guarantees that no state shall deny to any person within its jurisdiction the equal protection of the laws.

116. Defendant Regents acted under color of state law at all relevant times.

117. Jewish students were denied equal access to campus facilities through encampment barriers, ideological screening, and selective non-enforcement of neutral access rules.

118. Non-Jewish students were not subjected to comparable restrictions based upon identity or perceived affiliation.

119. Permitting access restrictions that burden a defined religious and ethnic group constitutes differential treatment under the Equal Protection Clause.

120. Differential treatment burdening religious identity and shared ancestry triggers heightened scrutiny.

121. The Constitution does not tolerate state-sponsored segregation disguised as protest accommodation. A public university may not permit third parties to condition access to public spaces on ideological conformity regarding Jewish identity or affiliation with Israel. To these Plaintiffs and most Jews, there is no real distinction between Jewish identity or affiliation with Israel as it forms a large part of their religious beliefs, history, tradition, and based on the Talmud. When Jewish students are told to avoid certain areas "for their own safety" while exclusionary encampments remain in place, the resulting regime is segregation in practical effect.

122. Regents cannot demonstrate that tolerating exclusionary encampments was narrowly tailored to serve a compelling governmental interest.

123. Regents possessed authority to dismantle encampments and enforce neutral access rules but chose not to.

124. Regents' selective non-enforcement constitutes official policy, custom, or ratified practice for purposes of § 1983 liability.

125. As a direct and proximate result, Plaintiffs suffered denial of equal access, academic harm, emotional distress, and other damages.

## VIII. SECOND CAUSE OF ACTION

(42 U.S.C. § 1983 – Free Exercise Clause)

125. Plaintiffs reallege and incorporate all preceding paragraphs.

126. The Free Exercise Clause prohibits government action that substantially burdens religious exercise without compelling justification.

127. Jewish students were burdened in practicing and expressing their Jewish identity on campus.

128. Regents tolerated exclusionary zones that impeded Jewish students' participation in religious and cultural activities.

129. Regents' conduct was neither neutral nor generally applicable.

130. Regents' actions substantially burdened Plaintiffs' religious exercise.

131. Plaintiffs suffered harm as a result.

## IX. THIRD CAUSE OF ACTION

(42 U.S.C. § 1983 – Free Speech Clause)

132. Plaintiffs reallege and incorporate all preceding paragraphs.

133. Regents are bound by the First Amendment.

134. Jewish students were deterred from expressing viewpoints supportive of Israel or Zionism due to hostile and exclusionary campus conditions.

135. Regents' selective enforcement chilled protected speech.

136. Regents' conduct constituted viewpoint discrimination.

126. Plaintiffs suffered harm as a result, including emotional distress, and other damages.

## X. FOURTH CAUSE OF ACTION

(Title VI – 42 U.S.C. § 2000d)

138. Plaintiffs reallege and incorporate all preceding paragraphs.

139. Title VI provides that no person shall, on the ground of race, color, or national origin, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program receiving federal financial assistance.

140. The Regents receive substantial federal financial assistance.

141. Jewish students constitute a protected class under Title VI where discrimination is based upon shared ancestry, ethnicity, or perceived affiliation with Israel.

142. Jewish students were subjected to exclusionary encampments, ideological checkpoints, obstruction, harassment, and denial of equal access to campus facilities.

143. These conditions were severe, pervasive, and objectively offensive.

144. The discriminatory conditions materially interfered with Plaintiffs' access to classrooms, campus resources, student organizations, and educational opportunities.

145. Among other things, Jewish students were required to navigate physical barricades, ideological questioning, and public hostility in order to attend class, access dining halls, and participate in student life. Some withdrew from housing. Others avoided campus facilities entirely. The discriminatory conditions were severe, pervasive, and objectively offensive, and they materially interfered with Plaintiffs' educational opportunities and access to federally funded programs.

146. Regents had actual knowledge of the discriminatory conditions through student complaints, public reporting, Frankel litigation, and federal enforcement action.

147. Despite such knowledge, Regents failed to take prompt and effective corrective action.

148. Regents' response was clearly unreasonable in light of the known circumstances.

149. Regents' deliberate indifference was a substantial factor in causing Plaintiffs' injuries.

150. Plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, and attorneys' fees as permitted by law.

## XI. FIFTH CAUSE OF ACTION

(California Civil Code § 52.1 – Bane Act)

151. Plaintiffs reallege and incorporate all preceding paragraphs.

152. Defendants interfered with Plaintiffs' constitutional rights by threats, intimidation, or coercion.

153. The tolerated encampment barriers and exclusionary practices constituted coercive interference with Plaintiffs' rights.

154. Plaintiffs suffered damages as a result.

## XII. SIXTH CAUSE OF ACTION

(California Civil Code § 51.7 – Ralph Act)

155. Plaintiffs reallege and incorporate all preceding paragraphs.

156. Plaintiffs were subjected to threats of violence based upon religious identity.

157. Regents failed to prevent or remedy such conduct.

158. Plaintiffs suffered damages.

## XIII. SEVENTH CAUSE OF ACTION

(California Civil Code § 51 – Unruh Act)

159. Plaintiffs reallege and incorporate all preceding paragraphs.

160. Regents denied equal accommodations and advantages within a business establishment.

161. Plaintiffs suffered damages.

## XIV. EIGHTH CAUSE OF ACTION

(Negligence)

162. Plaintiffs reallege and incorporate all preceding paragraphs.

163. Regents owed Plaintiffs a duty to maintain reasonably safe campus conditions.

164. Regents breached that duty by failing to enforce neutral access rules and protect Jewish students.

165. Plaintiffs suffered damages as a direct and proximate result of Defendant's negligence.

## XV. NINTH CAUSE OF ACTION

(Assault and Battery)

166. Plaintiffs reallege and incorporate all preceding paragraphs.

167. Plaintiffs were subjected to unwanted physical contact or threat thereof during encampment unrest.

168. Regents failed to prevent foreseeable physical confrontations.

169. Plaintiffs suffered damages.

## XVI. TENTH CAUSE OF ACTION

(Breach of Contract)

170. Plaintiffs reallege and incorporate all preceding paragraphs.

171. Plaintiffs paid tuition pursuant to contractual agreements guaranteeing access to campus facilities and nondiscrimination.

172. Regents breached those agreements by permitting exclusionary access restrictions.

173. Plaintiffs suffered damages proximately caused by Regents' breach of its contractual agreements.

## XVII. CLASS ACTION ALLEGATIONS

(Code of Civil Procedure § 382)

174. Plaintiffs bring this action on behalf of themselves and all similarly situated Jewish students enrolled at campuses governed by the Regents during the 2023–2025 academic years who were subjected to exclusionary encampments, ideological access checkpoints, or discriminatory denial of equal access to campus facilities.

175. The Class is so numerous that joinder of all members is impracticable.

176. Common questions of law and fact predominate over individual issues, including but not limited to:

a. Whether Regents permitted or tolerated exclusionary encampments;

b. Whether Regents had actual knowledge of discriminatory access restrictions;

c. Whether Regents' response constituted deliberate indifference;

d. Whether Regents' conduct violated the Equal Protection Clause;

e. Whether Regents' conduct violated the Free Exercise Clause;

f. Whether Regents' conduct violated Title VI;

g. Whether injunctive relief is warranted on a systemwide basis.

176. Plaintiffs' claims are typical of the claims of the Class.

177. Plaintiffs will fairly and adequately protect the interests of the Class.

178. Plaintiffs have retained competent counsel experienced in civil rights and complex litigation.

179. A class action is superior to individual litigation because it promotes judicial economy and ensures uniform adjudication.

180. Class-wide declaratory and injunctive relief is appropriate because Regents acted or refused to act on grounds generally applicable to the Class.

## XVIII. DECLARATORY RELIEF

181. An actual controversy exists between Plaintiffs and Regents regarding the legality of Regents' policies and practices concerning encampments and campus access.

182. Plaintiffs contend that Regents' conduct violated federal and state law.

183. Regents dispute that their actions were unlawful.

184. Plaintiffs seek a judicial declaration that Regents' conduct, policies, customs, and ratified practices violated the Equal Protection Clause, the Free Exercise Clause, the Free Speech Clause, Title VI, and related California statutes.

## XIX. INJUNCTIVE RELIEF

185. This case is identical to Frankel, which is subject to the PI Order attached hereto as Exhibit A. Like the similarly situated Plaintiffs in Frankel, Plaintiffs herein have suffered irreparable harm and face a real and immediate threat of future harm absent injunctive relief. Absent injunctive relief, Plaintiffs reasonably fear recurrence of exclusionary encampments and ideological access checkpoints during future geopolitical events. The constitutional injury is ongoing and capable of repetition yet evading meaningful review.

186. The Regents cannot constitutionally be subject to a federal preliminary injunction while prohibiting exclusion of Jewish students at UCLA while simultaneously maintaining policies or practices at UCLA, UC Davis or UC Santa Cruz that materially replicate the same exclusionary regime. Uniform statewide compliance is required to avoid inconsistent obligations and continued constitutional injury.

187. Monetary damages alone are inadequate to remedy ongoing constitutional violations.

188. At a minimum, Plaintiffs seek a state-wide preliminary and permanent injunctive that mirrors and replicates the PI Order already issued against UCLA in Frankel and in particular injunctive relief prohibiting:

a. Physical barricades or encampment structures that restrict access to public campus areas;

b. Ideological access checkpoints or screening mechanisms;

c. Selective non-enforcement of neutral time, place, and manner regulations;

d. Any policy or practice that denies Jewish students equal access to campus facilities.

188. Plaintiffs further seek systemwide implementation of neutral enforcement policies to ensure equal access across Regents campuses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Certify this action as a class action pursuant to Code of Civil Procedure § 382;
2. Enter declaratory judgment that Regents' conduct violated federal and state law;
3. Enter preliminary and permanent injunctive relief consistent with the foregoing;
4. Award compensatory damages according to proof;
5. Award statutory damages where applicable;

6. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988, Title VI, and applicable California statutes;

7. Grant such other and further relief as the Court deems just and proper.

DATED: March 2, 2026

LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation

By: Michael E. Reznick
Michael E. Reznick
E. Jay Gotfredson

Attorneys for Plaintiffs DOE JEWISH UCLA STUDENT 1958, DOE JEWISH UCLA STUDENT 1972, DOE JEWISH UCSC STUDENT 1987, DOE JEWISH USD STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

DATED: March 2, 2026

LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation

By: Michael E. Reznick
Michael E. Reznick
E. Jay Gotfredson

Attorneys for Plaintiffs DOE JEWISH UCLA STUDENT 1958, DOE JEWISH UCLA STUDENT 1972, DOE JEWISH UCSC STUDENT 1987, DOE JEWISH USD STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated

**EXHIBIT 5**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>Defendants. | Case No. 2:24-cv-04702-MCS-PD<br><br>**ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 48)** |

In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith.* UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protesters. But under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion.

In response to the exclusion of Jewish students from portions of UCLA's campus, Plaintiffs Yitzchok Frankel, Joshua Ghayoum, and Eden Shemuelian moved for a preliminary injunction against Defendants Regents of the University of California, Michael V. Drake, Gene D. Block, Darnell Hunt, Michael Beck, Monroe Gorden, Jr., and Rick Braziel (hereinafter, "UCLA"). (Mot., ECF No. 48-1.) UCLA opposed, (Opp'n, ECF No. 62), and Plaintiffs filed a reply, (Reply, ECF No. 64). Amici Agudath Israel of America, Union of Orthodox Jewish Congregations of America, and Faculty for Justice in Palestine at UCLA filed amicus briefs. (First Amicus Br., ECF No. 76; Second Amicus Br., ECF No. 88.) The Court heard oral argument on July 29, 2024. (Mins., ECF No. 77.) At the hearing, the Court ordered the parties to meet and confer on the terms of a proposed preliminary injunction that would protect Plaintiffs' rights while allowing UCLA the flexibility needed to administer the UCLA campus. (*Id.*) Plaintiffs and UCLA filed separate responses to the order, but were unable to make meaningful ground on a compromise position. (*See* Pls.' Resp., ECF No. 82; Defs.' Resp., ECF No. 83.) The Court deems this matter appropriate for decision without further oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

///

## I. BACKGROUND[1]

At the outset, the Court notes that this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counterprotest movements responding thereto.[2] This case is narrowly focused on the materially undisputed factual allegations presented to the Court in the complaint and motion papers.[3]

On April 25, 2024, a group of pro-Palestinian protesters occupied a portion of the UCLA campus known as Royce Quad and established an encampment. (Beck Decl. ¶ 5,

---

[1] Evidence in support of and in opposition to this motion includes the sworn declarations of Plaintiffs Frankel, Ghayoum, and Rassbach; Defendants Beck, Braziel, and Gorden; Plaintiffs' counsel Eric Rassbach; defense counsel Matthew Cowan; and third party Kamran Shamsa, as well as exhibits including various news articles, social media posts, emails, and documents. At later stages of this case, some of this evidence may be inadmissible for many reasons, including as hearsay. "A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1984)); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). The Court exercises its discretion to consider evidence that might otherwise be inadmissible in connection with the motion because Defendants do not place the key facts upon which this Order relies in material dispute.

[2] Nor is this case about the content or viewpoints contained in any protest or counterprotest slogans or other expressive conduct, which are generally protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[3] Amicus Faculty for Justice in Palestine at UCLA asserts several allegations in its brief that, if true, could support claims for violations of the constitutional or civil rights of pro-Palestinian activists. (Second Amicus Br. 7–12.) Those possible claims would be better addressed in a separately filed action.

ECF No. 62-3; Shemuelian Decl. Ex. 15, ECF No. 48-23.) Royce Quad is a major thoroughfare and gathering place and borders several campus buildings, including Powell Library and Royce Hall. (Shemuelian Decl. ¶¶ 49–52, ECF No. 48-8; Ghayoum Decl. ¶¶ 16–18, ECF No. 48-4.) The encampment was rimmed with plywood and metal barriers. (Frankel Decl. ¶¶ 29, 34, ECF No. 48-2; Ghayoum Decl. ¶ 37.) Protesters established checkpoints and required passersby to wear a specific wristband to cross them. (*See* Ghayoum Decl. ¶¶ 39–41.) News reporting indicates that the encampment's entrances were guarded by protesters, and people who supported the existence of the state of Israel were kept out of the encampment. (Rassbach Decl. Ex. 22, ECF No. 48-59.)[4] Protesters associated with the encampment "directly interfered with instruction by blocking students' pathways to classrooms." (Shemuelian Decl. Ex. 19, ECF No. 48-27.)

Plaintiffs are three Jewish students who assert they have a religious obligation to support the Jewish state of Israel. (Frankel Decl. ¶¶ 11–13; Ghayoum Decl. ¶ 11; Shemuelian Decl. ¶¶ 11, 128.) Prior to the protests, Plaintiff Frankel often made use of Royce Quad. (Frankel Decl. ¶¶ 23–25.) After protesters erected the encampment, Plaintiff Frankel stopped using the Royce Quad because he believed that he could not traverse the encampment without disavowing Israel. (*Id.* ¶¶ 26, 38, 41.) He also saw protesters attempt to erect an encampment at the UCLA School of Law's Shapiro courtyard on June 10, 2024. (*Id.* ¶ 45.) Similarly, Plaintiff Ghayoum was unable to access Powell Library because he understood that traversing the encampment, which

---

[4] In its brief, Amicus Faculty for Justice in Palestine at UCLA disputes the facts presented in the complaint and motion papers and asserts, inter alia, that no one "was denied entrance to the Palestinian solidarity encampment based on their identity." (Second Amicus Br. 5.) This conclusory assertion is in tension with Plaintiffs' record evidence, which UCLA declined to refute. Further, Amicus' assertion that no one was excluded from the encampment based on identity does not grapple with an important nuance—that Plaintiffs here assert that supporting the Jewish state of Israel is their sincerely held religious belief.

blocked entrance to the library, carried a risk of violence. (Ghayoum Decl. ¶¶ 34–38.) He also canceled plans to meet a friend at Ackerman Union after four protesters stopped him while he walked toward Janss Steps and repeatedly asked him if he had a wristband. (*Id.* ¶¶ 39–45.) Plaintiff Ghayoum also could not study at Powell Library because protesters from the encampment blocked his access to the library. (*Id.* ¶ 48.) And Plaintiff Shemuelian also decided not to traverse Royce Quad because of her knowledge that she would have to disavow her religious beliefs to do so. (Shemuelian Decl. ¶¶ 111, 118–20, 128.) The encampment led UCLA to effectively make certain of its programs, activities, and campus areas available to other students when UCLA knew that some Jewish students, including Plaintiffs, were excluded based of their genuinely held religious beliefs.

The encampment persisted for a week, until the early morning of May 2, when UCLA directed the UCLA Police Department and outside law enforcement agencies to enter and clear the encampment. (Shemuelian Decl. Ex. 19.)

Since UCLA dismantled the encampment, protesters have continued to attempt to disrupt campus. For example, on May 6, protesters briefly occupied areas of the campus. (Braziel Decl. ¶ 28, ECF No. 62-5.) And on May 23, protesters established a new encampment, "erecting barricades, establishing fortifications and blocking access to parts of the campus and buildings," and "disrupting campus operations." (Shemuelian Decl. Ex. 25, ECF No. 48-33; Rassbach Decl. Ex. 20, ECF No. 48-57; *see* Braziel Decl. ¶ 29.)

Most recently, on June 10, protesters "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" on campus. (Rassbach Decl. Ex. 21, ECF No. 48-58 (emphasis removed); *see* Braziel Decl. ¶ 30.) These protesters "restricted access to the general public" and "disrupted nearby final exams." (Rassbach Decl. Ex. 21. (emphasis removed).) Some students "miss[ed] finals because they were blocked from entering classrooms," and others were "evacuated in the middle" of finals. (Shemuelian Decl. Ex. 27, ECF No. 48-35.)

Based on these facts and other allegations, Plaintiffs assert claims for violations of their federal constitutional rights, including violation of the Equal Protection Clause, the Free Speech Clause, and the Free Exercise Clause; claims for violations of their federal civil rights, including violations of Title VI of the Civil Rights Act of 1964, conspiracy to interfere with civil rights, and failure to prevent conspiracy; claims for violations of their state constitutional rights, including violation of the California Equal Protection Clause and the California Free Exercise Clause; and claims for violations of their state civil rights, including violations of section 220 of the California Education Code, the Ralph Civil Rights Act of 1976, and the Bane Civil Rights Act. (Compl. ¶¶ 320–430, ECF No. 1.)

## II. STANDING

UCLA raises a challenge to Plaintiffs' constitutional standing to sue. (Opp'n 8–12.) Since the challenge pertains to the Court's jurisdiction, the Court addresses it first. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("A district court may not grant a preliminary injunction if it lacks subject matter jurisdiction over the claim before it."), *aff'd*, 709 F.3d 1281 (9th Cir. 2013).

### A. Legal Standard

At the preliminary injunction stage, a plaintiff "'must make a clear showing of each element of standing,' proving (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) 'a causal connection between the injury and the conduct complained of'; and that (3) 'the injury will likely be redressed by a favorable decision.'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)). To have standing "for injunctive relief . . . the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). In determining

standing to pursue injunctive relief, courts "presume the truth of [plaintiffs'] allegations" and "construe all of the allegations in [plaintiffs'] favor." *Id.* at 971.

UCLA's challenge to Plaintiffs' standing focuses on the first two elements. The Court considers each in turn.

**B. Imminent Likelihood of Future Injury**

UCLA argues that Plaintiffs lack standing because they fail to allege an imminent likelihood of future injury. (Opp'n 8–11.) But, "[i]t is well settled that evidence of past instances of enforcement is important in a standing inquiry." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (citing *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1128 (9th Cir. 1996)); *accord American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 507 (9th Cir. 1991)). While, "[p]ast wrongs are 'insufficient by themselves to grant standing,' [they] are 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (quoting *Davidson*, 889 F.3d at 967). "When a plaintiff's standing is grounded entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at 1119 (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (ellipsis in original) (quoting *Lyons*, 461 U.S. at 102). "Courts have also considered the Government's failure to disavow" unconstitutional acts "as a factor in favor of a finding of standing." *LSO, Ltd.*, 205 F.3d at 1155 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996), and *American-Arab*, 970 F.2d at 508). When government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Id.*

UCLA contends that its remedial actions following the Royce Quad encampment make any "future injury speculative at best." (Opp'n 8–9.) These actions include the creation of a new Office of Campus Safety and the transfer of day-to-day responsibility for campus safety to an Emergency Operations Center. (Braziel Decl. ¶¶ 12–16, 21, ECF No. 62-5.) The changes, while commendable, do not minimize the risk that Plaintiffs "will again be wronged" by their exclusion from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs below "a sufficient likelihood." *Wright*, 48 F.4th at 1119 (internal quotation marks omitted). First, since UCLA's changes, protesters have violated UCLA's protest rules at least three times: on May 6, May 23, and June 10. (Braziel Decl. ¶¶ 28–30.) While these events may not have been as disruptive as the Royce Quad encampment, according to a UCLA email, the June 10 events "disrupted final exams," temporarily blocked off multiple areas of campus, and persisted from 3:15 p.m. to the evening. (Shemuelian Decl. ¶ 151 & Ex. 27.) Similarly, also according to UCLA emails, the May 6 and 23 events disrupted access to several campus areas. (*Id.* ¶¶ 145, 148 & Exs. 25–26, ECF No. 48-33 to 34.) Further, any relative quiet on UCLA's campus the past few months, (Braziel Decl. ¶ 26), is belied by the facts that fewer people are on a university campus during the summer and that the armed conflict in Gaza continues, Fed R. Evid. 201(b)(1). Finally, while UCLA's focus on safety is compelling, UCLA has failed to assuage the Plaintiffs' concerns that some Jewish students may be excluded from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should exclusionary encampments return. In response to these concerns raised at the hearing, UCLA did "not state[] affirmatively that" they "will not" provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students. *Bland*, 88 F.3d at 737.

It remains to be seen how effective UCLA's policy changes will be with a full campus. While the May and June protests do not appear to have resulted in the same religious-belief-based exclusion as the prior encampment that gives rise to the

Plaintiffs' free exercise concerns, the Court perceives an imminent risk that such exclusion will return in the fall with students, staff, faculty, and non-UCLA community members. As such, given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown an imminent likelihood of future injury for standing purposes.

**C. Causation**

UCLA also argues that Plaintiffs lack standing because "they have not pleaded facts demonstrating that *UCLA* would be the *cause* of any future injury that they might suffer, such that an injunction directed *at UCLA* would redress those alleged injuries." (Opp'n 11–12.) "To show causation, the plaintiff must demonstrate a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

UCLA, however, misconstrues the Plaintiffs' injuries. The injuries are not simply the exclusion of Plaintiffs from certain of UCLA's ordinarily available programs, activities, and campus areas. The injuries result when Plaintiffs are excluded from certain of UCLA's ordinarily available programs, activities, and campus areas *and* UCLA *still provides* those programs, activities, and campus areas to other students knowing that Plaintiffs and students like them are excluded based on their religious exercise. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" (alteration in original) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)); *Carson*

*v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). The complaint is replete with allegations that Plaintiffs and other students were denied access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs. (*See, e.g.*, Compl. ¶¶ 16, 113, 115, 118, 121–22, 124, 134, 203, 249, 255, 278, 287, 348.) Taking these allegations as true, as the Court must at this stage, and given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown causation for standing purposes.

The Court rejects UCLA's standing challenge and proceeds to the merits of Plaintiffs' motion.

## III. PRELIMINARY INJUNCTION

### A. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Ninth Circuit also employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, an injunction may issue if the plaintiff shows that serious questions go to the merits, the balance of hardships tips sharply toward the plaintiff, the plaintiff is likely to suffer irreparable injury, and an injunction is in the public interest. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line,*

*Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**B. *Winter* Factors**

1. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of their federal equal protection, free speech, free exercise, and Title VI claims. (Mot. 15–24.) Because analysis of Plaintiffs' free exercise claim resolves this motion, the Court addresses only that claim in the interest of judicial economy.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free Exercise Clause extends to the states under the Fourteenth Amendment). The clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran*, 582 U.S. at 458 (alteration in original) (quoting *City of Hialeah*, 508 U.S. at 533, 542). "[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S.at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533). In other free exercise cases, challenged laws "must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 478 (2020)). "To satisfy strict scrutiny, government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* (internal quotation marks omitted).

Here, UCLA made available certain of its programs, activities, and campus areas when certain students, including Plaintiffs, were excluded because of their genuinely

held religious beliefs. For example, Plaintiff Frankel could not walk through Royce Quad because entering the encampment required disavowing the state of Israel. (Frankel Decl. ¶¶ 11, 26, 38; *see* Rassbach Decl. Ex. 22.) Similarly, Plaintiff Ghayoum was prevented from entering a campus area at a protester checkpoint, (Ghayoum Decl. ¶¶ 11, 39–45), and Plaintiff Shemuelian could not traverse Royce Quad, unlike other students, (Shemuelian Decl. ¶ 111, 118–120, 128).

In other contexts, the Supreme Court has invalidated state acts that had the effect of excluding individuals from public benefits based on their religious status. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (holding a state cannot withhold unemployment benefits from Seventh-day Adventist who refused to work on the Sabbath); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709, 720 (1981) (similar holding as to Jehovah's Witness who refused to participate in the production of weapons). As such, Plaintiffs' exclusion from campus resources while other students retained access raises serious questions going to the merits of their free exercise claim. *See All. for Wild Rockies*, 632 F.3d at 1131.

UCLA argues that their acts focused on deescalating and preventing violence satisfy strict scrutiny. (Opp'n 15–18.) This might be true, but the acts related to deescalating and preventing violence are not the acts which led to the likely Free Exercise Clause violation. As such, UCLA's strict scrutiny argument is not relevant to the free exercise issue.

2. <u>Likelihood of Irreparable Injury</u>

"It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) (cleaned up). "Irreparable harm is relatively easy to establish in a First Amendment case" because the plaintiff "need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch.*

*on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (internal quotation marks omitted). For all the reasons stated above, Plaintiffs have put forward a colorable claim that UCLA's acts violated their Free Exercise Clause rights. Further, given the risk that protests will return in the fall that will again restrict certain Jewish students' access to ordinarily available programs, activities, and campus areas, the Court finds that Plaintiffs are likely to suffer an irreparable injury absent a preliminary injunction.

3. Balancing the Equities and Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). As discussed above, Plaintiffs have demonstrated serious questions as to the merits. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). And the state "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). As such, the Court finds that the balance of the equities tips sharply toward Plaintiffs, and the public interest favors the issuance of an injunction.

4. Summary

For the reasons stated above, the Court finds that all the *Winter* factors favor granting a preliminary injunction. Because the Court analyzes only the facts pertinent to the federal free exercise claim, the Court issues a preliminary injunction addressing only those risks. The Court's injunction is thus narrower than Plaintiffs' proposed preliminary injunction.[5]

---

[5] The Court does not issue the injunction against Defendant Regents of The University of California. "The Eleventh Amendment bars suits which seek either damages or

Under the Court's injunction, UCLA retains flexibility to administer the university. Specifically, the injunction does not mandate any specific policies and procedures UCLA must put in place, nor does it dictate any specific acts UCLA must take in response to campus protests. Rather, the injunction requires only that, if any part of UCLA's ordinarily available programs, activities, and campus areas become unavailable to certain Jewish students, UCLA must stop providing those ordinarily available programs, activities, and campus areas to any students. How best to make any unavailable programs, activities, and campus areas available again is left to UCLA's discretion.

### C. Security

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks omitted).

UCLA does not request a bond. (Defs.' Resp. 9.) Courts have issued preliminary injunctions "without requiring security based on" likelihood of success of prevailing on a First Amendment claim. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 966 (N.D.

---

injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995) (citation omitted). "The Regents, a corporation created by the California constitution, is an arm of the state for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning of section 1983." *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir. 1992). That said, the injunction may issue as against the other defendants; immunity under the Eleventh Amendment is not absolute, and under the *Ex parte Young* doctrine, immunity does not apply when plaintiffs sue state officials in their official capacities for prospective injunctive relief. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996).

Cal. 2023); *see also Weaver v. City of Montebello*, 370 F. Supp. 3d 1130, 1139 (C.D. Cal. 2019). As such, the Court does not require security.

**D. Stay**

UCLA requests a stay of any preliminary injunction pending appeal. (Defs.' Resp. 8–9.) The request is denied for failure to comply with rules governing motion and ex parte practice. *E.g.*, C.D. Cal. Rs. 6-1, 7-3, 7-4, 7-19; *Smith v. Premiere Valet Servs., Inc.*, No. 2:19-cv-09888-CJC-MAA, 2020 U.S. Dist. LEXIS 228465, at *42 (C.D. Cal. Aug. 4, 2020) (collecting cases for the proposition that "a request for affirmative relief is not proper when raised for the first time in an opposition"). Denial is without prejudice to reraising the request in a properly noticed motion or ex parte application after an appeal is taken, if any.

## IV. CONCLUSION

"If a movant makes a sufficient demonstration on all four *Winter* factors (three when as here the third and fourth factors are merged), a court must not shrink from its obligation to enforce [movant's] constitutional rights, regardless of the constitutional right as issue." *Baird*, 81 F.4th at 1041 (cleaned up). Thus, the Court orders:

1. Defendants Drake, Block, Hunt, Beck, Gordon, and Braziel ("Defendants") are prohibited from offering any ordinarily available programs, activities, or campus areas to students if Defendants know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students.

2. Defendants are prohibited from knowingly allowing or facilitating the exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas, whether as a result of a de-escalation strategy or otherwise.

3. On or before August 15, 2024, Defendants shall instruct Student Affairs Mitigator/Monitor ("SAM") and any and all campus security teams (including without

limitation UCPD and UCLA Security) that they are not to aid or participate in any obstruction of access for Jewish students to ordinarily available programs, activities, and campus areas.

4. For purposes of this order, all references to the exclusion of Jewish students shall include exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel.

5. Nothing in this order prevents Defendants from excluding Jewish students from ordinarily available programs, activities, and campus areas pursuant to UCLA code of conduct standards applicable to all UCLA students.

5. Absent a stay of this injunction by the United States Court of Appeals for the Ninth Circuit, this preliminary injunction shall take effect on August 15, 2024, and remain in effect pending trial in this action or further order of this Court or the United States Court of Appeals for the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: August 13, 2024

Mark C. Scarsi

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.

EXECUTIVE ORDERS

# Executive Order on Combating Anti-Semitism

LAW & JUSTICE Issued on: **December 11, 2019**

★ ★ ★

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Policy. My Administration is committed to combating the rise of anti-Semitism and anti-Semitic incidents in the United States and around the world. Anti-Semitic incidents have increased since 2013, and students, in particular, continue to face anti Semitic harassment in schools and on university and college campuses.

Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d et seq., prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving Federal financial assistance. While Title VI does not cover discrimination based on religion, individuals who face discrimination on the basis of race, color, or national origin do not lose protection under Title VI for also being a member of a group that shares common religious practices. Discrimination against Jews may give rise to a Title VI violation when the discrimination is based on an individual's race, color, or national origin.

It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI.

Sec. 2. Ensuring Robust Enforcement of Title VI. (a) In enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies (agencies) charged with enforcing Title VI shall consider the following:

(i) the non-legally binding working definition of anti Semitism adopted on May 26, 2016, by the International Holocaust Remembrance Alliance (IHRA), which states, "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities"; and

(ii) the "Contemporary Examples of Anti-Semitism" identified by the IHRA, to the extent that any examples might be useful as evidence of discriminatory intent.

(b) In considering the materials described in subsections (a)(i) and (a)(ii) of this section, agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment. As with all other Title VI complaints, the inquiry into whether a particular act constitutes discrimination prohibited by Title VI will require a detailed analysis of the allegations.

Sec. 3. Additional Authorities Prohibiting Anti-Semitic Discrimination. Within 120 days of the date of this order, the head of each agency charged with enforcing Title VI shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying additional nondiscrimination authorities within its enforcement authority with respect to which the IHRA definition of anti-Semitism could be considered.

Sec. 4. Rule of Construction. Nothing in this order shall be construed to alter the evidentiary requirements pursuant to which an agency makes a determination that conduct, including harassment, amounts to actionable discrimination, or to diminish or infringe upon the rights protected under any other provision of law.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
December 11, 2019.